| | | |
|---|---|---|
| E. CLAIBORNE ROBINS COMPANY, INC., | : | |
| Plaintiff | : | |
| v. | : | Civil Action No. 3:18-cv-827 |
| TEVA PHARMACEUTICAL INDUSTRIES, LTD., | : | |
| And | : | |
| TEVA PHARMACEUTICALS USA, INC. | : | |
| Defendants | : | |

## AMENDED COMPLAINT

COMES NOW PLAINTIFF E. CLAIBORNE ROBINS COMPANY, INC., by counsel, and for its Amended Complaint against defendants TEVA PHARMACEUTICAL INDUSTRIES, LTD. and TEVA PHARMACEUTICALS USA, INC., states as follows:

### Introduction

1.    This is a contract claim. Defendants's predecessor company purchased all rights to the drug Amrix from plaintiff E. Claiborne Robins Company, Inc. ("Robins") pursuant to an Asset Purchase Agreement dated August 28, 2007 (the "Agreement," a copy of which is attached hereto as Exhibit 1). Amrix is cyclobenzaprine hydrochloride (a muscle relaxer) in a patented extended release form.

2.    During the contract period, the Agreement required Defendants, "at all times," to use "Commercially Reasonable Efforts" to market and sell Amrix.   The Agreement also

contains a formula fixing the amount of Robins's remaining post-sale compensation where, as here, Defendants failed to use Commercially Reasonable Efforts. Under that formula, Defendants must pay Robins $97.5 million, plus pre-judgment interest, as additional consideration beyond the "Base Purchase Price" for the purchase of Amrix. Robins's entitlement to this compensation under the Agreement is automatic upon Defendants's failure to use Commercially Reasonable Efforts at any time during the relevant period, without Robins's having to prove proximate causation or any actual damages.

## The Parties, Jurisdiction, and Venue

3.    Plaintiff Robins is a Virginia corporation with its principal place of business in Richmond, Virginia.

4.    Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel.

5.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

6.    The Agreement was made in Richmond, Virginia, the transaction was concluded in Richmond, Virginia with a "closing" in Richmond in August 2007, and has been performed in significant part in Richmond, Virginia.

7.    Section 13.11 of the Agreement provides that the parties irrevocably submit to jurisdiction and venue in the City of Richmond, Virginia for any action arising out of the Agreement.

8.    This Court has jurisdiction of this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive and interest and costs; and Plaintiff is a citizen of Virginia, and Defendant is a citizen of Israel.

2

9.     Robins developed and owned a patented drug known under the trade name Amrix, which was approved by the U.S. Food and Drug Administration under New Drug Application 21-777 effective February 1, 2007. The patent for Amrix expires February 20, 2025.

10.     Anesta AG ("Anesta"), a company organized under the laws of Switzerland, was a wholly owned subsidiary of Cephalon, Inc., a U.S. pharmaceutical company. Anesta negotiated to purchase all of Robins's rights and obligations related to Amrix, and in August 2007 Anesta and Robins signed the Agreement.

11.     The Agreement required Anesta to pay Robins a "Base Purchase Price," plus additional consideration called "Net Sales Milestone Payments" for 12 years following certain events occurring after execution of the Agreement. Based on those events, the Net Sales Milestone Termination Date is August 28, 2019.

12.     A significant part of the consideration for Robins's sale of Amrix to Anesta would depend on future sales, which in turn would depend on the efforts made by Anesta and its successors to market the product. Such efforts would be out of Robins's control.

13.     In order to assure Robins of additional payments of up to $255 million, Anesta agreed that at all times it would use "Commercially Reasonable Efforts" with respect to the marketing and sale of Amrix. But the Agreement recognizes that the Buyer and its successors may decide to focus marketing dollars and efforts elsewhere, and in such case it may be difficult or impossible to prove how, if at all, such decisions affected sales of Amrix. Therefore, the Agreement sets forth a formula to determine how much Robins would be owed automatically if "at any time" the buyer failed to use Commercially Reasonable Efforts:

> From and after the Closing until the Net Sales Milestone Termination Date, **Buyer hereby agrees to use**, or to cause its Affiliates to use, **Commercially**

**Reasonable Efforts with respect to the marketing and sale of the Product. If _at any time_ between the Closing Date and the Net Sales Milestone Termination Date** the business strategy of the (i) Buyer or Parent or (ii) following the Change of Control, any Successor Entity changes such that **Buyer or its Affiliates or such Successor Entity fails to use Commercially Reasonable Efforts with respect to the marketing and sale of the Product, then the Seller shall be entitled to receive** an amount equal to 50% of (A) $255 million less (B) the aggregate amount of all Net Sales Milestone Payments made to Seller or which Seller has become entitled to receive pursuant to Section 4.02(a) prior to the date on which Seller comes entitled to payment of an amount pursuant to this Section 4.02(c), which amount shall be paid within sixty (60) days of Seller becoming entitled thereto by wire transfer of immediately available funds to the account designated by Seller in writing within two (2) Business Days after Seller becomes entitled to receive such payment. As used in this Section 4.02(c), **"Commercially Reasonable Efforts" means, with respect to any Person, the efforts and resources that would be used (including the promptness in which such efforts and resources would be applied) by such Person consistent with its normal business practices, which in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry for a company similar in size and scope to such Person, with respect to _a product_ at a similar stage in its development or product life taking into account efficiency, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product.** Notwithstanding anything herein to the contrary, the "Commercially Reasonable Efforts" to be used by Buyer under this Section 4.02(c) shall not be less than those efforts Parent would be obligated to take under this Section 4.02(c) if Parent had executed and delivered this Agreement as Buyer.

Agreement, Section 4.02(c) (emphasis added).

14.     The standard imposed by Section 4.02(c) is objective and not dependent on the particular circumstances of the Buyer or its successor.

### Defendants's Breach of the Agreement

15.     Teva Ltd. is the world's biggest seller of generic drugs. In 2011, Teva Ltd. acquired Cephalon, Inc., the parent company of Anesta, for $6.8 billion. As part of that acquisition, Teva Ltd. acquired all of Cephalon/Anesta's rights and obligations related to Amrix.

16.     Teva USA is a wholly owned subsidiary of Teva Ltd. in the United States and designated by Teva Ltd. to carry out the sales and marketing of Amrix upon conclusion of Teva Ltd.'s acquisition of Cephalon, Inc.

17.  Each of the defendants is a "Successor Entity" following a "Change of Control," as those terms are used in Section 4.02(c) of the Agreement, and is therefore bound by all of Cephalon's obligations to Robins under the Agreement.  Upon information and belief, both Teva Ltd. and Teva USA are also assignees of the Agreement and, as such, are bound by all of Cephalon, Inc.'s obligations to Robins under the Agreement.

18.     Beginning in 2015, Teva Ltd. was confronted by a series of financial setbacks. Among other things, Teva Ltd. had illegally paid another company to delay bringing to market a drug that competed with one of Teva Ltd.'s drugs.  Teva Ltd. had to pay $1.2 billion to settle the resulting antitrust claim brought by the Federal Trade Commission.

19.     Teva Ltd. also undertook significant debt.  In August 2016, Teva Ltd. paid $40 billion to acquire Allergan PLC's generic drug business ("Actavis"), incurring $33.75 billion in debt and massive debt service obligations in the process.  Even before the acquisition closed, experts opined that Teva Ltd. was paying far too much for Activis.

20.     In December 2016, Teva Ltd. paid the U.S. Government another fine of $519 million for having violated the Foreign Corrupt Practices Act.

21.     Due to these heavy drains on Teva Ltd.'s funds and other poor decisions, the market capitalization of Teva Ltd.'s stock fell from $59.78 billion dollars as of January 5, 2016 to $12.02 billion as of November 8, 2017, a drop of $47.7 billion or 79.89%.

22.     Teva Ltd.'s CEO resigned at the beginning of February 2017, and a new CEO was not hired until September 2017.

23.     In light of its crushing debt and its stock price's tailspin, Teva Ltd. and Teva USA took drastic measures to cut costs.

24.     These measures included cutting the marketing budget and efforts regarding the sale of Amrix, such that at some point in 2016 or thereafter Teva Ltd. and Teva USA failed to use Commercially Reasonable Efforts with respect to the marketing and sale of Amrix.

25.     While Robins is not required under the Agreement to prove that such failure proximately caused sales to drop, the precipitous drop in gross and net sales of Amrix after 2016 is evidence of Teva Ltd.'s and Teva USA's failure.

26.     The failure of Teva Ltd. and Teva USA to use Commercially Reasonable Efforts at all times with respect to the marketing and sale of Amrix triggered the obligation set forth in Section 4.02(c) for Teva Ltd. and Teva USA to pay Robins compensation determined by contract formula—50% of $255 million less the aggregate amount of all Net Sales Milestone Payments to date.

27.     The Net Sales Milestone Payments to date are $60 million. Thus, Teva Ltd. and Teva USA owe Robins $97.5 million in accordance with Section 4.02(c) of the Agreement (50% of the difference between $255 million and $60 million), which they have failed and refused to pay Robins.

28.     Teva Ltd. and Teva USA also owe Robins pre-judgment interest on this amount from the day that Teva Ltd. and Teva USA first failed to use Commercially Reasonable Efforts with respect to the marketing and sale of Amrix, which interest is expected to bring the total owed by Teva Ltd. and Teva USA to Robins to at least $110 million.

WHEREFORE, Plaintiff E. Claiborne Robins Company, Inc. demands judgment against defendant Teva Pharmaceutical Industries, Ltd. and against Teva Pharmaceuticals USA, Inc.,

6

jointly and severally, in the amount of at least $110 million. Pursuant to Section 13.01 of the Agreement, Plaintiff prays further for an award of attorney's fees and other out-of-pocket costs incurred in connection with this action.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: December 14, 2018          Respectfully submitted,

E. CLAIBORNE ROBINS COMPANY, INC.

By: _____
            Counsel

Thomas Wolf (VSB No. 18234)
Kenneth T. Stout (VSB No. 88027)
LECLAIR RYAN, PLLC
919 East Main Street
Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 916-7143 telephone
(804) 916-7243 facsimile
thomas.wolf@leclairryan.com
kenneth.stout@leclairryan.com