**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIIA**
**Richmond Division**

**E. CLAIBORNE ROBINS COMPANY, INC.,**

        **Plaintiff,**

**v.**                                              **Civil Action No. 3:18cv827**

**TEVA PHARMACEUTICAL INDUSTRIES**
**LTD.,** *et al.***,**

        **Defendants.**

<u>**MEMORANDUM OPINION**</u>

This matter comes before the Court on four motions:

(1)      Defendant Teva Pharmaceutical Industries, Ltd.'s ("Teva Ltd.") Motion to Dismiss for Lack of Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2),[1] (ECF No. 57);

(2)      Defendants Teva Ltd. and Teva Pharmaceuticals USA, Inc.'s ("Teva USA") Motion to Dismiss for Failure to State a Claim pursuant to Federal Rules of Civil Procedure 12(b)(6),[2] (ECF No. 58);[3]

(3)      Defendant Cephalon, Inc.'s ("Cephalon") Motion to Dismiss for Failure to State a Claim pursuant to Federal Rules of Civil Procedure 12(b)(6), (ECF No. 60);

(4)      Defendant Teva Pharmaceuticals International GmbH's ("Teva Int'l") Motion to Dismiss for Failure to State a Claim pursuant to Federal Rules of Civil Procedure 12(b)(6), (ECF No. 70).

---

[1] Rule 12(b)(2) allows dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2).

[2] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[3] Teva Ltd. and Teva USA submitted a single Memorandum in Support for their two Motions to Dismiss. (*See* ECF No. 59.) The Court will refer to the Memorandum in Support of these Motions to Dismiss as the "Memorandum in Support of the Teva Joint Motions to Dismiss."

Plaintiff E. Claiborne Robins Company ("Robins") responded to the Teva Ltd.'s and Teva USA's Motions to Dismiss in a single filing. (ECF No. 65.) Robins also responded to Cephalon's Motion to Dismiss, (ECF No. 67), and Teva Int'l's Motion to Dismiss, (ECF No. 73). Teva Ltd. and Teva USA replied, (ECF No. 68), as did Cephalon, (ECF No. 69), and Teva Int'l, (ECF No. 74).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[4] For the reasons that follow, the Court will deny each of the Motions to Dismiss.

## I. Factual and Procedural Background

This breach of contract action arises out of Defendants' alleged failure to use Commercially Reasonable Efforts in the marketing and sale of a prescription drug, Amrix, used and marketed as a muscle relaxant. Robins[5] "developed and owned a patented extended-released form of cyclobenzaprine hydrochloride, sold under the trade name Amrix." (Second Am. Compl. ¶ 21, ECF No. 47.) In 2007, Robins "sold its rights in the drug" Amrix to Anesta AG[6]

---

[4] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States. . . [and] citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. §§ 1332(a)(1)–(a)(2). Robins is a citizen of Virginia, Teva USA is a citizen of Delaware and Pennsylvania, Teva Ltd. is a citizen of Israel, Teva Int'l is a citizen of Switzerland, Cephalon is a citizen of Delaware and Pennsylvania, and the Second Amended Complaint seeks damages exceeding $75,000.

[5] Robins "is a Virginia corporation with its principal place of business in Richmond, Virginia." (Second Am. Compl. ¶ 9, ECF No. 47.)

[6] Anesta "was a Swiss corporation having its principal place of business [in] . . . Switzerland." (Second Am. Compl. ¶ 13.) At the time of the 2007 Contract, "Anesta was a wholly owned subsidiary of Cephalon," one of the named Defendants in this action. (Id. ¶ 42.)

("Anesta") subject to an Asset Purchase Agreement, (the "Contract"), which was guaranteed by Cephalon.[7]  (Second Am. Compl. ¶¶ 1–2, ECF No. 47.)  In 2011, Teva Ltd.[8] purchased Cephalon.  (*Id.* ¶ 43.)  After this transaction, both Cephalon and Anesta became wholly owned subsidiaries of Teva Ltd.  (*Id.* ¶¶ 13, 43.)

Because this matter comes before the Court on Robins's Second Amended Complaint, the Court will discuss Robins's previous complaints and the dismissal without prejudice of Robins's First Amended Complaint before addressing the factual allegations raised in the Second Amended Complaint.

A.    **Initial Procedural History and Robins's Previous Complaints**

On November 29, 2018, Robins filed its Initial Complaint alleging a single breach of contract claim against Teva Ltd.  (Compl., ECF No. 1.)  On December 14, 2018, Robins filed its seven-page First Amended Complaint, as of right, adding Teva USA as a defendant and alleging a single breach of contract claim against Teva Ltd. and Teva USA.  (Am. Compl., ECF No. 4.)

In the First Amended Complaint, Robins alleged that Teva Ltd. "acquired all of . . . Anesta's rights and obligations related to Amrix" when it purchased Cephalon.  (Am. Compl. ¶ 15.)  In 2015, Teva Ltd.'s financial situation dramatically worsened, and the company's stock value fell nearly eighty percent.  (*Id.*)  As a result of Teva Ltd.'s deteriorating financial

---

In 2011, Teva Ltd. purchased Cephalon.  (*Id.* ¶ 43.)  After this transaction, both Cephalon and Anesta became wholly owned subsidiaries of Teva Ltd.  (*Id.* ¶¶ 13, 43.)

[7] Cephalon "is a Delaware corporation having its principal place of business [in] . . . [Pennsylvania]."  (Second Am. Compl. ¶ 12.)  Although Cephalon was the sole parent company for Anesta at the time of the Contract, in 2011, it became a wholly owned subsidiary of Teva Ltd.  (*Id.*)

[8] Teva Ltd., "the world's largest seller of generic drugs," is an Israeli corporation with its principal place of business in Israel.  (Second Am. Compl. ¶¶ 10, 43.)

condition, the company took "drastic" cost-cutting measures, including "cutting the marketing budget and efforts regarding the sale of Amrix, such that at some point in 2016 or thereafter Teva Ltd. and Teva USA failed to use Commercially Reasonable Efforts with respect to the marketing and sale of Amrix." (*Id*. ¶¶ 23–24.) Robins stated that the subsequent "precipitous drop in gross and net sales of Amrix" provided "evidence of [Teva Ltd. and Teva USA's] failure" to use Commercially Reasonable Efforts in marketing Amrix, as the Contract required. (*Id*. ¶ 25.)

Teva USA and Teva Ltd. filed Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (ECF Nos. 6, 41), while Teva Ltd. filed an additional Motion to Dismiss brought pursuant to Federal Rule of Procedure 12(b)(2) for lack of personal jurisdiction, (ECF No. 40). On September 18, 2019, the Court granted Teva Ltd. and Teva USA's Motions to Dismiss for failure to state a claim and denied as moot Teva Ltd.'s Motion to Dismiss for lack of jurisdiction. (Sept. 18, 2019 Mem. Op. & Order, ECF Nos. 45 & 46.)

In dismissing the First Amended Complaint, the Court determined that Robins had not "put forth facts sufficient to support its claim that Defendants did not use Commercially Reasonable Efforts to market Amrix." (Sept. 18, 2019 Mem. Op. 8, ECF No. 45.) The Court concluded that the First Amended Complaint failed to survive Rule 12(b)(6) scrutiny and dismissed the First Amended Complaint without prejudice.

B.     **Factual Allegations in the Second Amended Complaint**[9]

Robins timely filed its twenty-page Second Amended Complaint against Teva Ltd., Teva USA, Teva Int'l, and Cephalon, charging the Defendants breached the Contract—originally agreed to among Robins, Anesta, and Cephalon—by failing to use Commercially Reasonable Efforts in the marketing and sale of Amrix.  (*See* Second Am. Compl.)

1.     **The August 2007 Contract Between Robins, Anesta and Cephalon**

Robins "developed and owned [Amrix,] a patented extended-released form of cyclobenzaprine hydrochloride . . .  [used as] a muscle relaxant."  (Second Am. Compl. ¶¶ 21– 22.)  "[T]he U.S. Food and Drug Administration [approved Amrix] effective February 1, 2007." (*Id*. ¶ 27.)  In August 2007, Robins sold Anesta "all of Robins'[s] rights and obligations related to Amrix."  (*Id*. ¶ 28.)  "The [Contract] between Robins and Anesta was made in—and closed in—Richmond, Virginia."  (*Id*. ¶ 17.)  "It has been performed in significant part in Richmond, Virginia."  (*Id*.)

The Contract for Amrix provides that Anesta pay a "Base Purchase Price" while creating an additional form of remittance referred to as "Net Sale Milestones."  (*Id*. ¶ 29.)  The "Net Sales Milestones" designate a schedule by which Anesta would make additional payments to Robins for twelve years—until August 28, 2019—upon occurrence of certain events.  (*Id*. ¶¶ 29–30.) Because a large amount of Robins's earnings from the deal depended on the future sales of

---

[9] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in Robins's Second Amended Complaint as true, and draw all reasonable inferences in favor of Robins.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

Amrix, the Contract provides that "Anesta, its Affiliates,[10] and any Successor Entity[11]" will, at

all times, use "Commercially Reasonable Efforts" with respect to the marketing and sale of

Amrix.  (*Id.* ¶¶ 33–34; *see* Contract § 4.02(c).)  The Contract defines "Commercially Reasonable

Efforts" as:

> [W]ith respect to any Person,[12] the efforts and resources that would be used
> (including the promptness in which such efforts and resources would be applied)
> by such Person consistent with its normal business practices, which in no event
> shall be less than the level of efforts and resources standard in the pharmaceutical
> industry for a company similar in size and scope to such Person, with respect to a
> product at a similar stage in its development or product life taking into account
> efficiency, safety, commercial value, the competitiveness of alternative products of
> third parties that are in the marketplace or under development, and the Patent and
> other proprietary position of such product.  Notwithstanding anything herein to the
> contrary, the 'Commercially Reasonable Efforts' to be used by [Anesta] under this
> Section 4.02(c) shall not be less than those efforts [Cephalon] would be obligated
> to take under this Section 4.02(c) if [Cephalon] had executed and delivered this
> Agreement as [Anesta].

(Contract § 4.02(c).)  Should "Anesta, its Affiliates, [or] any Successor Entity," to the Contract

fail to use Commercially Reasonable Efforts in the relevant timeframe, a "separate compensation

provision would be triggered" entitling Robins, as the "Seller" to "an amount equal to 50% of

(A) $255 million less (B) the aggregate amount of all Net Sales Milestone Payments made to

[Robins]."  (Second Am. Compl. ¶¶ 39–40; Contract § 4.02(c).)

---

[10] The Contract defines "Affiliate" as an entity "that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with [Anesta]." (Second Am. Compl. Ex. 1 "Contract" § 1.01(b), ECF No. 48.)

[11] The Contract defines "Successor Entity" as "a successor entity to Buyer following a Change of Control."  (*Id.* § 1.01(yyy).)  The Contract defines "Change of Control" "as a transaction in which Cephalon, Inc.'s voting power ceased to represent 50% or more of the surviving entity."  (*Id.* § 1.01(r).)

[12] "Person," as used in the Contract means "any natural person, corporation, general partnership, limited partnership, limited liability company, joint venture, proprietorship, other business organization or entity, trust, union, association, or Governmental or Regulatory Authority."  (*Id.* § 1.01(jjj).)

Section § 13.11 of the Contract includes a forum selection clause[13] that provides for jurisdiction in one of several forums, stating, in relevant part:

> Each party hereby irrevocably submits to the jurisdiction of, and agrees that any action arising out of this Agreement shall be brought in, (i) the United States District Court for the Southern District of New York or, if such federal jurisdiction is unavailable, the state courts in the Borough of Manhattan, City of New York, (ii) the United States District Court for the Eastern District of Pennsylvania or, if such federal jurisdiction is unavailable, the state courts in the County of Chester, Pennsylvania, or (iii) the United States District Court for the Eastern District of Virginia or, if such federal jurisdiction is unavailable, the state courts in the City of Richmond, Virginia, and each party hereby irrevocably waives any objection which such party may now or hereafter have to the laying of improper venue or forum non conveniens in any such jurisdiction.

(*Id.* § 13.11.)[14]

At the time of the 2007 Contract, "Anesta was a wholly owned subsidiary of Cephalon." (Second Am. Compl. ¶ 42.)  As such, Cephalon "guaranteed Anesta's performance of its duties under the [Contract]."  (*Id.* ¶ 41; *see* Second Am. Compl. Ex. 2 "Cephalon Guaranty," ECF No. 49.)  In the Guaranty, a separate contract between Robins and Cephalon, Cephalon agreed to act as a guarantor and that it would "discharge or satisfy," or cause Anesta or another "affiliated or related entity . . . to discharge or satisfy," each of Anesta's obligations.  (Cephalon Guaranty 2.)

---

[13] Although the Contract refers to § 13.11 as a "venue" provision, the Court will refer to § 13.11 as a "forum selection clause."  A forum selection clause "is a contractual provision in which the parties establish the place (such as the country, state, or type of court) for specified litigation between them."  *Forum Selection Clause*, Black's Law Dictionary, (11th ed. 2019).  Section 13.11 names several possible venues, including the Eastern District of Virginia, and states that any such party "irrevocably waives any objection which such party may now or hereafter have to the laying of improper venue or forum non conveniens in any such jurisdiction."  (Contract § 13.11.)  Section 13.11 thus functions as a non-exhaustive forum selection clause, allowing for more than one permissible forum.

[14] No party disputes the validity of the choice-of-law and choice-of-venue provisions in the Contract, although disagreement exists over whether these Contract terms bind Teva Ltd. and Teva USA.

### 2.    Teva Ltd. Acquires Cephalon

In 2011, Defendant Teva Ltd., "purchased Cephalon for $6.8 billion." (Second Am.
Compl. ¶ 43.) After the transaction, both Cephalon and Anesta became wholly owned
subsidiaries of Teva Ltd. (*Id.*) "In 2012, Anesta merged with another wholly owned subsidiary
of Teva Ltd., Ivax International GmbH ('Ivax')," and "Ivax assumed Anesta's rights and
obligations under the [Contract]." (*Id.* ¶¶ 44–45.) As a result, Anesta "was deleted from the
Swiss Commercial Register." (*Id.* 8 n.4.) Ivax later changed its name to Teva Pharmaceuticals
International GmbH or "Teva Int'l." (*Id.* ¶ 46.) Teva Int'l is a Swiss corporation with its
principal place of business in Switzerland that remains a wholly owned subsidiary of Teva Ltd.
(*Id.* ¶ 16.)

Since Teva Ltd.'s purchase of Cephalon in 2011, Robins states that its "communications
about Amrix have been with Teva USA, Teva Ltd., or Teva Int'l . . . . [and] not . . . with
Cephalon or Anesta." (*Id.* ¶ 47.) In 2014, John C. Jacobs, Teva's Senior Director of Therapeutic
Marketing & Senior Head of CNS Marketing East, corresponded with Robins about Teva's
marketing efforts and sales goals concerning Amrix from a "@tevapharm.com" email address.
(Second Am. Compl. Ex. 3 "May 19, 2014 Email" 1, ECF No. 50.) In his May 19, 2014 Email
to Robins employees, Jacobs stated that Teva had "maintained similar promotional efforts in
2014 as we did in 2013 . . . . [t]here are 324 sales representatives selling AMRIX . . . . [and] [o]ur
marketing budget has remained consistent from 2013 to 2014." (*Id.*) After sending detailed
information to Robins concerning the marketing and sale of Amrix, Jacobs wrote:

> [b]y way of this message I would like to introduce Julie Pan who will serve as your
> contact person with Teva for all inquiries re: AMRIX moving forward. Julie
> handles new business and alliance management for our business unit and having

one single point of contact should help us to streamline our communications process to better serve you.

(*Id.*)

Robins alleges that "Teva has been vague about which entities within the Teva umbrella of companies have assumed or have been assigned rights and obligations under the [Contract]" and that Robins "does not know, and has no way of knowing, about transactions concerning Amrix that have occurred within the Teva family of companies." (Second Am. Compl. ¶¶ 48, 52.) Robins states, on information and belief, that "Teva Ltd. has caused Anesta, Cephalon, and/or Teva Int'l to assign, license, or transfer rights and obligations vis-à-vis Amrix to other entities under the Teva Ltd. family of companies, including Cephalon, Teva USA, Teva Int'l, and Teva Ltd." (*Id.* ¶ 53.) Because Cephalon, Teva USA, Teva Int'l, and Teva Ltd. are "successors and permitted assigns" to the Contract, Robins maintains they are "bound by the [Contract], including the earnout payment obligations set forth in § 4.02(c)." (*Id.* ¶ 54.)

### 3. Defendants Fail to Use Commercially Reasonable Efforts in the Marketing and Sale of Amrix Between 2014 and 2019

In the years preceding Teva Ltd.'s acquisition of Cephalon, "[n]et sales of Amrix were robust." (Second Am. Compl. ¶ 56.) Since 2016, however, "Amrix's net sales have dropped precipitously." (*Id.* ¶ 57.)

Robins contends that "[t]here was nothing about Amrix itself to explain this precipitous drop that began sometime in 2016." (*Id.* ¶ 59.) "Amrix has been shown to be safe and effective, and there [were] no published [studies] during the relevant period (i.e., 2014 to 2019) . . . calling into question Amrix's safety and efficacy." (*Id.* ¶ 60.) There similarly were no changes in applicable market conditions between 2014 and 2019: (1) Amrix remained "under patent and is the only extended-release form of cyclobenzaprine hydrochloride on the market;" (2) there "are

no lower-cost substitutes that are safer and more effective than Amrix;" and, (3) there were "no changes in the patent status of competing drugs that could account for the drastic decline in sales that Amrix experienced." (*Id.* ¶¶ 61–63.)  In short, neither "Amrix's commercial value or competitiveness" declined between 2015 and 2019, "[n]or was there anything about Amrix or market conditions during this period that would justify . . . cutting marketing efforts for Amrix." (*Id.* ¶¶ 61, 65.)

During this time period, Teva Ltd. suffered a serious of financial setbacks.  Teva Ltd. "had to pay [U.S. federal regulators] $1.2 billion to settle an antitrust claim," undertook "$33.75 billion in debt" to finance the acquisition of another drug business, and "paid the U.S. government . . . $519 million for having violated the Foreign Corrupt Practices Act." (*Id.* ¶¶ 68– 70.)  "Due to these heavy drains on Teva Ltd.'s funds and other poor decisions, the market capitalization of Teva Ltd.'s stock fell from $59.78 billion dollars as of January 5, 2016 to $12.02 billion as of November 8, 2017, a drop of $47.7 billion or 79.89%." (*Id.* ¶ 71.)

As a result of Teva Ltd.'s deteriorating financial condition, Robins avers that Teva took "drastic" cost-cutting measures, specifically "Teva Ltd. and Teva USA slashed billions of dollars of costs across the board, including for marketing and sales." (*Id.* ¶¶ 72–73.)  Robins contends that Teva's compromised "financial position has caused Defendants to sacrifice Amrix" by "shifting its marketing to other products." (*Id.* ¶ 75.)

Although previously forthcoming with information regarding the marketing and sales efforts for Amrix, since 2015, Teva's representatives have "refused to provide any meaningful information about its marketing efforts and marketing budget for Amrix." (*Id.* ¶ 80.)  Despite Robins's many requests for specific information regarding Teva's marketing efforts, Teva Ltd. and Teva USA "provided only vague and inadequate excuses for Amrix's drastic decline in

sales," (*id.* ¶ 83), and continued to blame the decline in sales "on the genericization of the market," (*id.* ¶ 96).  However, Robins submits that "the market . . . was highly genericized at the time Robins developed Amrix" meaning that the so-called genericization of the market does not explain the decline in sales.  (*Id.* ¶ 86.)

Robins contends that Defendants stopped using Commercially Reasonable Efforts with respect to Amrix in three ways, specifically by cutting:  (1) the Amrix sales force; (2) the co-pay card program; and, (3) the discount coupon program.  (*Id.* ¶ 103.)  Robins submits that each of these programs were necessary to "meet Commercially Reasonable Efforts[,]" yet Defendants made cuts in the sales force and essential programs "substantially and unreasonably."  (*Id.*)  For example, in its communications with Robins, Teva stated that it was "no longer offering copay coupons [for Amrix], a marketing component recognized in the industry as critical to successful sales efforts for brand name prescription drugs like Amrix, but failed to explain why."  (*Id.* ¶ 87.)  Similarly, Teva cut its number of sales representatives from 324 in 2012—"the number of sales representatives required to satisfy Commercially Reasonable Efforts"—and "refused to state how many sales representatives were marketing Amrix" in 2017.  (*Id.* ¶¶ 78–79, 84.)

Robins concludes that "Teva's slashing of its marketing and sales efforts for Amrix are not justified by considerations of efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, or the Patent and other proprietary position of Amrix."  (*Id.* ¶ 104.)  Robins asserts that "a company similar in size and scope to Cephalon, Teva USA or Teva Ltd. would not have made the same reduction in sales force, marketing budget, and marketing efforts made by Teva."  (*Id.* ¶ 105.)  Thus, Robins contends that "at some point during the 12-year earnout period, beginning in 2016

or shortly thereafter," the Defendants have failed to use Commercially Reasonable Efforts in marketing Amrix, as required by the Contract.  (*Id.* ¶ 106.)

Robins seeks compensation as "determined by contract formula" in the amount of "$97.5 million" plus pre-judgment interest and attorney's fees as provided for in Section 13.12(b) of the Contract.[15]  (*Id.* ¶¶ 107–10.)

## C.   <u>Procedural History</u>

Teva Ltd. and Teva USA first jointly filed their Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  (ECF Nos. 57, 58.)  Soon after, Cephalon filed its Motion to Dismiss pursuant to 12(b)(6), (ECF No. 60), adopting the arguments regarding breach of the Commercially Reasonable Efforts Contract provision set forth in the Memorandum in Support of the Teva Joint Motions to Dismiss, (ECF No. 59).  On December 30, 2019, Teva Int'l filed its Motion to Dismiss pursuant to 12(b)(6), (ECF No. 70), also adopting the same arguments regarding the breach of the Commercially Reasonable Efforts Contract provision set forth in the Memorandum in Support of the Teva Joint Motions to Dismiss, (ECF No. 59).

For the reasons stated below, the Court will deny the Motions to Dismiss.  In reaching that conclusion, the Court determines that Robins has pleaded facts in the Second Amended Complaint supporting a reasonable inference that Teva Ltd. and Teva USA can be held liable under the Contract, and that the Defendants failed to use Commercially Reasonable Efforts in the

---

[15] Section 13.12(b) of the Contract states that

[i]n the event a Party brings an action to enforce any terms and provisions of this Agreement in a court of law or equity, the non-prevailing Party in such action shall pay all of the out-of-pocket costs incurred by the prevailing Party, including reasonable attorney's fees.

(Contract § 13.12(b).)

marketing and sale of Amrix.  The Court next addresses the issue of personal jurisdiction,

concluding that Robins has made a *prima facie* case of personal jurisdiction over Teva Ltd.

## II.  Standard of Review

### A.     Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952

(4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain

sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that

states a claim for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled

to relief are not enough.  *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing

necessitate some factual enhancement within the complaint to cross the line between possibility

and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193

(4th Cir. 2009) (citations omitted).

A complaint achieves facial plausibility when the facts contained therein support a

reasonable inference that the defendant is liable for the misconduct alleged.  *Twombly*, 550 U.S.

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context specific and

requires "the reviewing court to draw on its judicial experience and common sense." *Francis*,

588 F.3d at 193.  The Court must assume all well pleaded factual allegations to be true and

determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to

an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)).  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### A.    <u>Federal Rule of Civil Procedure 12(b)(2)</u>

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  When, as here, a district court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence.  *Id.*; *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  "This '*prima facie* case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019).  "That is, the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Id.*  If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to

violate due process." *Reynolds Foil, Inc. v. Pai*, No. 3:09cv657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)).

The Court "has considerable procedural leeway in choosing a methodology for deciding the [Rule 12(b)(2)] motion." 5B ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1351, at 305 (3d ed. 2004). A number of courts have identified three possible approaches: ruling on the written record, permitting discovery, or holding an evidentiary hearing. *See, e.g.*, *Williams v. FirstPlus Home Loan Tr. 1996-2*, 209 F.R.D. 404, 409 (W.D. Tenn. 2002) (stating that a court "may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions."). A hearing may be appropriate "in particularly complex cases." 5B ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1351, at 305, 308 (3d ed. 2004). In straightforward cases, such as the one before the Court, "[t]he Court may resolve the issue based on the affidavits and the supporting documents" without a hearing. *Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 477–78 (E.D. Va. 1997).

When ruling on a Rule 12(b)(2) Motion to Dismiss, the Court "may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins*, 935 F.3d at 226; *see also* WRIGHT & ARTHUR MILLER, § 1351, at 305 ("The court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts."). "For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true." *Reynolds Foil*, 2010 WL 1225620, at *1. "In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume

15

credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (quoting *Bakker*, 886 F.2d at 676). Still, a plaintiff cannot rely on "bare pleadings alone" after a defendant properly challenges personal jurisdiction. *Machulsky*, 210 F. Supp. 2d at 537 (quotation omitted). Instead, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits and competent evidence . . . . [A] plaintiff must respond with actual proof[], not mere allegations." *Id.* (quotation omitted); *see also FirstPlus*, 209 F.R.D. at 409–10 (concluding that a court need not "ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiffs." (quoting *Kerry Steel v. Paragon Indus., Inc.,* 106 F.3d 147, 153 (6th Cir. 1997))).

### III.  Analysis:  Failure to State a Claim

The Court will deny Defendants' Motions to Dismiss brought pursuant to Rule 12(b)(6). (ECF Nos. 58, 60, 70.)  Viewing all factual allegations in the light most favorable to Robins, Plaintiff has stated a claim that Teva Ltd. and Teva USA are bound by the Contract.  The Court further determines that Robins has pled facts sufficient to survive a motion to dismiss that Defendants breached the Contract by failing to use Commercially Reasonable Efforts in the marketing and sale of Amrix.

### A.    Legal Standard:  Breach of Contract Under New York Law

 "Under New York law, a cause of action for breach of contract requires '(1) the existence of an agreement,[16] (2) adequate performance of the contract by the plaintiff,[17] (3)

---

[16] No party disputes the existence of the Contract or the Commercially Reasonable Efforts provision.

[17] Defendants do not claim that Robins failed to adequately perform under the Contract.

breach of contract by the defendant, and (4) damages." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co. L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004)). "The plaintiff must allege the specific provisions of the contract upon which liability is predicated . . . [and] [i]t is a fundamental principle of contract law that agreements are interpreted in accordance with the parties' intent[.]" *Id.* (internal citations omitted). "Stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract." *N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12cv3584, 2013 WL 1500333, at *9 (S.D.N.Y. Apr. 12, 2013) (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 262, 267 (S.D.N.Y. 2010)); *see also Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 597 (S.D.N.Y. 2017) ("Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." (internal citations omitted)).

**B.      Robins States a Plausible Claim that Teva Ltd. and Teva USA Are Bound By the Contract**

Teva Ltd. and Teva USA[18] argue that Robins does not allege sufficient facts to plausibly infer the first element of breach of contract—that Teva Ltd. and Teva USA are bound by the Contract.  (Mem. Supp. Teva Jt. Mots. Dismiss 17, ECF No. 59.)  Reading Robins's factual allegations in the most favorable light, the Court determines otherwise for purposes of this Motion to Dismiss.

Pursuant to New York law, the general successor-liability rule establishes that "a party who is not a signatory to a contract cannot be held liable for breaches of that contract." *In re*

---

[18] Cephalon and Teva Int'l do not contest that they are bound by the Contract nor that they are subject to personal jurisdiction in the Eastern District of Virginia.  (*See* Cephalon Mot. Dismiss; Teva Int'l Mot. Dismiss).

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 478 (S.D.N.Y. 2014) (internal citation omitted).  But several exceptions to that general rule exist.  Namely, a successor entity may be bound by a contract's provisions when:  "(1) there is an express or implied agreement to assume the other company's debts and obligations; (2) the transaction was fraudulent; (3) there was a *de facto* merger or consolidation of the companies; or (4) the purchasing company was a mere continuation of the selling company."  *Eclaire Advisor Ltd. v. Daewoo Engineering & Construction Co., Ltd.*, 375 F. Supp. 2d 257, 267 (S.D.N.Y. 2005) (internal citations omitted); *see also Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 n.4 (S.D.N.Y. 2019) (accord).  Under New York law, successor liability in a contract is "highly fact-specific" and typically cannot be determined as a matter of law.  *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 703 (2d Cir. 2009).

Here, Robins has adequately plead the first exception to the general rule against successor liability:  that "an express or implied agreement to assume the other company's debts and obligations" existed here.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.  Robins supports its position that both Teva Ltd. and Teva USA undertook Cephalon and Anesta's "debts and obligations" under the Contract under three plausible rationale.  *Id.*  First, Robins alleges an express agreement on the part of Teva Ltd. and Teva USA to undertake Anesta and Cephalon's contractual obligations.  Second, Teva employees conducted themselves as if they were bound by the Contract, including implicitly referring to Teva as a "Party" to the Contract.  Finally, Teva Ltd.'s acquisition of Cephalon and Teva's corporate structure suggest the existence of an express or implied agreement to undertake Anesta and Cephalon's debts and obligations relating to Amrix because they show that the debts and obligations to Amrix entered the Teva corporate family following 2011.

18

### 1. Robins Alleges an Express Agreement on the Part of Teva Ltd. and Teva USA to Undertake Anesta and Cephalon's Contract Obligations

First, Robins alleges an express agreement on the part of Teva Ltd. and Teva USA to undertake Anesta and Cephalon's obligations pursuant to the Contract.  The Second Amended Complaint states that "[o]n information and belief, Teva Ltd. has caused Anesta, Cephalon, and/or Teva Int'l to assign, license, or transfer rights and obligations vis-à-vis Amrix to other entities under the Teva Ltd. family of companies, including Cephalon, Teva USA, Teva Int'l, and Teva Ltd."  (Second Am. Compl. ¶ 53.)  While Teva Ltd. and Teva USA protest that this allegation amounts to no more than a legal conclusion, Robins supports this allegation with other facts in the Second Amended Complaint.  This finding is explained in the discussion about Personal Jurisdiction that follows.  The Second Amended Complaint thus pleads the first exception to successor and assignment liability:  an express agreement for Teva Ltd. and Teva USA to assume Anesta and Cephalon's obligations under the Contract.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.

### 2. Teva Employees Conducted Business with Robins As if an Express or Implied Agreement to Undertake Anesta and Cephalon's Contractual Obligations Existed

Second, Robins alleges that Teva's employees conducted business regarding Amrix as if Teva had assumed Anesta and Cephalon's "debts and obligations" under the Contract.[19]  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.  To show successor liability under New York law through the existence of an express or implied agreement to assume the other company's debts and obligations, Robins alleges that since 2011, the year after Teva Ltd. acquired Cephalon, its

---

[19] It is not apparent from the Second Amended Complaint whether Robins communicated with Teva USA employees or Teva Ltd. employees.  Robins, in its Response to the Teva Joint Motions to Dismiss, states that Francine Del Ricci is "a Teva USA employee."  (Resp. Teva Jt. Mots. Dismiss 10, ECF No. 65.)

"communications about Amrix have been with Teva USA, Teva Ltd., or Teva Int'l . . . . [t]hey have not been with Cephalon or Anesta." (Second Am. Compl. ¶ 47.) The communications provided to the Court, both by Robins and Teva, confirm this assertion and give rise to the inference that Teva assumed Anesta and Cephalon's debts and obligations under the Contract.

Robins provides its communications with Teva employees concerning Teva's efforts in maintaining Commercially Reasonable Efforts under the Contract. The record shows that in 2014, John C. Jacobs (Teva's Senior Director of Therapeutic Marketing & Senior Head of CNS Marketing East) corresponded with Robins about Teva's marketing efforts and sales goals concerning Amrix. (May 19, 2014 Email 1.) In his May 19, 2014 Email to Robins, Jacobs stated that Teva had "maintained similar promotional efforts in 2014 as we did in 2013 . . . . [t]here are 324 sales representatives selling AMRIX . . . . [and] [o]ur marketing budget has remained consistent from 2013 to 2014." (*Id.*) After sending detailed information to Robins concerning the financial viability of Amrix, Jacobs continued:

> [b]y way of this message I would like to introduce Julie Pan who will serve as your contact person with Teva for all inquiries re: AMRIX moving forward. Julie handles new business and alliance management for our business unit and having one single point of contact should help us to streamline our communications process to better serve you.

(*Id.*)

Robins inclusion of the May 19, 2014 Email from Jacobs (Teva's Senior Director of Therapeutic Marketing & Senior Head of CNS Marketing East) plainly demonstrates that Teva employees such as Jacobs viewed the company as responsible for marketing and selling Amrix, and that it was in a "business and alliance management" relationship with Robins. (*Id.*) By providing these communications with Teva, Robins has stated more than a plausible claim that Teva undertook "an express or implied agreement to assume" Cephalon and Anesta's "debts and

obligations" regarding the marketing and sale of Amrix.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at

267.  Teva cannot claim that it did not enter into an "express or implied agreement to assume"

Anesta and Cephalon's debts and obligations regarding Amrix when it maintained 324 sales

representatives selling Amrix in 2014, provided the marketing budget for the drug, and

corresponded with the other party to the Contract about those efforts.  *Id.*; *see Aguas,* 585 F.3d at

703 (finding relevant for question of successor liability that one company "assumed operating

control of the facilities and infrastructure improvements, as well as business channels, to deliver,

without interruption, the same services.")

Teva also provides emails from its employees in support of its Motion to Dismiss that

confirm the existence of an express or implied agreement on the part of Teva to undertake

Anesta and Cephalon's debts and obligations under the Contract.  Between December 2017 and

January 2018, Francine Del Ricci, a Senior Vice President at Teva, engaged in email

correspondence with various Robins's employees about Teva's marketing and sales efforts

regarding Amrix and Teva's stated reasons for Amrix's declined sales.  (Mem. Supp. Teva. Jt.

Mots. Dismiss Exs. 2–3, ECF Nos. 59-3–4)

On January 23, 2018, Del Ricci sent a letter responding to a January 9, 2018 inquiry from

Robins that had questioned whether Teva had fulfilled its obligations under the Contract (the

"January 23, 2018 Letter").  (Mem. Supp. Teva. Jt. Mots. Dismiss Ex. 3 "Jan. 23, 2018 Letter,"

ECF No. 59-4.)  In that January 23, 2018 Letter, Del Ricci states that Robins had "question[ed]

Teva's performance under Section 4.2 of its August 28, 2007 Asset Purchase Agreement . . . for

AMRIX."  (*Id.* 1.)  Del Ricci continued that Robins's "letter includes a number of inaccuracies,

and your suggestion that *Teva may have breached its obligations*, under Section 4.2, to market

AMRIX using Commercially Reasonable Efforts is patently false."  (*Id.* (emphasis added).)

While Del Ricci's January 23, 2018 Letter laid out substantial grounds for disputing Robins's claims that Teva had not used Commercially Reasonable Efforts, it did not state that Teva Ltd., Teva USA, or any Teva entity, was not bound by the terms of the Contract.  (*Id.*)

To the contrary, Del Ricci referred to Teva's "obligations" under § 4.02 of the Contract without reservation.  (*Id.*)  Courts applying New York law on successor liability have looked to "factors such as whether the buyer's conduct or representations indicate such an intent [to be bound by a contract], including admissions of liability by officers or other [spokespersons] of the buyer."  *Vasquez v. Ranieri Cheese Corp.,* No. 07cv464, 2010 WL 1223606, at *11 (E.D.N.Y. Mar. 26, 2010).  Teva cannot now contend that it did not assume debts and obligations pursuant to the Contract, when it includes correspondence from senior employees referring to the company's "obligations" under that same Contract.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.

The January 23, 2018 Letter includes a second comment that suggests Teva's belief that it viewed itself as bound by the Contract.  Del Ricci continues by saying that if Robins were to bring suit against Teva and lose, Robins would "under Section 13.12 of the Agreement . . . be responsible to pay all of Teva's out-of-pocket costs."  (Jan. 23, 2018 Letter 2.)  Section 13.12(b) of the Contract states that

> [i]n the event a Party brings an action to enforce any terms and provisions of this Agreement in a court of law or equity, the non-prevailing Party in such action shall pay all of the out-of-pocket costs incurred by the prevailing Party, including reasonable attorney's fees.

(Contract § 13.12(b).)  By informing Robins of Teva's intent to exercise rights that exclusively belong to a "Party" under the Contract, Teva reiterated that it viewed itself as such:  a Party bound by the Contract.  (*Id.*)  The January 23, 2018 Letter demonstrates Teva's corporate awareness of an "express or implied agreement" to assume Cephalon and Anesta's "debts and obligations" and become a Party to the Contract.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.

22

Read together, the statements of Jacobs and Del Ricci, both Teva employees, plausibly show that Teva viewed itself as a party to the Contract.  Their actions strongly support the existence of "an express or implied agreement to assume" Cephalon's and Anesta's "debts and obligations" under the Contract.  *Eclaire Advisor Ltd.,* 375 F. Supp. 2d at 267.

> ### 3. Teva Ltd.'s Acquisition of Cephalon and Teva's Corporate Structure Further Support the Existence of an Agreement to Assume Cephalon's Duties and Obligations Under the Contract

Third, as pled, Teva Ltd.'s acquisition of Cephalon, when considered alongside Teva's conduct, further supports the existence of "an express or implied agreement" on the part of both Teva Ltd. and Teva USA to assume Cephalon's rights and duties regarding the marketing of Amrix.  *Eclaire Advisor Ltd.*, 375 F. Supp. 2d at 267.

Although Robins's allegation that Teva Ltd. acquired Cephalon, standing alone, would be insufficient to state a claim for successor liability under New York law, *Vasquez,* 2010 WL 1223606, at *10 ("a corporation that purchases the assets of another corporation is not liable for the selling corporation's liabilities" subject to four common law exceptions), Teva Ltd.'s acquisition of Cephalon, *alongside* the Contract's language designating Teva Ltd. as a successor entity *and* the corporate structure of Teva, plausibly allow the inference that Teva Ltd. and Teva USA were assigned the rights to Amrix or became Successor Entities as defined in the Contract.

To show successor liability under New York law through the existence of an express or implied agreement to assume the other company's debts and obligations, Robins submits facts that in 2011, Defendant Teva Ltd., "purchased Cephalon for $6.8 billion."  (Second Am. Compl. ¶ 43.)  After the transaction, Robins alleges that Cephalon became a "wholly owned subsidiary" of Teva Ltd, that Anesta merged with a wholly owned subsidiary of Teva Ltd, and that eventually, Anesta was deleted from the Swiss Commercial Register.  (*Id.* ¶¶ 12, 44–46.)

23

The Contract defines of a "Successor Entity" as a "Buyer following a Change of Control." (Contract § 1.01 (yyy)). In turn, the Contract defines a Change of Control as "a transaction which results in . . . the voting securities of [Cephalon] immediately prior to such transaction ceasing to represent at least fifty percent (50%) of the combined voting power of [Cephalon] or the Successor Entity to [Cephalon] immediately after such transaction." (*Id.* § 1.01(r).) Teva Ltd.'s takeover of Cephalon as a "wholly-owned subsidiary" plausibly establishes a "Change of Control" because the "the voting securities of [Cephalon] immediately prior to such transaction" ceased "to represent at least fifty percent (50%) of the combined voting power of [Cephalon] or the Successor Entity to [Cephalon] immediately after such transaction." (Contract § 1.01(r).) Under the Contract's terms, Teva Ltd., and its wholly owned subsidiary Teva USA, became a "Successor Entity" to Cephalon. (*Id*. § 1.01(yyy)).

These connections, outlined in the Second Amended Complaint, plausibly show that the rights, debts, and obligations associated with Amrix entered the "Teva family of companies" following 2011. (Second Am. Compl. ¶ 53.) If between 2011 and 2019, Teva Ltd. and Teva USA were responsible for the sale and marketing of Amrix, then it reasonably follows that those entities became parties to the Contract: either by the acquisition of Cephalon as a "Successor Entit[ies]" or as assignees.[20] These facts, *combined* with various Teva employees' actions

---

[20] Teva Ltd. and Teva USA also argue that no assignment of the Contract was necessary as "Anesta would retain responsibility to Robins under the Agreement, even if other companies were to sell the drug." (Reply Teva Ltd. & Teva USA Mot. Dismiss 10.) Under this interpretation, Anesta could give Teva the rights to sell Amrix, while maintaining its own responsibilities to use Commercially Reasonable Efforts. This argument materially deviates from the factual allegations in the Second Amended Complaint.

Since 2011, Robins's communications concerning Amrix have been with "Teva USA Teva Ltd., or Teva Int'l . . . . [t]hey have not been with Cephalon or Anesta." (Second Am. Compl. ¶ 47.) Teva employees, not Anesta employees, informed Robins of Teva's marketing and sales efforts—obligations tied to the Commercially Reasonable Efforts clause in the Contract. Furthermore, Del Ricci sent the January 23, 2018 Letter to Robins appearing to state

24

relating to the marketing and sale of Amrix, plausibly show that Teva Ltd. and Teva USA entered into an "express or implied agreement" to undertake Cephalon's "debts and obligations" relating to Amrix.  *Eclaire Advisor Ltd.*, 375 F. Supp. 2d at 267.  The presence of Amrix in Teva's portfolio thus support a reasonable inference that Teva Ltd. and Teva USA assumed rights and obligations under the Contract and are liable for the misconduct alleged.  *Twombly*, 550 U.S. at 556.

Though the issue of successor liability in a contract is a "highly fact-specific" inquiry, *Aguas,* 585 F.3d at 703, the Court concludes that Robins has stated a claim that Teva Ltd. and Teva USA are bound by the Contract either as assignees or successor entities.  At this procedural posture, the allegations support the plausible inference that Teva Ltd. and Teva USA are bound by the Contract, including the Commercially Reasonable Efforts provision in § 4.02(c).  The Court will therefore deny the Teva Ltd. and Teva USA Motion to Dismiss on this ground.

**C.** **Robins States a Plausible Claim that Defendants Breached the Contract by Failing to Use Commercially Reasonable Efforts in The Marketing and Sale of Amrix**

The Court also finds that Robins's Second Amended Complaint states a plausible claim that Defendants breached the Contract and failed to use Commercially Reasonable Efforts in the marketing and sale of Amrix.  The Court first evaluates the language of the Contract.  Based on the language of the Contract, the Court determines that, considering the factors articulated in the Contract, Robins adequately states facts that Amrix's value did not decline between 2015 and 2019.  The Court also concludes that, considering Amrix's unchanged value, Robins's

---

that Teva was bound by the Contract.  (*See* Jan. 23, 2018 Letter.)  So while possible that Anesta could have retained its obligations under the Contract while assigning its rights to Teva, the facts as alleged in Robins's Second Amended Complaint and the supporting documentation provided by Teva suggest the opposite inference.

allegations concerning Defendants's efforts regarding the marketing and sale of Amrix adequately state a claim for breach of the Commercially Reasonable Efforts provision of the Contract under New York law.

### 1.    Legal Standard:  Commercially Reasonable Efforts

In New York, a contract should be "interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."  *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000).  A plaintiff must plead plausible, comparative facts in support of a breach of contract claim where the plaintiff alleges a failure to use Commercially Reasonable Efforts.  "When interpreting the meaning of a 'reasonable efforts' clause, 'New York courts use the term 'reasonable efforts' interchangeably with 'best efforts' . . . [and] a 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities.'"  *Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) (quoting *Monex Fin. Servs. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009)).

Relevant here, the New York Court of Appeals has found that a plaintiff did not state a plausible claim on a breach of a commercially reasonable efforts clause when it "fail[ed] to allege any commercially reasonable step that [defendant] should have taken."  *JFK Holding Co. LLC v. City of New York*, 999 N.E.2d 1161, 1163 (N.Y. 2013); *see also Robert Wood Johnson Univ. Hosp. v. SMX Capital, Inc.*, No. 12cv7049, 2013 WL 4510005, at *4 (D.N.J. Aug. 26, 2013) (dismissing a complaint in part because "Plaintiff does not allege what commercially reasonable efforts or steps, if any, Defendant made or failed to make.")

### 2.   The Commercially Reasonable Efforts Provision in the Contract

The Court begins, as it must, with the "language of the contract." *Morgan Stanley Group*, 225 F.3d at 275.  Because a significant amount of Robins's earnings from its sale of the rights to Amrix depended on the future sales of Amrix, the Contract provides that "Anesta, its Affiliates, and any Successor Entity" will, at all times, use "Commercially Reasonable Efforts" with respect to the marketing and sale of Amrix.  (Second Am. Compl. ¶¶ 33–34; *see* Contract § 4.02(c).)  The Contract defines "Commercially Reasonable Efforts" as:

> [W]ith respect to any Person, the efforts and resources that would be used (including the promptness in which such efforts and resources would be applied) by such Person consistent with its normal business practices, which in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry for a company similar in size and scope to such Person, with respect to a product at a similar stage in its development or product life taking into account efficiency, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product.

(Contract § 4.02(c).)  The Contract thus defines Commercially Reasonable Efforts as, at a minimum, the "level of efforts and resources standard in the pharmaceutical industry" that a "company similar in size and scope" to Defendants would employ in marketing a product at a similar stage in development to Amrix.  (*Id.*)

To determine whether Robins has adequately alleged a breach of the Commercially Reasonable Efforts provision, the Court must assess:  (1) Robins's allegations regarding the profitability of Amrix during the time in question using the five factors established by the Contract; and, (2) Robins's allegations regarding Defendants' efforts in marketing and selling Amrix and how those efforts compare to those of a similarly sized pharmaceutical company.  Considering these two factors, and reading the Second Amended Complaint in the light most

favorable to Robins, Robins plausibly alleges that Defendants' efforts in marketing and selling

Amrix fell below those of a company similar in size and scope in the pharmaceutical industry.

### 3. Amrix Did Not Decline in Commercial Value, Safety, Effectiveness, Competitiveness, or Proprietary Position Between 2015 and 2019

First, Robins plausibly alleges that nothing about Amrix or the market could explain the

drop in sales. Robins advances detailed factual allegations that Amrix did not decline in

"efficiency, safety, commercial value . . . competitiveness . . . [or] proprietary position."

(Contract § 4.02(c).) In the Second Amended Complaint, Robins states that since 2016 "Amrix's

net sales have dropped precipitously," (Second Am. Compl. ¶ 57), yet "[t]here was nothing about

Amrix itself to explain this precipitous drop," (*id.* ¶ 59). "Amrix has been shown to be safe and

effective, and there . . . were no studies during the relevant period calling into question Amrix's

safety and efficacy." (*Id.* ¶ 60.)

There similarly were no changes in applicable market conditions between 2014 and 2019:

(1) Amrix remained "under patent and is the only extended-release form of cyclobenzaprine

hydrochloride on the market;" (2) there "are no lower-cost substitutes that are safer and more

effective than Amrix;" and, (3) there were "no changes in the patent status of competing drugs

that could account for the drastic decline in sales that Amrix experienced." (*Id.* ¶¶ 61–63.)

Taking Robins's factual allegations as true, and viewing them in the most favorable light,

Amrix's "commercial value or competitiveness," at the very least, remained steady between

2015 and 2019 considering the factors articulated in the Contract.[21] (*Id.* ¶ 61.)

---

[21] As noted above, the January 23, 2018 Letter from Teva Senior Vice President Francine Del Ricci to Robins includes certain claims about Teva's perspective of why Amrix had declined in sales. In the Memorandum in Support of the Teva Joint Motions to Dismiss, Teva Ltd. and Teva USA encourage the Court to consider Del Ricci's factual assertions and fault Robins for "not even address[ing] (much less refut[ing]) the contrary facts that Ms. Del Ricci laid out in the letters referenced above." (Mem. Supp. Teva Jt. Mots. Dismiss 27.)

**4.      Considering Amrix's Stable Value, Defendants' Drastic Cuts to the Marketing and Sales Budget for Amrix Fell Below the Commercially Reasonable Efforts Required by the Contract**

Second, because Amrix did not decline in market value under the factors articulated in the Contract, Robins's assertions that Teva made drastic cuts to the marketing and sales budget for Amrix suffices to state a claim for breach of the Commercial Reasonable Efforts provision.

In its September 18, 2019 Memorandum Opinion, the Court identified two flaws in Robins's Amended Complaint.  First, the Court found that while Robins alleged facts that were "consistent" with liability, it stopped short of including "factual allegations pertaining to 'what commercially reasonable efforts or steps, if any, Defendant made or failed to make.'"  (Sept. 18, 2019 Mem. Op. 10 (quoting *Robert Wood Johnson Univ. Hosp.*, 2013 WL 4510005, at *4)).  Second, looking to the five factors articulated in the Contract for assessing Amrix's viability, the Court found that while Robins broadly alleged that Teva cut its marketing and sales budget, it made no comparative "allegation that a company similar in size and scope would not have made

---

Because the Court cannot weigh competing factual claims about Amrix at this stage of the litigation, the Court will not consider Del Ricci's claims for the truth of their representations about Amrix.  Although Robins attached portions of its emails with Del Ricci to its Second Amended Complaint, it would be inappropriate to consider her emails and letters for the veracity of her claims concerning the viability of Amrix.  "Plaintiffs attach exhibits to their complaints for all sorts of reasons."  *Goines v. Valley Comm. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) (internal citations omitted).  "Accordingly, before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it."  *Id.*

Here, Robins attached these documents to show that Teva was "stonewalling" Robins, (Compl. ¶¶ 98, 101), by failing to provide Robins with the marketing and sales information regarding Amrix.  Robins did not adopt the factual statements of Del Ricci as true; statements which appeared to have been prepared with an eye towards litigation.  (*See* Jan. 23, 2018 Letter 1 ("Your letter includes a number of inaccuracies, and your suggestion that Teva may have breached its obligations, under Section 4.2, to market AMRIX using Commercially Reasonable Efforts is patently false.")  At this procedural posture, the Court is ill-equipped to weigh the factual allegations of the Second Amended Complaint against Del Ricci's denials and counter-factual assertions.

the same the reductions." (*Id.* 11.)  The Court finds that Robins has remedied both of those deficiencies in its Second Amended Complaint.

Regarding Robins's beefed up effort to allege facts to undergird its claim of liability, the Second Amended Complaint includes detailed factual allegations concerning what "commercially reasonable efforts or steps . . . Defendant[s] made or failed to make." *Robert Wood Johnson Univ. Hosp.,* 2013 WL 4510005, at *4.  Robins contends that Defendants stopped using Commercially Reasonable Efforts in three ways, by cutting:  (1) the Amrix sales force; (2) the co-pay card program; and, (3) the discount coupon program.  (Second Am. Compl. ¶ 103.) Robins avers that each of these programs were necessary to "meet Commercially Reasonable Efforts" yet Defendants made cuts in the sales force and essential programs "substantially and unreasonably."  (*Id.*)  For example, in its communications with Robins, Teva stated that it was "no longer offering copay coupons [for Amrix], a marketing component recognized in the industry as *critical to successful sales efforts* for brand name prescription drugs like Amrix, but failed to explain why."  (*Id.* ¶ 87 (emphasis added).)  Teva similarly cut its number of sales representatives from 324 in 2012—"the number of sales representatives required to satisfy Commercially Reasonable Efforts"—and "refused to state how many sales representatives were marketing Amrix" in 2017.  (*Id.* ¶¶ 78–79, 84.)

Regarding Robins's contentions that Teva failed to make Commercially Reasonable Efforts in marketing and sales, the Court concludes that Robins alleges sufficient comparative claims "that a company similar in size and scope would not have made the same the reductions." (Sept. 18, 2019 Mem. Op. 11.)  Indeed, Robins explicitly states that "Teva's slashing of its marketing and sales efforts for Amrix are not justified . . . . and a company similar in size and scope to Cephalon, Teva USA, or Teva Ltd. would not have made the same reductions in sales

force, marketing budget, and marketing efforts made by Teva."[22]  (Second Am. Compl. ¶¶ 104–05.)

In further support of this contention, Robins also plausibly notes the reason for Defendants' failure to use Commercially Reasonable Efforts:  Teva's declining financial condition.  Specifically, between 2015 and 2019, Teva "had to pay $1.2 billion to settle an antitrust claim," undertook "$33.75 billion in debt" to finance an acquisition, and "paid the U.S. government . . . $519 million for having violated the Foreign Corrupt Practices Act."  (*Id*. ¶¶ 68–70.)  As a result of these expenses and "other poor decisions" Teva's stock fell dramatically.  (*Id*. ¶ 71.)  Robins alleges that Defendants' "straitened financial position . . . caused Defendants to sacrifice Amrix [by] shifting its marketing efforts to other products."  (*Id*. ¶ 75.)  Taken together, Robins states that Defendants failed to use Commercially Reasonable Efforts by making certain budget reductions, they made such reductions because of their weakened financial condition, and another company of similar size and scope would not have made the same reductions.

Teva argues that "courts have repeatedly recognized that commercially reasonable efforts provisions do not require a company to disregard its own financial condition" and cites three cases in support of that proposition.  (Mem. Supp. Teva Jt. Mots. Dismiss 24.)  This Court has also noted that "[c]ompanies often change their budgets and sales efforts for certain products to

---

[22] Teva contends that, in order to meet this criterion, Robins would have to provide more detail about "how other reasonable companies would have marketed a comparable drug, and why the Amrix marketing plan fell below that level."  (Mem. Supp. Teva Jt. Mots. Dismiss 27.)  Similarly, in Reply, Teva states that Robins does not compare Teva's actions to those "of a similarly situated company competing in a similar marketplace with a similar product."  (Reply Teva Jt. Mots. Dismiss 6, ECF No. 68.)  This overstates the Court's ruling and the law.  At this early stage, Robins need not necessarily plead in the affirmative exactly what a company should do vis-à-vis a different company.  That level of specificity comments to a heightened pleading standard.  Given the context and detail presented in the Second Amended Complaint, Robins has satisfied its burden at the motion to dismiss stage.

adapt to an everchanging market-place." (Sept. 18, 2019 Mem. Op. 11.) Yet the Court cannot weigh whether Teva's reductions in marketing and sales for Amrix, despite the drug's alleged continued viability, were commercially *reasonable* without further factual development. Notably, each of the cases cited by Teva considered a business's financial condition at the summary judgment stage—not the current procedural posture.[23] And all three of those cases *denied* summary judgment, determining that whether a party had used commercially reasonable efforts in a contract was, as the *Cott Beverages* Court stated, a "factually intense issue." 721 F. Supp. 2d at 926. At this stage of the litigation, taking Robins's factual allegations as true, Robins has stated a claim that a company similar in size and scope to Teva, considering the continued viability of Amrix, would not have cut the key marketing and sales programs necessary to maintain Amrix's profitability.[24]

Robins's additional factual allegations set its twenty-page Second Amended Complaint apart from those cases relied upon by this Court in its September 18, 2019 Memorandum Opinion. For instance, in *Soroof Trading Development Company*, the plaintiff asserted that a defendant had failed to use "reasonable efforts to supply" fuel cells under the terms of a contract.

---

[23] *See, e.g., Bear Stearns Funding, Inc. v. Inerace Grp.-Nev., Inc.*, No. 03cv8259, 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007) (finding on summary judgment that plaintiff's arguments about failure to use commercially reasonable efforts "intrude too greatly upon Bear Stearns' business discretion"); *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 926 (E.D. Cal. June 14, 2010) (finding on summary judgment "that 'commercially reasonable efforts' permits the performing party to consider its economic business interests"); *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. 03cv5441, 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005) (finding that "[n]o business would agree to perform to its detriment" but determining that standard of commercial reasonableness was fact driven assessment precluding disposition at the summary judgment stage.")

[24] While the Court may weigh Teva's financial position at the summary judgment stage, a defendant may not escape the requirements of a Commercially Reasonable Efforts provision by merely stating that its own financial condition required it to cut its marketing and sales budget for a product.

842 F. Supp. 2d at 512.  The *Soroof* court dismissed that bare allegation, finding that the

"[Plaintiff] provides no facts—such as specific instances of delay, facts regarding what efforts

were lacking, or even allegations concerning [defendant's] capabilities and its failure to live up

to them—to support these conclusory statements.  *Id*.  Here, unlike the plaintiff in *Soroof*, Robins

has made more than conclusory accusations against Defendants.  Robins has cited specific facts

regarding "what efforts were lacking" in the marketing and sales of Amrix; specifically,

Defendants unreasonable cuts to its marketing personnel, its co-pay program, and discount-

coupon program.  *Id*.

Similarly, in *Robert Wood Johnson,* the plaintiff filed suit for failure to use commercially

reasonable efforts regarding the construction of a solar facility, but the complaint alleged only

that defendant failed to make "commercially-reasonable efforts to satisfy the Conditions

Precedent."  2013 WL 4510005, at *4.  The district court dismissed the complaint, determining

that it "does not allege what commercially reasonable efforts or steps, if any, Defendant made or

failed to make."  *Id*.  By contrast to the bare allegation in *Robert Wood Johnson*, Robins has

identified a number of specific steps Defendants failed to make in the marketing and sale of

Amrix between 2015 and 2019.

"Under New York law, a cause of action for breach of contract requires '(1) the existence

of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract

by the defendant, and (4) damages."  *Benihana of Tokyo, LLC,* 259 F. Supp. 3d at 33.

Considering the Second Amended Complaint's additional, comparative factual allegations

concerning Defendants' efforts regarding Amrix, the Court concludes that Robins has pleaded

33

(or pled) sufficient facts to state a breach of contract claim against Defendants.[25]  The Court will therefore deny Defendants' Motions to Dismiss brought pursuant to Rule 12(b)(6).  (ECF Nos. 58, 60, 70.)

### IV.  Analysis:  Personal Jurisdiction

For the reasons stated below, the Court concludes that it has personal jurisdiction over Teva Ltd.[26]  It will therefore deny Teva Ltd.'s Motion to Dismiss pursuant to Rule 12(b)(2). (ECF No. 57.)

### A.    Legal Standard:  Personal Jurisdiction & Forum Selection Clauses

In the United States Court of Appeals for the Fourth Circuit a valid forum-selection clause may "act as a waiver to objections to personal jurisdiction."  *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 n.11 (4th Cir. 2009) (internal citations omitted); *see also W.L. Gore & Assocs. v. Medtronic, Inc.*, 778 F. Supp. 2d 667, 671 (E.D. Va. 2011) ("A valid forum selection clause allows for personal jurisdiction in the chosen forum under the principles of 'contractual consent or waiver'") (internal citations omitted).

 "[W]hen parties to a contract confer jurisdiction and venue on a particular court, as a general matter federal common law directs courts to favor enforcement of the agreement, so long as it is not unreasonable."  *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 649 (4th Cir. 2010).  "This presumption of enforceability, however, only applies if the forum selection clause is mandatory rather than permissive."  *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's*

---

[25] Defendants do not contest, at this stage, that Robins has performed under the Contract or that it has sufficiently pled damages from breach.  As stated above, although Teva Ltd. and Teva USA argue that Robins has not stated sufficient facts to find "the existence of an agreement" as to those entities, the Court finds their arguments unavailing.  *Benihana of Tokyo, LLC*, 259 F. Supp. 3d at 33.

[26] The other three Defendants, Teva USA, Teva Int'l, and Cephalon, do not contest personal jurisdiction in the Eastern District of Virginia.

*Def. Acquisition Program Admin.*, 884 F.3d 463, 470 (4th Cir.), *as amended* (Mar. 27, 2018), cert. denied sub nom. *Republic of Korea's Def. Acquisition Program Admin. v. BAE Sys. Sol. & Servs., Inc*., 139 S. Ct. 209 (2018)

"A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere." *Id*. "[A] forum selection clause is 'mandatory,' [if] it contains some language requiring that 'the designated courts are the only ones which have jurisdiction.'" *Unistaff, Inc. v. Koosharem Corp.*, 667 F. Supp. 2d 616, 619 (E.D. Va. 2009) (internal citations omitted). Courts have determined that "[w]ords such as 'shall,' 'only' or 'exclusive' are often indicators that a clause is mandatory rather than permissive." *Id*.

Where a forum selection clause does not confer personal jurisdiction, a Defendant's conduct may satisfy Virginia's long arm statute and due process. "[F]ederal courts exercise personal jurisdiction in the manner provided by state law . . . ." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). Therefore, a district court must first decide whether Virginia state law permits the court to exercise personal jurisdiction over the defendant, and second, whether the exercise of such jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Id.*; *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).

"Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, . . . 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36

(4th Cir. 1996)) (internal citation omitted).  Accordingly, the inquiry becomes whether the defendants maintain sufficient minimum contacts with the forum state so as not to offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst*, 334 F.3d at 397.  "If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction. . . . [I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State."[27] *ALS Scan*, 293 F.3d at 712 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U .S. 408, 414 & nn.8–9 (1984)).

The Fourth Circuit has adopted a three-part test to determine whether specific jurisdiction exists. *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013) (citing *ALS Scan*, 293 F.3d at 712).  The Court must consider:  "(1) the extent to which the defendant purposely availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and[,] (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (quoting *ALS Scan*, 293 F.3d at 712).  "If,

---

[27] General jurisdiction exists only when a defendant's "affiliations with the [s]tate are so 'continuous and systematic' as to render [it] *essentially at home* in the forum [s]tate.'" *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (emphasis added).  Nothing in the record indicates, and Plaintiff does not contend, that Teva Ltd. engaged in "continuous and systematic" activities within Virginia.  *ALS Scan*, 293 F.3d at 712.  Consequently, the Court's inquiry focuses on whether Teva Ltd.'s conduct allows the Court to exercise specific personal jurisdiction over Teva Ltd.

and only if . . . the plaintiff has satisfied this first prong . . . need [the Court] move on to a consideration of prongs two and three." *Consulting Eng'rs*, 561 F.3d at 278.

Because the Court has not held an evidentiary hearing on the jurisdictional issue, Robins need only make a *prima facie* case of personal jurisdiction. *Carefirst*, 334 F.3d at 396. At this procedural posture, the Court must also make all inferences in favor of jurisdiction. *See Brooks v. Motsenbocker Adv. Devs., Inc.,* 242 F. App'x 889, 890 (4th Cir. 2007).

> **B.      The Court May Exercise Personal Jurisdiction Over Teva Ltd. Because Robins Has Made a *Prima Facie* Case That the Contract's Forum Selection Clause Binds Teva Ltd.**

The Court will deny Teva Ltd.'s Motion to Dismiss for lack of personal jurisdiction for the reasons discussed below. First, the Court finds that the forum selection clause in § 13.11 of the Contract is a valid forum selection clause which waives personal jurisdiction. Second, the Court concludes that Robins has stated a *prima facie* case that the Contract's forum selection clause binds Teva Ltd. Third, Teva Ltd. has not shown that applying the forum selection clause would be unreasonable or unjust in the circumstances before this Court. Fourth, an additional reason for denying Teva Ltd.'s Motion to Dismiss pursuant to 12(b)(2) exists; namely, that the facts integral to the issue of personal jurisdiction are intertwined with those central to the merits of the dispute.

> **1.      A Valid Forum Selection Clause, Such as the Mandatory One Found in Contract § 13.11, May Act as a Waiver to Personal Jurisdiction**

"[W]hen parties to a contract confer jurisdiction and venue on a particular court, as a general matter federal common law directs courts to favor enforcement of the agreement, so long as it is not unreasonable." *Albemarle,* 628 F.3d at 649. In the Fourth Circuit, a valid forum-selection clause may "act as a waiver to objections to personal jurisdiction." *Consulting Eng'rs*, 561 F.3d at 282 n.11 (internal citations omitted); *see also W.L. Gore,* 778 F. Supp. 2d at 671 ("A

valid forum selection clause allows for personal jurisdiction in the chosen forum under the principles of 'contractual consent or waiver'") (internal citations omitted).  Furthermore, "where one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation." *Hawkins*, 935 F.3d at 227 (internal citations omitted).

Section § 13.11 of the Contract contains a forum selection clause.  The language of the forum selection clause is mandatory.  The forum selection clause states, in relevant part, that:

> Each party hereby irrevocably submits to the jurisdiction of, and agrees that any action arising out of this Agreement *shall* be brought in, (i) the United States District Court for the Southern District of New York or, if such federal jurisdiction is unavailable, the state courts in the Borough of Manhattan, City of New York, (ii) the United States District Court for the Eastern District of Pennsylvania or, if such federal jurisdiction is unavailable, the state courts in the County of Chester, Pennsylvania, or (iii) *the United States District Court for the Eastern District of Virginia* or, if such federal jurisdiction is unavailable, the state courts in the City of Richmond, Virginia, and each party hereby irrevocably waives any objection which such party may now or hereafter have to the laying of improper venue or forum non conveniens in any such jurisdiction.

(Contract § 13.11 (emphases added).)  This mandatory language provides that the parties "agree[] that any action arising out of this Agreement *shall* be brought in" one of the three specified federal jurisdictions, or their state court counterparts.  (*Id.* (emphasis added).)  *See Unistaff*, 667 F. Supp. 2d at 619 ("Words such as 'shall,' 'only' or 'exclusive' are often indicators that a clause is mandatory rather than permissive.")  Because the forum selection clause is mandatory, the forum selection clause is presumed to be enforceable, *BAE Sys. Tech. Sol. & Servs., Inc.,* 884 F.3d at 470, "so long as it is not unreasonable." *Albemarle Corp,* 628 F.3d at 649.

Teva Ltd. does not argue that the forum selection clause is unreasonable or fraudulent. *See W.L. Gore & Assocs.*, 778 F. Supp. 2d at 671 ("[F]orum selection clauses are valid and

accepted unless they are clearly unreasonable or fraudulent." (internal citation omitted))  And, as discussed further below, application of the forum selection clause to Teva Ltd. would not be unreasonable or unjust. Rather, Teva Ltd. argues that it is not bound by the Contract's forum selection clause because "Anesta's independent decision to submit to jurisdiction in the Commonwealth does not confer personal jurisdiction over Teva Ltd., which is a separate legal entity that had nothing to do with Anesta at the time of the [Contract]."  (Mem. Supp. Teva Jt. Mots. Dismiss 19.)  For the reasons below, however, Robins has set forth a *prima facie* case that Teva Ltd. is bound by the forum selection clause in Contract § 13.11.

### 2. Robins Has Made a *Prima Facie* Showing of Personal Jurisdiction By Alleging that Teva Ltd. Was Assigned Rights Under the Contract and By Stating a Claim That Teva Ltd. Is Bound By the Contract

At this procedural posture, Robins need only make a *prima facie* showing of personal jurisdiction over Teva Ltd.  Drawing all inferences in favor of jurisdiction, *Brooks*, 242 F. App'x at 890, Robins has made that *prima facie* showing by alleging that Teva Ltd. assigned itself rights under the Contract and by stating a claim that Teva Ltd. entered into an express or implied agreement to undertake Cephalon and Anesta's debts and obligations.

A plaintiff can establish a *prima facie* showing of personal jurisdiction by alleging that the defendant is the successor-in-interest to or assignee of an agreement that contains a valid consent to jurisdiction.  *Vianix Delaware v. Nuance Comms.*, 637 F. Supp. 2d 356, 362 (E.D. Va. 2009) ("Accepting as true the allegation that [the defendant] is the successor of [the contract signer], it appears that [the defendant] would be bound by the forum selection clause in the License, since the License is binding on each party's successors"); *Hawkins*, 935 F.3d at 227 ("[W]here one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation.")

The Contract states that "[t]his Agreement is binding upon . . . the parties hereto and their respective successors and permitted assigns." (Contract § 13.07.) In the Second Amended Complaint, Robins alleges that Teva Ltd. is one such "successor[] and permitted assigns" and is therefore "bound by the Agreement." (Second Am. Compl. ¶¶ 53–54.) Accepting Robins's factual allegations as true, as the Court must at this procedural posture, Robins has established a *prima facie* case that the forum selection clause binds Teva Ltd., rendering it subject to personal jurisdiction in the Eastern District of Virginia.

Teva Ltd. argues that *Vianix* "is irrelevant" because the "law in New York is different: An acquiring company does not assume the seller's obligations." (Reply Teva Jt. Mots. Dismiss 7 n.2.) But that argument fails for two reasons. First, Robins alleges that Teva Ltd. has assumed Cephalon and Anesta's obligations. The Court cannot discredit that factual allegation in assessing personal jurisdiction.

Second, as stated above, the Second Amended Complaint includes sufficient factual allegations concerning Teva Ltd.'s conduct regarding Amrix, including Teva Ltd.'s acquisition of Cephalon, Teva's marketing and sales efforts regarding the drug, and Teva's corporate structure, to state a claim that Teva Ltd. undertook Cephalon and Anesta's debts and obligations under the Contract. (*See supra* § III(B).) Put simply, if Teva Ltd. entered into "an express or implied agreement to assume" [Cephalon's] "debts and obligations" under the Contract, *Eclaire Advisor Ltd.*, 375 F. Supp. 2d at 267, then it is also bound by the Contract's forum selection clause.[28]

_____

[28] Teva Ltd.'s argument also ignores the language of the Contract. The Contract states that "[t]his Agreement is binding upon . . . the parties hereto and their respective successors and permitted assigns." (Contract § 13.07.) While it is true that in New York an acquiring company does not automatically assume the seller's obligations, that is exactly the factual scenario that Robins alleges here and that the plain language of the Contract contemplates. Robins alleges that

At this stage of the litigation, Robins has stated a *prima facie* case of personal jurisdiction over Teva Ltd.  Because Robins has succeeded in stating a claim that Teva Ltd. inherited Anesta and/or Cephalon's liabilities, the forum selection clause may be applied to Teva Ltd.  *Hawkins*, 935 F.3d at 227 ("where one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation.")  Because the Court finds below that enforcement of the forum selection clause is neither unreasonable nor unjust, the Court will exercise personal jurisdiction over Teva Ltd.

### 3. Teva Ltd. Has Not Shown That Enforcement of the Forum Selection Clause Would Be Unreasonable or Unjust

The Court does not find application of the forum selection clause to Teva Ltd. would be unreasonable or unjust.

While a forum selection clause may "act as a waiver to objections to personal jurisdiction," *Consulting Eng'rs*, 561 F.3d at 282 n.11, it may not bind a non-resident defendant

---

Teva Ltd. has been assigned rights under the Contract and is now a "successor[] and permitted assign." (Second Am. Compl. ¶¶ 53–54.)  As stated above, the Court cannot, at this procedural posture, discredit that factual allegation.  Under the plain language of the Contract, the forum selection clause in § 13.11 binds Teva Ltd. as a permitted successor or assign.

The language of the Contract separates the case at bar from those Teva Ltd. cites in its Reply in Support of its Joint Motions to Dismiss.  (Reply Mem. Supp. Teva Jt. Mots. Dismiss 12.)  For instance, Teva Ltd. relies heavily on *In re Refco Inc. Securities Litigation,* in which the Southern District of New York stated that "even if an agreement purports to bind successors and assigns of the parties to the agreement, 'an assignee or successor will not be bound to the terms of a contract absent an affirmative assumption of the duties under the contract.'"  826 F. Supp. 2d at 494.  But in that case, the operative contract contained a strict limitation on assignment, stating that "[n]o party shall assign the rights or delegate the duties pursuant to this Agreement without the prior written consent of the other parties."  *Id.*  Considering the contract language, the *Refco* Court found that "[t]here is nothing in the Amended Complaint alleging that written consent was obtained to assign [the defendant] the rights and duties pursuant to the Service Agreement."  *Id.*

In contrast, written consent was necessary to assign the rights and obligations under the Contract before the Court.  (*See generally* Contract.)  The allegations in the Second Amended Complaint also suggest that Teva Ltd. affirmatively assumed the duties under the Contract through its conduct.

if the non-resident defendant clearly shows "that enforcement would be 'unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Marathon Res. Mgmt. Grp., LLC v. C. Cornell, Inc*., No. 3:19cv89, 2019 WL 5549195, at *4 (E.D. Va. Oct. 25, 2019) (quoting *The M/S Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 15 (1972)).  Enforcement is deemed "unreasonable and unjust" when (1) agreement to the forum-selection clause was induced by "fraud or overreaching," (2) enforcement "would contravene a strong public policy of the forum in which suit is brought," or (3) trial in the contractual forum will be "so gravely difficult and inconvenient" that the complaining party will "for all practical purposes be deprived of his day in court." *Id*. at *15–19.

Teva Ltd. does not claim that enforcement of the forum selection clause would be unreasonable or unjust on any of the above *M/S Bremen* factors, and the Court sees no basis on the record for concluding that it would be.  No evidence suggests that the forum selection clause was induced by fraud, or that enforcement would contravene a strong public policy of the Commonwealth of Virginia.  *Id*.  Furthermore, while Teva Ltd. is an Israeli company, it is "the world's largest seller of generic drugs" and maintains a wholly owned subsidiary in the United States.  (*See* Second Am. Compl. ¶¶ 10, 11, 43, 68–70.)  It will therefore likely not be "so gravely difficult and inconvenient" for Teva Ltd. to litigate here such that it will "for all practical purposes be deprived of [its] day in court." *M/S Bremen,* 407 U.S. at 18.

Because Teva Ltd. has not met its burden of showing that application of the forum selection clause would be unreasonable or unjust, the Court will apply the forum selection clause to Teva Ltd. and exercise personal jurisdiction over it.

**4.    Because the Facts Integral to the Issue of Personal Jurisdiction Are Intertwined With Those Central to the Merits of the Dispute, the Court Should Resolve the Issue By a Proceeding on the Merits**

Although Robins's allegations are sufficient for a finding of personal jurisdiction at this procedural posture, the Court notes another related reason for denying Teva Ltd.'s Motion to Dismiss pursuant to Rule 12(b)(2).  In matters involving a challenge to personal jurisdiction, the Fourth Circuit has cautioned that "'where the jurisdictional facts are intertwined with the facts central to the merits of the dispute' deferring resolution of that factual dispute to a proceeding on the merits 'is the better view.'"  *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219  (4th Cir. 1982)); *see also Verizon Online Servs. v. Ralsky*, 203 F. Supp. 2d 601, 609 n.6 (E.D. Va. 2002) ("when jurisdictional facts are inextricably intertwined with underlying claims, the proper course is to resolve the issue by proceeding on the merits"); *Raymond, Colesar Glaspy & Huss, P.C. v. Allied Capital Corp.*, 761 F. Supp. 423, 429 (E.D. Va. 1991) (accord).

In the case at bar, this Court's determination of whether it can permissibly exercise personal jurisdiction over Teva Ltd. turns on whether Teva Ltd. is bound by the Contract, a matter "which is also the heart of the lawsuit itself."  *Ralsky*, 203 F. Supp. 2d at 609 n.6. Because the facts the Court must consider in assessing personal jurisdiction are "inextricably intertwined with underlying claims" for breach of contract, and Robins has succeeded in stating a *prima facie* case of personal jurisdiction, "the proper course is to resolve the issue by proceeding on the merits." *Id.*

The Court acknowledges that Teva Ltd. has filed a declaration from the Secretary of Teva USA asserting that "Teva Ltd. has never been assigned the rights to Amrix or any of the rights and obligations under the Agreement."  (Mem. Supp. Teva Jt. Mots. Dismiss Ex. 5 "Decl. Brian

43

Shanahan" ¶ 8, ECF No. 59-5.)  The Shanahan Declaration also avers that Teva Ltd. "did not

assume any of the rights or obligations under the Agreement . . . and that it has not assumed any

of the rights or obligations under the Agreement at any other point in time."  (*Id.* ¶ 7.)  But the

Court will not consider the Shanahan Decleration here.  As the *Ralsky* Court stated, "the court

should not weigh the controverting assertions of the party seeking dismissal because to do so

would allow [the] Defendant[] to 'avoid personal jurisdiction simply by filing an affidavit

denying all jurisdictional facts.'"  *Id.*  (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257,

1262 (6th Cir. 1996) (finding it appropriate to prevent "non-resident defendants from regularly

avoiding personal jurisdiction simply by filing an affidavit denying  all jurisdictional facts.")

Because Robins has stated a *prima facie* case of jurisdiction, and the jurisdictional facts

necessary to resolve the jurisdictional issue are intertwined with the facts that are central to the

merits of the dispute, the Court will deny Teva Ltd.'s Motion to Dismiss for lack of personal

jurisdiction pursuant to Rule 12(b)(2).

## V.  Conclusion

For the foregoing reasons, the Court will deny Defendant Teva Ltd.'s Motion to Dismiss

brought pursuant to Federal Rule of Civil Procedure 12(b)(2), (ECF No. 57), and Defendants'

Motions to Dismiss brought pursuant to Rule 12(b)(6), (ECF Nos. 58, 60, 70).

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: September 25, 2020
Richmond, Virginia

44