**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| E. CLAIBORNE ROBINS COMPANY, INC.,<br><br>Plaintiff<br><br>v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICALS INTERNATIONAL GMBH AND CEPHALON, INC.,<br><br>Defendants. | Civ. Action No. 3:18-cv-00827-DJN |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), Teva Pharmaceutical USA, Inc. ("Teva USA"), Teva Pharmaceuticals International GmbH ("TPIG"), and Cephalon, Inc. ("Cephalon") (collectively, "Defendants"), submit the following as their Memorandum of Law in Support of Motion for Summary Judgment.

## INTRODUCTION

Teva Ltd. is not subject to personal jurisdiction in this Court—it is an Israeli corporation that has no physical presence in this jurisdiction, and does not do business here. Despite the lack of the requisite minimum contacts, Plaintiff claims the exercise of jurisdiction over Teva Ltd. is proper because it is bound by a forum selection clause in the Asset Purchase Agreement (the "Agreement"). Although this Court previously concluded that Plaintiff had adequately alleged a *prima facie* case of personal jurisdiction over Teva Ltd. under the theory that Teva Ltd. was bound by the forum selection clause, those allegations, still unproven at the close of discovery, are not enough to allow Plaintiff's claim against Teva Ltd. to be heard in this Court.

Discovery has confirmed that Teva Ltd. was never assigned any rights to Amrix, never expressly assumed any obligations or liabilities under the agreement related to Amrix, and did not engage in conduct that could even conceivably be construed as an implied assumption of any duties, obligations, or liabilities under that agreement. On this record, there is simply no genuine dispute of material fact that Teva Ltd. is not bound by the forum selection clause under any theory that could allow it to be hauled into this Court. As a result, Teva Ltd. is entitled to judgment as a matter of law and Plaintiff's case against Teva Ltd. should be dismissed.

Even if Teva Ltd. were subject to personal jurisdiction in this Court (which it is not), summary judgment would still be appropriate as to *all* Defendants because Plaintiff's theory of breach is predicated on an inaccurate understanding of the law: that the "Commercially Reasonable Efforts" provision (the "CRE Provision") of the parties' agreement precludes consideration of

Defendants' overall financial condition and maximization of profitability across its full portfolio of products. Plaintiff, in its pleadings and now through its expert disclosures, has made clear that its theory does not permit the assessment of commercially reasonable efforts to take into account the overall profitability of Defendants' full portfolio of products and Defendants' financial condition as a whole. Indeed, Plaintiff's whole theory is that Defendants' alleged elimination of sales force and marketing support for Amrix was ***necessitated*** by Defendants' financial condition. It follows, then, that if Defendants' financial condition and related factors are appropriately taken into account in assessing Defendants' reasonableness—and indeed they are, for the reasons set forth below—then Defendants' alleged conduct must have been commercially reasonable.

The law is clear that the reasonableness of a party's actions can (and should) take into account the party's overall financial position, and the steps needed to protect it. *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, --- F. Supp. 3d ---, 2021 WL 3604850, at *10 (S.D.N.Y 2021) ("A commercially reasonable efforts clause is not a 'hell or high water' clause tying the signatory to use all efforts possible, no matter the cost."). Plaintiff ignores that Defendants have a "legal privilege to protect" their "business interests," which includes an interest in saving a company from financial collapse. *See Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018) ("'[C]ommercially reasonable efforts' clause requires . . . something less than a degree of efforts that jeopardizes one's business interests."). Even accepting as true Plaintiff's allegations that Defendants eliminated all sales support for Amrix in 2017, Defendants' decisions, according to Plaintiff, were to avoid financial collapse, an interest protected by the law that directly undermines Plaintiff's breach theory. *Id.* Accordingly, Defendants respectfully request this Court enter summary judgment on Plaintiff's breach of contract claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### A. The Agreement, Guaranty, and Early Inter-Company Agreements.

1. Under the August 23, 2007 Asset Purchase Agreement (defined above as the "Agreement"), Plaintiff sold Amrix, a branded skeletal muscle relaxant, to Anesta AG ("Anesta") in exchange for a one-time "Base Purchase Price" of $100 million and the right to future "Net Milestone Payments" if Amrix hit certain sales targets. Ex. 1, Agreement §§ 4.01, 4.02(a). Plaintiff's right to "Net Milestone Payments" ended upon the "Net Sales Milestone Termination Date," which is the later of either 12 years after the Agreement's Closing Date or the first sale of a generic version of Amrix. *Id.* §§ 4.02(a), 1.01 (bbb). Plaintiff and Anesta are the only signatories to the Agreement. *Id.* at 50-51.

2. Therein, Anesta promised to "use, or to cause its Affiliates to use, Commercially Reasonable Efforts with respect to the marketing and sale of [Amrix.]" *Id.* § 4.02(c).

3. Section 4.02(c) of the Agreement defines "Commercially Reasonable Efforts" as:

> with respect to any Person, the efforts and resources that would be used (including the promptness in which such efforts and resources would be applied) by such Person consistent with its normal business practices, which in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry for a company similar in size and scope to such Person, with respect to a product at a similar stage in its development or product life taking into account efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product. [(previously defined as the "CRE Provision")]

4. If the CRE Provision is breached "between the Closing Date and the Net Milestone Termination Date," then Plaintiff is entitled to a penalty "equal to 50% of (A) $255 million less (B) the aggregate amount of all Net Sales Milestone Payments" Plaintiff had received. *Id.* § 4.02(c).

5. The Agreement is governed by New York law. *See id.* § 13.10.

6. The Agreement includes a choice of venue provision that provides: "any action arising out of this Agreement shall be bought in" the state or federal courts of one of three states, including "the United States District Court for the Eastern District of Virginia," and that "each party hereby irrevocably waives any objection which such party may now or hereafter have to the laying of improper venue or *forum non conveniens* in any such jurisdiction." *Id.* § 13.11.

7. On the same day as Plaintiff and Anesta signed the Agreement, Plaintiff also entered into a separate contract with Anesta's parent company, Cephalon (the "Guaranty"). Cephalon was not a party to the Agreement, but through the Guaranty agreed to act as a guarantor, stating that it would "discharge or satisfy," or cause Anesta or another "affiliated or related entity . . . to discharge or satisfy," each of Anesta's obligations under the Agreement. *See* Ex. 2, Guaranty.

8. In 2007, Anesta entered into a services agreement with Cephalon whereby Anesta appointed Cephalon as its nonexclusive distribution service provider for Amrix in the United States. *See generally* Ex. 3**,** Services Agreement, §1(a). Anesta also appointed Cephalon to promote and detail Amrix to healthcare providers. *See id.* § 1(b).

**B. Teva Ltd.'s Acquisition of Cephalon and Changes in Corporate Structure.**

9. In 2011, an indirect, wholly-owned Delaware subsidiary of Teva Ltd., Copper Acquisition Corp., merged with Cephalon. *See* ECF No. 59-5, ¶ 6, Decl. of B. Shanahan. The Agreement and Plan of Merger ("Merger Agreement") for this transaction provided that the "Merger Sub," Copper Acquisition Corp., would be merged with and into Cephalon with Cephalon surviving the merger. Ex. 4, Merger Agreement § 1.1.

10. Under the Merger Agreement, "all properties, rights, privileges, powers and franchises of [Cephalon] and [Copper Acquisition Corp.] . . . vest[ed] in the Surviving Corporation," which was Cephalon. *See* Merger Agreement § 1.4. Additionally, the Merger

Agreement explicitly provided that "all debts, liabilities and duties of [pre-merger Cephalon] and [Copper Acquisition Corp.] shall become the debts, liabilities and duties of the Surviving Corporation," Cephalon. *See id.*

11. As a result of that merger, Cephalon and Anesta became indirect, wholly-owned subsidiaries of Teva Ltd. ECF No. 59-5, ¶ 6, Decl. of B. Shanahan. Teva Ltd. Cephalon and Anesta remained distinct, fully operational entities post-merger. *See id.* Anesta retained its contractual rights and obligations under the Agreement following the 2011 merger. *See id.*

12. Teva Ltd. was not assigned the rights to Amrix nor did it expressly assume, and was not assigned, any of the rights or obligations under the Agreement as a result of the merger or at any other time. ECF No. 59-5, ¶¶ 7-8, Decl. of B. Shanahan.

13. On December 4, 2012, a wholly-owned subsidiary of Teva Ltd. named IVAX International GmbH ("IVAX") entered into a Merger Agreement with Anesta whereby Anesta became a wholly-owned subsidiary of IVAX. As part of this merger, IVAX assumed all of Anesta's assets and liabilities. Ex. 5, TEVA_AMRIX_00179081. Pursuant to the merger, IVAX, as the successor company to Anesta, held the rights to Amrix.

14. Also in 2012, IVAX entered into a distribution agreement with Teva USA whereby IVAX appointed Teva USA as a nonexclusive distributor of Amrix in the United States. Under that agreement, and the amendments thereto, Teva USA agreed to market, sell, and distribute Amrix in the United States. *See* ECF No. 59-5, ¶ 10, Decl. of B. Shanahan.

15. The agreement between Teva USA and IVAX specifically provided that Teva USA was an independent contractor to IVAX and that Teva USA did not act as a legal representative of IVAX. *See* Ex. 6, Teva Inter-Group Distribution Agreement.

16. IVAX eventually changed its name to Teva Pharmaceuticals International, GmbH ("TPIG"). ECF No. 59-5, Decl. of B. Shanahan ¶ 11. TPIG has maintained a distribution agreement with Teva USA with respect to Amrix, under which TPIG supplies Teva USA with Amrix and Teva USA markets, sells, and distributes Amrix in the United States. *Id.*

17. Costs and expenses for Amrix, such as legal and vendor fees for Amrix-related patent litigation, *see* Ex. 7, TEVA_AMRIX_00608930, and expenses incurred for Amrix marketing and sales efforts, *see* Ex. 8, TEVA_AMRIX_00609038, were paid by Teva USA and invoiced to TPIG.

18. Plaintiff submitted invoices for Net Milestone Payments to IVAX, *see* Ex. 9, ROBINS_0009856, and later to TPIG, *see* Exs. 10-12, TEVA_AMRIX_00054948; TEVA_AMRIX_00058013; TEVA_AMRIX_00315571.

### C. Teva Ltd. Had No Contacts with Virginia and Was Not Responsible for Amrix Marketing Efforts.

19. Teva Ltd. is and always has been a corporation organized and existing under the laws of Israel, and its principal place of business is located in Tel Aviv, Israel. Ex. 13, Decl. of B. Shanahan, ¶ 5.

20. Teva Ltd. is not incorporated under the laws of the United States or Virginia, nor has it registered, or been registered, to do business in Virginia at any time. *See id.* ¶ 6.

21. Teva Ltd. does not engage in and has not been engaged in the transaction of business in Virginia at any time, nor has it reached into Virginia to initiate or solicit any business. *See id.* ¶ 7.

22. Teva Ltd. has no office or other facility anywhere in Virginia and it has no telephone or mailing address in Virginia. *See id.* ¶ 8.

23. Teva Ltd. has not designated any person in Virginia as an authorized agent for service of process, and has not filed or indicated its consent to service of process in Virginia at any time. *See id.* ¶ 9.

24. Teva Ltd. does not own, lease, possess, or maintain and has not owned, leased, possessed, or maintained any real or personal property, office, residence, or place of business in Virginia at any time. *See id.* ¶ 10.

25. Teva Ltd. was never assigned Anesta's, IVAX's, or TPIG's rights to Amrix, nor did it explicitly assume any responsibilities or duties under the Agreement. *See id.* ¶ 16.

26. Teva Ltd. never explicitly assumed, nor was it assigned, Cephalon's responsibilities or duties under the Guaranty. *See id.* ¶ 17.

27. Teva Ltd. does not maintain employees in Virginia or in the United States, including any sales force. *See id.* ¶ 11.

28. Teva Ltd. personnel were not responsible for creating or executing the marketing strategy for Amrix in the United States. *See id.* ¶ 20. Marketing efforts for U.S. products, like Amrix, are typically led by members of a U.S.-based commercial team. *See id.* ¶ 22; *see also id.* ¶ 21 (individuals alleged to have been involved in the marketing of Amrix are not current or former employees of Teva Ltd.). *See also* Ex. 14 (Downey Tr. at 99:14-18) (North American lead with no recollection of more senior people than him making decisions about Amrix); Ex 15 (Hassler Tr. at 132:21-133:8) (responding to question about involvement of the board of directors in product marketing strategy and stating, "I don't believe that they tend to see the specific tactical plans that are associated with [the] brands").

29. Marketing decisions about Amrix were made by individuals in the North American Central Nervous System business unit ("CNS Unit"), which is the business unit that held responsibility for Amrix. *See* Ex. 14 (Downey Tr. 96:18-97:8); Ex. 16 (Jacobs Tr. 34:13-17).

30. The CNS Unit employees reported up to Larry Downey, the former head of North America Specialty Medicines. *See* Ex. 14 (Downey Tr. 22:10-21). Mr. Downey was not a direct employee of Teva Ltd. *See* Ex. 13, Decl. of B. Shanahan ¶ 21.

31. For Amrix, the product brand manager would formulate a marketing strategy that was reviewed by individuals within the CNS Unit before Mr. Downey ultimately approved that strategy. Ex. 17 (Dierks Tr. 50:14-51:8); Ex. 18 (Reckner Tr. 131:4-13). Mr. Downey similarly approved the sales force size for Amrix. Ex. 14 (Downey Tr. 83:1-84:13.)

32. Mr. Downey generally had final responsibility for key Amrix-related marketing decisions. Ex. 14 (Downey Tr. 199:21-200:6) (responsibility for pricing decisions); Ex. 17 (Dierks Tr. 50:4-51:8) (stating brand strategy would be "rolled up" to Larry Downey for final review and approval). Mr. Downey had final approval as to the sales force size for the CNS Unit, which included Amrix. Ex. 14 (Downey Tr. 83:1-84:13); *see also id.* (Downey Tr. 143:3-10) (stating he approved "cutting the sales force [team] . . . to 118"); Ex. 15 (Hassler Tr. 222:17-22) (stating Downey gave Mr. Hassler the directive to eliminate the sales force for Amrix); Ex. 16 (Jacobs Tr. 84:11-85:4) (stating Downey would "sign-off" on "primary detail equivalent" numbers). Although budget amounts were sometimes set at a higher, "corporate level," the determination of the marketing strategy used was ultimately Mr. Downey's "decision based on the analysis that [his team] did product by product and business unit by business unit to decide where was the best place to put that money." Ex. 14 (Downey Tr. 68:4-70:4 and 103:2-12).

33. Teva Ltd. employees did not communicate with Plaintiff about Amrix. *See, e.g.*, Exs. 19-33 (communications between Defendants' employees and Plaintiff). None of the individuals who communicated with Plaintiff were direct employees of Teva Ltd. *See id.*; *see also* Ex. 13, Decl. of B. Shanahan ¶ 21.

34. Neither Teva Ltd. nor its employees manufactured, marketed, promoted, sold, or distributed Amrix in the United States. *See id.* ¶ 18.

**D. Plaintiff's Second Amended Complaint and Motion to Dismiss.**

35. In the operative Second Amended Complaint ("SAC"), Plaintiff asserts a single claim for breach. *See* ECF No. 47, SAC ¶ 1. Plaintiff alleges Defendants failed to comply with the CRE Provision when they "stopped using Commercially Reasonable Efforts" to market and sell Amrix "in 2016." *See, e.g.*, *id.* ¶ 102.

36. Plaintiff asserts that Defendants' alleged failure to use "Commercially Reasonable Efforts" to market and sell Amrix was due to "Teva Ltd.'s poor financial position." *Id.* ¶ 74. Plaintiff explains that Teva Ltd. suffered a "series of financial setbacks," including: (1) having to "pay $1.2 billion to settle an antitrust claim brought by the Federal Trade Commission"; (2) undertaking "significant debt," including "incurring $44.75 billion in debt and concomitant debt-service obligations" in connection with Teva Ltd.'s acquisition of "Allergan PLC's generic drug business"; and (3) paying "the U.S. Government another fine of $519 million for having violated the Foreign Corrupt Practices Act." *Id.* ¶¶ 67-70.

37. Plaintiff alleges that, as a result of Teva Ltd.'s "crushing debt and its stock price's tailspin," "Teva Ltd. and Teva USA took drastic measures to cut costs." *Id.* ¶ 72. In fact, Plaintiff contends "Teva Ltd. and Teva USA slashed billions of dollars of costs across the board, including for marketing and sales," and "stopped undertaking Commercially Reasonable Efforts," "[a]s a

result of Teva Ltd.'s poor financial position. *Id.* ¶¶ 73-74. Put differently, Plaintiff alleges, "Teva's straitened financial position . . . caused Defendants to sacrifice Amrix—shifting its marketing efforts to other products." *Id.* ¶ 75.

38. Plaintiff further alleges, "[i]n evaluating whether Anesta, its Affiliates, or any Successor Entity, has complied with the obligation to use Commercially Reasonable Efforts to market and sell Amrix, the parties are to consider 'efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such products.'" *Id.* ¶ 36 (quoting Agreement § 4.02(c)). Plaintiff contends that "these consideration do *not* include: (1) the obligor's overall financial state, (2) the mix of drugs within the obligor's portfolio, including drugs with similar indications, or (3) whether it would be more profitable for obligor to shift its marketing and sales efforts from Amrix to other products." *Id.* ¶ 37 (emphasis in original[1]).

39. Defendants moved to dismiss the SAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 58, 60, 70. In her ruling, Judge Lauck explained she could not "weigh whether Teva's reductions in marketing and sales for Amrix, despite the drug's alleged continued viability, were commercially *reasonable* without further factual development," but noted, "the Court may weigh Teva's financial position at the summary judgment stage." ECF No. 75, MTD Order, at 32, n.24 (emphasis in original).

40. Teva Ltd. also moved to dismiss Plaintiff's SAC for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). *See* ECF No. 57. In its opposition, Plaintiff effectively conceded that Teva Ltd. did not have minimum contacts with Virginia sufficient for

[1] Unless otherwise noted, as is the case here, all emphasis is added.

the exercise of specific personal jurisdiction over it. *See* ECF No. 65 at 31-34 (failing to respond to Teva Ltd.'s argument that Teva Ltd. lacked minimum contacts with Virginia); *see also* ECF No. 68 at 7. Ultimately, the Court, drawing all inferences in favor of jurisdiction, found "Robins . . . stated a *prima facie* case that the Contract's forum selection clause binds Teva Ltd." MTD Order at 37, 39. Specifically, Judge Lauck noted that the Agreement stated it "is binding upon . . . the parties hereto and their respective successors and permitted assigns," and found Plaintiff adequately pled that Teva Ltd. was a "successor[] and permitted assign[ee]" and therefore "bound by the Agreement." *Id.* at 40 (quoting SAC ¶ 53-54). In doing so, Judge Lauck acknowledged she could not "discredit" the allegation that "Teva Ltd. ha[d] assumed Cephalon and Anesta's obligations" under the Agreement in "assessing personal jurisdiction" at the motion to dismiss stage, and found the SAC contained sufficient "factual allegations" that Teva Ltd. "entered into 'an express or implied agreement to assume' [Cephalon's] 'debts and 'obligations' under the Contract." *Id.* (alteration in original) (citation omitted).

41. Judge Lauck identified only two plausible theories for finding Teva Ltd. was bound by the agreement: (1) "that Teva Ltd. assigned itself rights under the" Agreement; or (2) that Teva Ltd. either expressly or impliedly assumed Anesta or Cephalon's debts and obligations under the Agreement. *See* MTD Order at 39. As to the latter theory, Judge Lauck explained that Plaintiff asserted "three plausible rationales" for Teva Ltd. assuming Cephalon and Anesta's "debts and obligations" under the Agreement: (1) Teva Ltd. expressly assumed Anesta and Cephalon's contractual obligations under the Agreement; (2) Teva Ltd. impliedly assumed the obligations because "Teva employees" conducted themselves as if bound by the Agreement; and (3) "Teva Ltd.'s acquisition of Cephalon and Teva's corporate structure suggest the existence of an express or implied agreement to undertake Anesta and Cephalon's debts and obligations relating to

Amrix." *Id.* at 18; *see also id.* at 23 (Teva Ltd.'s acquisition of Cephalon could support an express or implied assumption of "Cephalon's rights and duties regarding the marketing of Amrix.").

42. In assessing whether Teva Ltd. impliedly assumed debts or obligations under the Agreement, Judge Lauck considered: (1) Plaintiff's allegations that its "communications about Amrix have been with Teva USA, Teva Ltd., or Teva Int'l," *id.* at 20; (2) certain communications between John Jacobs and Francine Del Ricci, on the one hand, and Plaintiff, on the other hand, *id.* at 20-23; and (3) whether Teva was responsible for the marketing of Amrix, *see id.* at 20 ("Teva employees . . . viewed the company as responsible for marketing and selling Amrix . . . ."). Judge Lauck noted the SAC did not show what entity employed Mr. Jacobs and Ms. Del Ricci. *Id.* at 19.

43. Judge Lauck reasoned, "[i]f between 2011 and 2019, Teva Ltd. . . . w[as] responsible for the sale and marketing of Amrix, then it reasonably follows that . . . [it] became [a party] to the Contract: either by the acquisition of Cephalon as a 'Successor Entit[y]' or as [an] assignee[]." *Id.* at 24.

**E. The Expert Reports of Peter A. Lankau.**

44. On November 22, 2021, Mr. Peter A. Lankau issued his expert report on behalf of Plaintiff. *See* Ex. 34, Nov. 22, 2021 Expert Report of Peter A. Lankau ("Lankau Report"). Therein, Mr. Lankau opined, "beginning in 2016 and continuing over the succeeding years," Defendants efforts marketing and selling Amrix did not constitute commercially reasonable efforts as defined by the Agreement. *See generally id.* at 6, 25-26.

45. As part of Mr. Lankau's work, he "considered" the "expert witness report[ ]" of, and data compilations created by, Mr. Davis. *Id.* at 3, 4.

46. In his opening report, Mr. Lankau opined that it was "Teva's financial condition" that necessitated "significant budget cuts," including the "elimination of the Amrix field sales force" in July 2017. *Id.* at 14-15.

47. While it is true that by November 2017, field sales force had transitioned off of Amrix, internal sales efforts on Amrix remained active. *See* Ex. 35, Dec. 6, 2021 Expert Rebuttal Report of John Russell at 35.

48. In the Rebuttal Expert Report of Peter A. Lankau ("Rebuttal Report"), Mr. Lankau maintained that [redacted] *Id.* at 24.

49. Mr. Lankau relied on Appendices I, J, and L, which purport to show [redacted] *Id.* at App. I, J, and L.

**F. The Expert Report of Guy A. Davis.**

50. On November 22, 2021, Plaintiff moved for leave to present the testimony of an additional expert on Defendants' "dire financial circumstances . . . from mid-2016 onward." ECF No. 190 at 2. Plaintiff argued this information was "highly relevant" and necessary to explain that Defendants' alleged actions in reducing sales and marketing support for Amrix were the result of

Defendants' "liquidity crisis," which nearly "bankrupted the company." *Id.* at 2-3. In its reply, Plaintiff further argued Mr. Davis's report was necessary to show that Teva Ltd. was "'distressed'—i.e., likely to file for bankruptcy in the near future." ECF No. 214 at 6.

51. The Court denied Plaintiff's motion, ECF No. 231 at 1, but despite that, Mr. Davis's report is cited in the Lankau Report, *see* Lankau Report at 4, and the consulting group associated with Mr. Davis, Protiviti, is disclosed as having assisted Mr. Lankau with his rebuttal report, *see* Rebuttal Report at Appendix A.

52. In Mr. Davis's disallowed expert report (Ex. 37, Nov. 22, 2021 Expert Report of Guy Davis, CPA, CIRA, CDBV, CFE ("Davis Report")), Mr. Davis opined, [redacted] *Id.* at 11; *see also id.* at 22-24.

53. Mr. Davis further opined that [redacted] *Id.* at 11.

54. Mr. Davis also opined that [redacted] *id.* at 25.

55. Mr. Davis identified part of Defendants' purported remediation strategy to be the "optimization of Teva's product portfolios and research initiatives." *Id.* at 39. "This process

involved a prioritization of [Defendants'] product lines and research initiatives based on profitability and future potential and a discontinuation of the products that were selected from the lowest ranks of the Company's portfolio." *Id.*

56. Mr. Davis concluded, [redacted] *Id.* at 12.

57. Mr. Lankau's Rebuttal Report presents many of the same analyses and information originally disclosed through Mr. Davis. For example, Mr. Lankau's Appendix I is identical to Table 18, which appears in the Davis Report. *Compare* Lankau Report at Appendix I, *with* Davis Report at 50; *also compare* Lankau Rebuttal Report, Appendix K, *with* Davis Report ¶ 71(b); *see also* Rebuttal Report at 24 [redacted]

**ARGUMENT**

As a threshold matter, Defendant Teva Ltd. is not subject to personal jurisdiction in this Court under any plausible theory. Setting aside the jurisdictional deficiencies, all Defendants are entitled to summary judgment because Plaintiff's theory of breach is flawed as a matter of law.

## I. THIS COURT LACKS PERSONAL JURISDICTION OVER TEVA LTD.

In an order denying Teva Ltd.'s Motion to Dismiss for lack of personal jurisdiction, the Court, having drawn all inferences in favor of jurisdiction, found that "Robins . . . stated a *prima*

*facie* case that the Contract's forum selection clause binds Teva Ltd." SUMF ¶ 40.[2] Specifically, Judge Lauck found Plaintiff had adequately pled that Teva Ltd. was a "successor[] and permitted assign[ee]" and "bound by the Agreement." *Id.* In doing so, Judge Lauck acknowledged she could not "discredit" the allegation that "Teva Ltd. ha[d] assumed Cephalon and Anesta's obligations" under the Agreement in "assessing personal jurisdiction" at the motion to dismiss stage, and further found the SAC contained sufficient "factual allegations" that Teva Ltd. "entered into 'an express or implied agreement to assume' [Cephalon's] 'debts' and 'obligations' under the Contract." *Id.* Now, more than a year since the Court's prior decision, Plaintiff cannot carry its burden to make an "averment of facts that, if credited by the trier, would suffice to establish jurisdiction over [Teva Ltd.]" under any of those theories. *See A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 870 F. Supp. 2d 415, 421 (D. Md. 2012).

There can be no genuine dispute of material fact that Teva Ltd. is not bound by the Agreement (and its forum selection clause) because the record is devoid of any facts indicating that Teva Ltd.: (1) was assigned any rights, obligations, or liabilities under the Agreement; or (2) expressly or impliedly assumed any rights, obligations, or liabilities under the Agreement related to Amrix. In addition, because Teva Ltd. has no contacts with Virginia, Plaintiff cannot demonstrate that the exercise of personal jurisdiction over Teva Ltd. in Virginia is otherwise proper. Accordingly, this Court should dismiss Plaintiff's SAC as to Teva Ltd.

**A. Teva Ltd. Is Not Bound by the Agreement's Forum Selection Clause.**

This Court lacks personal jurisdiction over Teva Ltd. because the undisputed facts demonstrate that Teva Ltd. is not bound by the Agreement, including the forum selection clause.

[2] "[A] valid forum selection clause . . . may act as a waiver to objection to personal jurisdiction." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 n.11 (4th Cir. 2009).

After considering Plaintiff's SAC, Judge Lauck identified two plausible theories for finding Teva Ltd. bound by the agreement: (1) "that Teva Ltd. assigned itself rights under the" Agreement; or (2) that Teva Ltd. either expressly or impliedly assumed Anesta or Cephalon's debts and obligations under the Agreement. *See* SUMF ¶ 41. As to the latter theory, Judge Lauck explained that Plaintiff had asserted "three plausible rationales" for Teva Ltd. assuming Cephalon and Anesta's "debts and obligations" under the Agreement, including that: (1) Teva Ltd. expressly assumed Anesta and Cephalon's contractual obligations under the Agreement; (2) Teva Ltd. impliedly assumed the obligations because "Teva employees" conducted themselves as if bound by the Agreement; and (3) "Teva Ltd.'s acquisition of Cephalon and Teva's corporate structure suggest the existence of an express or implied agreement to undertake Anesta and Cephalon's debts and obligations relating to Amrix." *Id.*

Discovery has yielded no facts that plausibly support any of these theories. Thus, Plaintiff cannot substantiate its *prima facie* case of personal jurisdiction over Teva Ltd., and summary judgment is proper. *See A Love of Food I*, 870 F. Supp. 2d at 421.

1. *There is no evidence that Teva Ltd. assigned itself any rights or obligations under the Agreement.*

At the motion to dismiss stage, the Court found Plaintiff made a *prima facie* showing of personal jurisdiction "by alleging that Teva Ltd. assigned itself rights under the" Agreement. SUMF ¶ 41. More than a year later, however, Plaintiff cannot demonstrate that Teva Ltd. was actually assigned any rights or obligations under the Agreement. In fact, sworn statements in the record definitively confirm that Teva Ltd. was ***never*** assigned any rights related to Amrix. *See* SUMF ¶¶ 12, 25. Plaintiff can point to nothing to refute these sworn statements. Accordingly, there is no genuine dispute of material fact that Teva Ltd. was not assigned any rights related to Amrix.

2. *There is no evidence that Teva Ltd. expressly assumed any debts or obligations under the Agreement.*

Next, Judge Lauck found Plaintiff made a *prima facie* case of personal jurisdiction by alleging that Teva Ltd. expressly assumed Anesta and Cephalon's contractual obligations. SUMF ¶ 41. Plaintiff can point to no record evidence to substantiate its allegations of an express assumption by Teva Ltd. of any obligation under the Agreement, including the obligation to litigate in this forum. *First*, the record shows that Anesta and Plaintiff were signatories to the Agreement, not Teva Ltd. *See id.* ¶ 1. *Second*, there is no record evidence demonstrating that as a result of the 2011 Merger Agreement, Teva Ltd. expressly assumed any of Cephalon's purported duties related to Amrix. Cephalon, Anesta's parent corporation, merged with an indirect, wholly owned subsidiary of Teva Ltd. in 2011. *Id.* ¶ 9. The Merger Agreement provided that all of Cephalon's and Copper Acquisition Corp.'s rights, debts, liabilities, and duties would vest in the "Surviving Corporation," which was Cephalon. *See id.* ¶ 10. Thus, Cephalon's pre-merger debts and duties remained with Cephalon post-merger. *See id.* There was no express assumption of obligations by Teva Ltd.

Nor did Teva Ltd. expressly assume any obligations under the Agreement through later corporate changes. Although as part of the 2011 merger, "Cephalon and Anesta became indirect, wholly-owned subsidiaries of Teva Ltd," *id.* ¶ 11, all three remained separate, operational entities after the transaction, and Anesta retained all of its contractual rights and obligations following the 2011 merger. *Id.* Anesta continued in existence until December of 2012 when it merged with IVAX International GmbH, another wholly owned subsidiary of Teva Ltd. located in Switzerland. *See id.* ¶ 13. As part of that merger, IVAX took over from Anesta all "assets and liabilities" by way of a universal successions as a result of a merger by absorption. *Id.* Therefore, following that merger, all rights and obligations related to Amrix under the Agreement were held by IVAX, which later

changed its name to Teva Pharmaceuticals International, GmbH (TPIG), one of the defendants here. *Id.* ¶ 16.[3] As these transaction documents and sworn statements confirm, Teva Ltd. never expressly assumed any of the rights or obligations under the Agreement as part of any of these corporate changes. *See id.* ¶¶ 25-26.

The record in this case confirms that Teva Ltd. did not expressly assume any debts or obligations under the Agreement related to Amrix, and Plaintiff can point to no contrary evidence to refute that point. Accordingly, there is no genuine dispute that Teva Ltd. did not expressly assume any obligation under the Agreement, including the requirement to litigate in Virginia. *See Danstan Properties v. Merex Corp.*, No. 09 CIV 6137, 2011 WL 135843, at *3 (S.D.N.Y. Jan. 7, 2011) (granting summary judgment in favor of defendant on successor liability claim where, in part, the plaintiff failed to "adduce[ ] any facts from which the Court [could] infer that [d]efendant explicitly assumed liabilities" under the relevant agreement).

3. *There is no genuine dispute that Teva Ltd. did not impliedly assume Anesta's or Cephalon's debts or obligations under the Agreement.*

There is no record evidence indicating that Teva Ltd. impliedly assumed Anesta or Cephalon's debts or obligations under the Agreement or Guaranty related to Amrix. "While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to" assume the obligations, debts, or liabilities of the seller. *State of N.Y. v. N. Storonske Cooperage Co., Inc.*, 174 B.R. 366, 389 (N.D.N.Y. 1994) (citation omitted). Courts have identified two factors to consider in evaluating the intent of the buyer: (1) whether any "[a]dmissions of

[3] Consistent with this, Plaintiff submitted invoices for its net sales milestone payments under the Agreement to both IVAX and TPIG. *Id.* ¶ 18.

liability on the part of officers or other spokesmen of the successor corporation" were made; and (2) "the effect of the transfer upon creditors of the predecessor corporation." *Id.* at 889-90. The Court also previously found relevant a third factor: (3) whether Teva Ltd. was responsible for the marketing of Amrix. SUMF ¶ 42. All of these factors weigh in favor of finding that Teva Ltd. did not impliedly assume Cephalon's or Anesta's debts or obligations under the Agreement.

*First*, there have been no admissions of liability by any Teva Ltd. employees. Although Plaintiff alleged that since 2011 its "communications about Amrix have been with Teva USA, Teva Ltd., or Teva Int'l," *id.*, there are no communications between Plaintiff and any Teva Ltd. employee in the record. Indeed, none of the individuals Plaintiff principally communicated with (Erick Beardsley, Betsy Simmons, Brian Hirsch, Shanna Clark, Jessi Goron, Amy McAleer, Vijayarani Korrapati, Randy Zakreski, Lauren Belvedere, John Jacobs, Julie Pan, John Berman, and Francine Del Ricci) were directly employed by Teva Ltd. *See id.* ¶ 28; *see* Ex. 19, ROBINS_0002092 (Betsy Simmons); Ex. 20, ROBINS_0001674 (Brian Hirsch); Ex. 21, ROBINS_0002183 (Jessi Goron, Amy McAleer, Erick Beardsley); Ex. 23, TEVA_AMRIX_00224635 (John Jacobs; Randy Zakreski) Ex. 24, ROBINS_0009703 (Vijayarani Korrapati, Shanna Clark, Julie Pan); Ex. 27, ROBINS_0001976 (John Berman, Francine Del Ricci); Ex. 33, ROBINS_0000134 (Lauren Belvedere).

At the motion to dismiss stage, Judge Lauck cited communications between John Jacobs and Francine Del Ricci, on the one hand, and Plaintiff, on the other hand, to demonstrate that Teva Ltd. had potentially impliedly assumed the obligations under the Agreement. SUMF ¶ 42. However, Judge Lauck recognized that the SAC failed to show what entity employed Mr. Jacobs and Ms. Del Ricci. *See id*. Discovery confirms that neither of these individuals was employed by Teva Ltd. *Id.* ¶ 28. (*See* Ex. 38 Defs.' 2d Am. Interrog. Responses; Ex. 13, Shanahan Decl. ¶ 21.)

Therefore, any purported admissions of these individuals cannot be construed as admissions of Teva Ltd. as a matter of law.

Plaintiff has not identified any relevant statements about Amrix made by any Teva Ltd. employee and therefore, cannot point to any "[a]dmissions of liability on the part of officers or other spokespersons of [Teva Ltd.]" that indicate that Teva Ltd. expressed an intention to assume any debts, obligations, or liabilities under the Agreement. *Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 537 (W.D.N.Y. 2001). This factor weighs heavily in favor of finding that Teva Ltd. did not impliedly assume any debts, obligations, or liabilities under the Agreement. *See id.* (finding no implied assumption of liability on the part of an alleged successor corporation where "[n]o evidence ha[d] been offered . . . revealing any admissions of liability on the part of officers or other spokespersons of the alleged successor corporation"); *Marenyi v. Packard Press Corp.*, No. 90-CV-4439, 1994 WL 16000129, at *9 (S.D.N.Y. June 9, 1994), *report and recommendation adopted*, No. 90 CIV. 4439 (CSH), 1994 WL 533275 (S.D.N.Y. Sept. 30, 1994) (finding no implied assumption of liability where the alleged corporate successor "was careful . . . in its dealings after the purchase was consummated, to avoid conduct and representations that would suggest a broad assumption of all . . . liabilities").

The second factor also weighs against finding Teva Ltd. impliedly assumed obligations under the Agreement. Courts have held that "a 'finding of implied assumption is more likely' where the asset seller becomes a 'mere shell' as a result of the sale, creating the 'real possibility' that creditors are 'left without a remedy.'" *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 965 N.Y.S.2d 284, 311 (N.Y. Sup. Ct. 2013) (citation omitted). There is no evidence that Cephalon or Anesta became "mere shells" as a result of the 2011 merger. Both entities continued to operate post-merger. SUMF ¶ 11. Although Anesta was ultimately subsumed into IVAX before changing

its name to TPIG, that entity continues to operate today and is an active participant in this litigation. In fact, Plaintiff submitted invoices to IVAX and later to TPIG for payment of Net Sales Milestones, and Plaintiff makes no allegation that it did not receive timely payment from those entities, other than the amount it seeks for the purported breach of the Agreement. *See id.* ¶ 18. This factor also favors finding there was no implied assumption by Teva Ltd. of any of Anesta's debts or obligations under the Agreement.

*Third*, to find that Teva Ltd. potentially impliedly assumed debts and obligations under the Agreement, Judge Lauck also considered that "Teva employees . . . viewed the company as responsible for marketing and selling Amrix . . . ." *Id.* ¶ 42. But, after almost a year of discovery, the record demonstrates that Teva Ltd. has never manufactured, marketed, promoted, sold, or distributed Amrix in the United States, *id.* ¶ 34; it does not maintain any sales force in the United States, *id.* ¶ 27; neither it or its representatives or agents have corresponded with Plaintiff concerning Amrix, *id.* ¶ 33; and it is not responsible for the creation of marketing and sales strategies for Amrix, *id.* ¶¶ 28-29, 34.

Contrary to Plaintiff's allegations, the record confirms the North American CNS Unit had primary responsibility for Amrix marketing decisions, *id.* ¶¶ 28-32, and final decisions, including the amount of the budget and the size of the sales force, were made by Larry Downey, former head of Teva's North America Specialty Medicines division, with limited, if any, input from corporate parent entities, *id.* ¶ 32. Plaintiff did not even depose any employees or officers of Teva Ltd. during the discovery period to attempt to confirm its theories. Thus, there is no genuine dispute of material fact that Teva Ltd. was not responsible for Amrix marketing and sales in the United States, *id.* ¶¶ 28-34, which also weighs against finding it impliedly assumed any debts and obligations under the Agreement.

4. *Teva Ltd.'s acquisition of Cephalon and its corporate structure do not support the existence of any agreement for Teva Ltd. to assume Cephalon's duties and obligations under the Agreement.*

Judge Lauck further suggested that Teva Ltd.'s acquisition of Cephalon could support an express or implied assumption of "Cephalon's rights and duties regarding the marketing of Amrix." SUMF ¶ 41. Indeed, Judge Lauck reasoned that, "[i]f between 2011 and 2019, Teva Ltd. . . . w[as] responsible for the sale and marketing of Amrix, then it reasonably follows that . . . [it] became [a party] to the Contract: either by the acquisition of Cephalon as a 'Successor Entit[y]' or as [an] assignee[]." *Id.* ¶ 43. Neither of these theories is borne out by record evidence.

As discussed, Teva Ltd. was not responsible for the sale and marketing of Amrix, *id.* ¶¶ 29-34, and never assigned itself any rights to Amrix under the Agreement, *id.* ¶¶ 12, 25-26. Plaintiff can point to no record evidence to refute this point. There is no doubt that Teva Ltd. did not acquire Amrix-related obligations through its conduct and was not an "assignee[ ]." *Id.* ¶ 43.

Although Judge Lauck noted the Agreement was "binding upon . . . the parties hereto and their respective successors and permitted assigns," *id.* ¶ 40, "New York courts hold that even if an agreement purports to bind successors and assigns of the parties to the agreement, 'an assignee or successor will not be bound to the terms of a contract absent an *affirmative* assumption of the duties under the contract.'" *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 494 (S.D.N.Y. 2011) (quoting *Amalgamated Transit Union Local 1181, AFL-CIO v. City of New York*, 45 A.D.3d 788, 790 (N.Y. App. Div. 2007)). Because Teva Ltd. did not make any affirmative statements or take any affirmative actions that could be plausibly construed as indicating an intent to assume the duties under the Agreement, Plaintiff cannot demonstrate Teva Ltd. is bound by the agreement as either a successor or assign. *See id.*; SUMF ¶¶ 12, 25-26, 28, 29. What is more, "the mere assignment of a contract is an assignment of the rights in the contract and *not* of the assignor's

duties and liabilities incurred prior to the assignment." *In re Refco*, 826 F. Supp. 2d, at 495. Under New York law, an assignee receives only the *rights* under a contract unless it *affirmatively assumes* the assignor's duties and liabilities. *See id.* Even if Teva Ltd. had received some form of assignment (and the record makes plain it did not), that is still insufficient to find Teva Ltd. responsible for the obligations under the Agreement related to Amrix.

**B. Teva Ltd. Is Not Subject to Specific Jurisdiction in This Court Because It Has No Contacts with Virginia.**

At the motion to dismiss stage, Plaintiff effectively conceded that Teva Ltd. did not have minimum contacts with Virginia sufficient for the Court to exercise specific personal jurisdiction over it. SUMF ¶ 40. Discovery has confirmed that Teva Ltd. has no contacts with Virginia. Even assuming that Plaintiff had sufficiently pled such a jurisdictional theory, Plaintiff would still not be able to make an averment of facts to substantiate any such *prima facie* showing.

"For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). To determine whether specific jurisdiction is proper, courts "consider (1) the extent to which the defendant purposefully availed itself of the privileges of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

Plaintiff cannot make the requisite showing. Teva Ltd. not only lacks *minimum* contacts with Virginia, it has *no* such contacts. Plaintiff can point to no facts indicating that any of the "nonexclusive factors" frequently considered by courts in assessing "a party's purposeful

availment" weigh in its favor. *Id.* (listing relevant factors). The record confirms that Teva Ltd. has not purposefully availed itself of Virginia. Teva Ltd. is and always has been incorporated under the laws of Israel, and its principal place of business is located in Tel Aviv, Israel. SUMF ¶ 19. Teva Ltd. is not incorporated within the United States and has never been registered to do business in Virginia at any time. *Id.* ¶ 20. In fact, Teva Ltd. does not do business in Virginia, has no physical presence in Virginia, and has not consented to service of process in this state. *Id.* ¶¶ 21-23. Teva Ltd. has also not reached into Virginia for business and has not contacted Plaintiff concerning Amrix or the Agreement. *See id.* ¶¶ 21, 28.

With respect to Amrix, Teva Ltd. is not responsible for the marketing—and has never marketed—Amrix in the United States, including Virginia. SUMF ¶ 28-29, 34. Nor did Teva Ltd. or its employees ever manufacture, market, promote, sell, or distribute Amrix in the United States. *See id.* ¶ 34. Also, as noted above, Teva Ltd. does not employ or maintain its own sales force in the United States, including Virginia, for the marketing and sale of Amrix. *Id.* ¶ 27.

Even if Plaintiff had made a *prima facie* showing of personal jurisdiction based on Teva Ltd.'s contacts with Virginia at the motion to dismiss stage (it did not), Plaintiff cannot support that theory with facts sufficient to establish specific personal jurisdiction over Teva Ltd. *See A Love of Food*, 879 F. Supp. 2d at 421. This conclusion accords with the weight of authority, as courts across the country have rejected attempts to bring Teva Ltd. into court based on inadequate contacts with the forum state.[4]

---

[4] *See, e.g.*, *Smith v. Teva Pharms. USA, Inc.*, No. 17-61058-CIV, 2018 WL 550252, at *3 (S.D. Fla. Jan. 24, 2018) (holding Teva Ltd. was not subject to personal jurisdiction in Florida because it had "no contact whatsoever with the state"); *Plumbers' Loc. Union No. 690 Health Plan v. Apotex Corp.*, No. CV 16-665, 2017 WL 3129147, at *3, *7–8 (E.D. Pa. July 24, 2017) (finding no specific jurisdiction over Teva Ltd. in Pennsylvania because it did not direct activities toward, and there were no allegations that its drugs were sold in, Pennsylvania).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM BECAUSE PLAINTIFF'S THEORY OF BREACH FAILS AS A MATTER OF LAW.

Defendants are entitled to summary judgment on Plaintiff's breach of contract claim for Defendants' alleged failure to use "Commercially Reasonable Efforts" because Plaintiff's theory of breach is legally flawed. Defendants have a "legal privilege to protect" their "business interests," *Holland Loader Co., LLC*, 313 F. Supp. 3d at 472 (citation omitted), and were not required to act against that interest in adhering to the parties' CRE provision, *see, e.g.*, *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758, 2021 WL 4803582, at *41 (S.D.N.Y. Oct. 13, 2021), *judgment entered*, No. 19 CIVIL 9758, 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021); *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 926 (E.D. Cal. 2010). Even assuming *arguendo* that all Plaintiff's allegations are true, its theory would require Defendants to risk bankruptcy to prioritize the marketing and sale of a single product, Amrix. The law does not support such a theory. *See In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 833 (Bankr. S.D.N.Y. 2020) (rejecting as "utterly preposterous" an interpretation of a commercially reasonable efforts provision that would have required an entity "to maintain operations no matter what obstacles came in its way"). As such, the matter is ripe for summary judgment.[5] *See InspiRx, Inc.*, 2021 WL 3604850, at *14 (granting summary judgment on a commercially reasonable efforts claim where the defendant

[5] While Defendants agree with the Court that commercially reasonable efforts claims generally require fact intensive inquiries that are not suited to disposition at the summary judgment stage, Dkt. No. 184 at 2, Plaintiff's expert disclosures, which postdated the Court's and parties' commentary on this issue, have left a single, dispositive legal question at issue—whether the CRE Provision permits Defendants to take into consideration their own financial state when making marketing and sales decisions for Amrix. If the answer is "yes," then any reduction or alteration of Amrix's marketing or sales effort would be commercially reasonable, according to Plaintiff itself, because it was necessary to avoid bankruptcy. Hence the need for this motion.

"demonstrated an absence of material fact as to the reasonableness of its efforts").[6]

### A. Under New York Law, a "Commercially Reasonable Efforts" Clause Does Not Require a Signatory to Ignore Its Business Interests.

Plaintiff's entire theory hinges on the incorrect assumption that the CRE Provision forecloses consideration of Defendants' "overall financial state" in assessing reasonableness, merely because those words do not appear among the provision's listed considerations of "efficacy, safety, commercial value, competitiveness of alternative products of third parties . . . , and the Patent and other proprietary position of such products." SUMF ¶ 38. But New York law expressly allows consideration of the Defendants' business interests in assessing reasonableness.

Under New York law, "it is well-settled that a commercially reasonable efforts clause does not require the signatory to act against its own interest." *InspiRx, Inc.*, 2021 WL 3604850, at *10; *see also, e.g.*, *Alto*, 2021 WL 4803582, at *41 (discussing "'commercially reasonable efforts' clauses under New York law" and stating that "under no circumstances is a party required to act against its own business interests"); *Bioventus LLC v. Trindent Consulting Int'l, Inc.*, No. 1:18-CV-815, 2020 WL 8996156, at *5 (M.D.N.C. Oct. 20, 2020) (recognizing that the evaluation of a commercially reasonable efforts provision under New York law "includes a 'subjective evaluation' . . . because 'no business would agree to perform to its detriment'" (quoting *Holland Loader*, 313 F. Supp. 3d at 472)).[7] In fact, in *Holland Loader*, the district court explicitly recognized that an

[6] *See also Napo Pharms., Inc. v. Salix Pharms., Inc.*, No. 651214/2011, 2014 WL 1093536 (N.Y. Sup. Ct. Jan. 29, 2014) (holding on summary judgment that the "business decision not to spend millions of dollars to purchase" certain equipment prior to the results of a clinical trial was "commercially reasonable as a matter of law" where the plaintiff's own expert admitted that "only 50% of the drugs that reach their final Phase III trial are eventually approved").

[7] *See also MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013) (same); *Bear Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03 CIV 8259, 2007 WL 1988150, at *22 (S.D.N.Y. July 10, 2007) (finding plaintiff's arguments about failure to use commercially reasonable efforts "intrude too greatly upon Bear Stearns' business discretion").

entity's "legal right to protect its business interests," includes "the right to prioritize its product lines based on financial reasons." *Id.* at 477.[8] Because "no business would agree to perform to its detriment," the consideration of an entity's "financial resources" and financial state is relevant to any analysis of a commercially reasonable efforts clause, including this one. *LeMond Cycling, Inc.*, 2005 WL 102969, at *5. Contrary to Plaintiff's urging, New York law permits this Court to consider Defendants' financial state and overall business interests in assessing Defendants' compliance with the CRE Provision.

### B. Even Under Plaintiff's Own Theory, When Considering Teva's Overall Financial Condition, Defendants' Marketing Efforts for Amrix Were Reasonable, as They Were "Necessary" to "Save the Company."

Plaintiff alleges in its SAC that Defendants experienced significant financial difficulties in late 2016, which included paying $1.2 billion to settle an antitrust claim, acquiring "Allergan PLC's generic drug business" for $40 billion, and paying the U.S. Government a fine of $519 million for violating the Foreign Corrupt Practices Act. *See* SUMF ¶ 36. "As a result of" Defendants' "poor financial position," Plaintiff alleges that Defendants "stopped undertaking Commercially Reasonable Efforts to market and sell Amrix." *Id.* ¶¶ 37-38. This theory of breach hinges on the incorrect assumption that it was ***unreasonable*** for Defendants to make decisions with respect to their marketing of Amrix that took into account their overall financial condition.

Since Defendants' motions to dismiss, Plaintiff has doubled down on the theory, retaining

---

New York courts are not alone in recognizing that commercially reasonable efforts provisions do not require a business to perform to its detriment. *See, e.g.*, *Citri-Lite Co.*, 721 F. Supp. 2d at 926; *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. CIV. 03-5441, 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005).

[8] *See also InspiRx, Inc.*, 2021 WL 3604850, at *9 (A "Commercially Reasonable Efforts" provisions "d[oes] not require [a defendant] to 'prioritize' the Products over all others.").

experts whose opinions are that [redacted]. *Id.* ¶¶ 46, 48, 50, 52-56. But Plaintiff has not developed any evidence to support the theory that a company similarly situated to Teva—[redacted], as Plaintiff alleges, *id.* ¶¶ 46, 48, 53-54, 56—would do anything ***but*** what Teva did with respect to the reduction of marketing spend for a drug like Amrix. Just the opposite, in fact. Mr. Lankau opines that "[redacted]" *Id.* ¶ 48. He explains that Defendants' "[redacted]" *Id.* Likewise, Mr. Davis concludes Defendants' "[redacted]." *Id.* ¶ 56. Mr. Davis further opines it was "[redacted]" *Id.* Nowhere does Mr. Lankau, Mr. Davis, or any fact witness proffer that it would be ***unreasonable*** for a similarly situated company to [redacted] *Id.* ¶ 48.

In ruling on Defendants' motion to dismiss, Judge Lauck recognized "the Court may weigh Teva's financial position at the summary judgment stage." *Id.* ¶ 39. Here, Plaintiff's own experts have done that work for the Court. According to Messrs. Davis and Lankau, Defendants did exactly what they should have done when considering the business interests of the company as a whole—[redacted]. *Id.* ¶ 48. Plaintiff can point to no record evidence demonstrating that it would have been commercially reasonable for Defendants to maintain marketing and sales support for Amrix [redacted]

[redacted], ***as Plaintiff itself alleges***.

Summary judgment on Plaintiff's breach claim is therefore proper because Plaintiff admits, when considering Teva's alleged financial condition as a whole, that Defendants' actions with respect to Amrix in particular were [redacted] SUMF ¶ 57. In effect, Plaintiff and its experts have themselves made the case for Defendants, explaining that (and why) it was reasonable for them to act as they did, given their alleged precarious financial condition. Plaintiff can point to no evidence in the record that a reduction in Amrix marketing spend would be ***unreasonable*** for a similarly situated company when considering Teva's alleged overall financial condition. *See InspiRx, Inc.*, 2021 WL 3604850, at *10 (granting summary judgment on a commercially reasonable efforts claim where the plaintiff failed to put forward material facts supporting defendant's actions were anything but "commercially reasonable"); *Napo Pharms., Inc.*, 2014 WL 1093536 (holding on summary judgment that the "business decision not to spend millions of dollars to purchase" certain equipment prior to the results of a clinical trial was "commercially reasonable as a matter of law" where the plaintiff's own expert admitted that "only 50% of the drugs that reach their final Phase III trial are eventually approved").

Of course, the result might be different if a company's financial condition were irrelevant to the reasonableness of its conduct—the very premise of Plaintiff's theory. But the law is to the contrary, and Plaintiff itself admits that Defendants' actions were reasonable in light of—and indeed necessitated by—their allegedly dire financial situation. Defendants are therefore entitled to summary judgment on Plaintiff's breach of contract claim.

## CONCLUSION

Defendants respectfully request this Court enter summary judgment in their favor.

Dated: December 24, 2021

Respectfully submitted,

*<u>/s/ M. F. Connell Mullins, Jr.</u>*
SPOTTS FAIN P.C.
Hugh M. Fain, III (VSB No. 26494)
hfain@spottsfain.com
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
411 East Franklin St., Suite 600
Richmond, VA 23219
T: (804) 697-2000
F: (804) 697-2100

KIRKLAND & ELLIS LLP

Jay P. Lefkowitz, P.C. (admitted *pro hac vice*)
Devora W. Allon, P.C. (admitted *pro hac vice*)
Kyla A. Jackson (admitted *pro hac vice*)
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian D. Sieve, P.C. (admitted *pro hac vice*)
Christina E. Sharkey (admitted *pro hac vice*)
Chris Stackhouse (admitted *pro hac vice*)
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of December 2021, I filed a copy of the foregoing document using the Court's CM/ECF electronic filing system, which will electronically serve a copy on all counsel of record by email.

*/s/ M. F. Connell Mullins, Jr.*

M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
SPOTTS FAIN P.C.
411 East Franklin St., Suite 600
Richmond, VA 23219
T: (804) 697-2000
F: (804) 697-2100