**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| E. CLAIBORNE ROBINS COMPANY, INC.,<br><br>Plaintiff<br><br>v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES, LTD., *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No: 3:18-cv-827-DJN-EWH |

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**

# CONTENTS

**TABLE OF AUTHORITIES** .......... **iii**

**INTRODUCTION** .......... **1**

**RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS** .......... **2**

**ROBINS' STATEMENT OF ADDITIONAL MATERIAL FACTS** .......... **4**

**ARGUMENT** .......... **16**

**I. Teva Ltd. is bound by the Agreement's consent-to-jurisdiction provision** .......... **16**

A. Teva Ltd. is a "successor" or "assign" under the Agreement. .......... 16

B. Teva Ltd. is the alter ego of entities over which the Court has jurisdiction. .......... 18

**II. The record evidence supports Robins' contract claim against Defendants.** .......... **20**

A. Teva breached § 4.02(c) of the Agreement. .......... 20

B. Teva's financial problems do not justify its failure to use CRE. .......... 22

C. Teva's breach of the CRE provision did not improve profits. .......... 26

**III. The Court should reject Teva's assertion that Robins has pleaded itself out of a contract claim** .......... **27**

**CONCLUSION** .......... **30**

TABLE OF AUTHORITIES

**Cases**

*407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37 (N.Y. 1968) .................... 28

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006). .......... 18

*Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021).......... 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 20

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03 CIV. 8259 (CSH), 2007 WL 1988150 (S.D.N.Y. July 10, 2007) .......... 23

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F.Supp. 3d 16 (S.D.N.Y. 2017).......... 21

*Bioventus LLC v. Trindent Consulting Int'l, Inc.*, No. 1:18-CV-815, 2020 WL 8996156 (M.D.N.C. Oct. 20, 2020).......... 23

*CAI Rail, Inc. v. Badger Mining Corp.*, No. 20 CIV. 4644 (JPC), 2021 WL 705880 (S.D.N.Y. Feb. 22, 2021) .......... 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 20

*ChemTreat, Inc. v. Certain Underwriters at Lloyd's of London*, 488 F. Supp. 3d 343 (E.D. Va. 2020) .......... 20

*Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912 (E.D. Cal. 2010) .......... 23

*Dunn Auto Parts, Inc. v. Wells*, 155 N.Y.S.3d 507 (App. Div. 2021) .......... 23

*Eclaire Advisor as Tr. to Daewoo Int'l (Am.) Corp. Creditor Tr. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257 (S.D.N.Y. 2005) .......... 17

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168 (2d Cir. 2004).......... 21

*FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 56 N.Y.S.3d 12 (App. Div. 2017).......... 19

*Fox Film Corp. v. Springer*, 8 N.E.2d 23 (N.Y. 1937) .......... 24

*Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447 (S.D.N.Y. 2018) .......... 23

*In re Condado Plaza Acquisition LLC*, 620 B.R. 820 (Bankr. S.D.N.Y. 2020) .......... 28

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*, No. 20 CIV. 3214 (JPC), 2021 WL 3604850 (S.D.N.Y. Aug. 12, 2021).......... 24, 25

*Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900 (1987) .......... 27

*LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. CIV.03-5441 PAM/RLE, 2005 WL 102969 (D. Minn. Jan. 14, 2005). .......... 23

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013) .......... 23

*Mylan Laboratories, Inc. v. Akzo, N. V.*, 2 F.3d 56 (4th Cir. 1993) .......... 16

*Napo Pharmaceuticals, Inc. v. Salix Pharmaceuticals, Inc.*, No. 651214/2011, 2014 WL 1093536 (N.Y. Sup. Ct. Jan. 29, 2014) .......... 24, 25

*Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, No. 19-CV-2519 (PKC), 2021 WL 6092462 (S.D.N.Y. Dec. 22, 2021) .......... 27

*Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375 (4th Cir. 2018) .......... 19

*Village of Webster v. Town of Webster*, 705 N.Y.S.2d 774 (App. Div. 2000) .......... 23

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir. 1984) .......... 18

**Rules**

Fed. R. Civ. P. 56(c)(2) .......... 29

**Other Authorities**

Black's Law Dictionary (11th ed. 2019). .......... 17

INTRODUCTION

In this contract action, Robins asserts that Teva breached its promise to market and sell the drug Amrix using Commercially Reasonable Efforts ("CRE"). The evidence supports Robins' claim. Even after deducting royalties and milestone payments, Amrix generated approximately $40 million a year in annual operating profits. The drug was promotionally sensitive, though, meaning that it needed an active field sales team to maintain those profits. Evidence in the record shows that in 2017—as part of a companywide cost-cutting effort—Teva eliminated the entire Amrix field sales force, effectively killing off the product. Teva's actions were inconsistent with its own practices, were inconsistent with standard industry efforts, and were inconsistent with Teva's contractual obligations under the CRE provision.

Although it seeks summary judgment, Teva does not—and cannot—dispute Robins' ability to establish a prima facie case that Teva breached the Agreement. Instead, Teva revisits arguments that this Court considered, and rejected, at the motion-to-dismiss stage. First, it claims that the Court lacks jurisdiction over Teva Ltd., the Israeli parent company at the head of the Teva family of companies. The evidence, however, supports Robins' claim that Teva Ltd. voluntarily assumed obligations under the Agreement and so is bound by the Agreement's consent-to-jurisdiction provision. Second, Teva claims that it cannot be held liable under the Agreement's CRE clause because, Teva says, *Robins* argues that maintaining an Amrix field sales team (~[redacted] representatives) would have bankrupted the multi-billion-dollar Teva organization. Robins asserts no such thing. Teva, for its part, provides no evidence that complying with its obligations under the Agreement would have been financially ruinous. And even if compliance would have bankrupted Teva, this still would not excuse its breach.

For all these reasons, the Court should deny Teva's motion for summary judgment.

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Paragraphs 1-16 of Defendants' Statement of Undisputed Material Facts ("SUMF") quote and describe the contents of certain instruments and purport to state their legal effect. Robins does not dispute the existence of those agreements, but to the extent that Defendants' quotations and descriptions are inconsistent with the instruments' contents, Robins disputes those quotations and descriptions. The validity, meaning, and legal effect of the contracts present questions of law as to which no further response is necessary.

2. Robins does not dispute ¶¶ 17, 18, 19, 20, 21, 22, 23, 24, 27, 30, 33, 57.

3. With respect to ¶¶ 25 and 34, Robins disputes Defendants' assertion that Teva Ltd. did not assume responsibilities or duties under the August 23, 2007 Asset Purchase Agreement ("Agreement"). By its actions, Teva Ltd. assumed ultimate authority over the sale and marketing of Amrix and thereby assumed the buyer's obligations under the Agreement. (*See infra*, Robins' Statement of Additional Material Facts ("SAMF"), at ¶¶ 9-23.)

4. With respect to ¶ 26, Robins disputes Defendants' assertion that Teva Ltd. did not assume Cephalon's responsibilities or duties under its Guaranty. (*See infra*, SAMF, at ¶¶ 9-23.)

5. With respect to ¶ 28, Robins disputes Defendants' assertion that Teva Ltd. personnel were not responsible for creating or executing the marketing strategy for Amrix in the United States. During the times at issue in this suit, Teva Ltd.'s Chief Executive Officer ("CEO") and Board of Directors ("Board") had ultimate responsibility for and authority over the development and execution of Amrix strategy. (*See* SAMF, *infra*, at ¶¶ 14-23.) In particular, the CEO and Board had approval authority over the Annual Operating Plans ("AOPs") submitted for Amrix by the Central Nervous System business unit ("CNS unit") and the North American Specialty Medicines ("NASM") division of Teva. (*Id.*)

6. With respect to ¶ 29, Robins admits that individuals within the CNS unit proposed plans for the marketing and sale of Amrix, but asserts that Teva Ltd.'s CEO and Board had ultimate approval authority over such plans. (*See* SAMF, *infra*, at ¶¶ 14-23.)

7. With respect to ¶ 31, Robins admits that Downey's subordinates formulated marketing strategy for Amrix that required Downey's approval, but asserts that Downey did not have final approval authority over such strategy. (*See* SAMF, infra, at ¶¶ 14-23.) Final approval authority rested in Teva Ltd.'s CEO and Board. *Id.*

8. Robins denies the allegations in ¶ 32. Ultimate approval authority for Amrix marketing decisions rested in Teva Ltd.'s CEO and Board. (*See* SAMF, infra, at ¶¶ 14-23.)

9. Paragraphs 35-43 and 50-51 merely quote and describe pleadings, motions, briefs, and orders that are already in the record and that speak for themselves. Robins denies the allegations in ¶¶ 35-43 and 50-51 to the extent that the quotations and descriptions are inconsistent with the filings that are already in the record.

10. Paragraphs 44-46 and 48-49 merely quote and describe the opening and rebuttal reports of Plaintiff's expert witness, Peter A. Lankau. These reports speak for themselves. Robins denies the allegations in ¶¶ 44-46 and 48-49 to the extent that the quotations and descriptions are inconsistent with Lankau's reports.

11. With respect to ¶ 47, Robins agrees that Defendants eliminated the field sales force for Amrix before November 2017. Robins denies that Defendants' efforts on Amrix's behalf "remained active." (*See* SAMF, infra, at ¶¶ 24-47.)

12. Paragraphs 52-56 quote and describe a report prepared by Guy Davis that Lankau reviewed when preparing his reports. The Davis report speaks for itself. Robins denies the

allegations in ¶¶ 52-56 to the extent that the quotations and descriptions are inconsistent with Davis' report.

ROBINS' STATEMENT OF ADDITIONAL MATERIAL FACTS

*The Product*

1. Cyclobenzaprine hydrochloride is a skeletal muscle relaxant that has long been available in a generic, immediate-release, formulation. In February 2007, Robins obtained FDA approval for a patented extended-release version of the drug, sold under the name "Amrix." (FDA Approval Letter for NDA 21-777, attached as **Exhibit 1.**)

2. The extended-release formulation has many clinical advantages over the immediate-release generics. (Deposition of John Jacobs, excerpts attached as **Exhibit 2**, at 106:19-108:14.) Other things being equal, Amrix is the skeletal muscle relaxant most preferred by physicians. (*Id.* at 113:14-21; T_A_00251677, at 21.) [1]

3. Robins sold its Amrix rights to Anesta AG ("Anesta") pursuant to an Asset Purchase Agreement ("Agreement") dated August 23, 2007. (A copy of the Agreement is attached hereto as **Exhibit 3.)** The "Base Purchase Price" was $100.1 million. (*Id.* § 4.02.)

4. The Agreement also included "Additional Consideration"—namely, a 12-year earnout provision entitling Robins to payments of up to an additional $255 million if Amrix sales met certain "Net Sales Milestones." (*Id.* at § 4.02(a).) Thus, although Robins sold off Amrix's intellectual property, it still had a $255 million interest in the product's success. The earnout period ended in August 2019 (the "Net Sales Milestone Termination Date"). (*Id.*)

[1] Discovery documents are identified by the Bates number of the first page of the document. Robins has shortened the TEVA_AMRIX_ prefix to T_A_.

5. The Agreement anticipates that—due to shifting "business strategy"—the buyer's desire to promote Amrix could change during the 12-year earnout period for reasons unrelated to the product's merits. (*Id.* at § 4.02(c).) To protect Robins' rights to additional consideration, the Agreement requires the buyer (and its successors, including Defendants) to market and sell the drug using contractually defined CRE at all times during the earnout period. (*Id.*) Failure to do so triggers an alternate earnout price defined by formula. (*Id.*)

6. The Agreement defines CRE as the "efforts and resources" that the buyer would use "consistent with its normal business practices," which "in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry" for a similarly sized company,[2] taking into account "efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product." (Agreement, **Ex. 3**, at § 4.02(c).) The Agreement effectively gives the buyer a choice: either (1) continue to market and sell Amrix using CRE through August 2019, or (2) pay the alternate earnout price, as defined by the formula in § 4.02(c) of the Agreement.

7. Defendant Cephalon, Inc. ("Cephalon") guaranteed Anesta's obligations under the Agreement. (A copy of Cephalon's Guaranty is attached hereto as **Exhibit 4.)**

8. In 2011, Teva Pharmaceuticals Industries Ltd. ("Teva Ltd.") acquired Cephalon and Anesta. (Def's SUMF ¶¶ 9-11.) Anesta's rights and obligations under the Agreement—including the obligation to use commercially reasonable efforts in the sale and marketing of

[2] The yardstick for a company "similar in size and scope" to the buyer (Anesta) was Cephalon (Anesta's parent and a multi-billion-dollar company). Teva acquired Cephalon and Anesta in 2011 for $6.8 billion. *See* https://www.businesswire.com/news/home/20110502005825/en/Teva-to-Acquire-Cephalon-in-6.8-Billion-Transaction (last accessed 01/05/2022).

Amrix—were expressly assumed by IVAX International GmbH ("IVAX"), a wholly owned subsidiary of Teva Ltd. (Def's SUMF ¶ 13.) IVAX was later renamed "Teva Pharmaceuticals International GmbH" ("Teva Int'l"). (Def's SUMF ¶ 16.)

*Teva Operates as a Single Business Enterprise*

9. Teva Ltd. is a publicly traded Israeli company that owns, directly or indirectly, a family of companies that includes Defendants Teva Int'l, Teva Pharmaceuticals USA, Inc. ("Teva USA"), and Cephalon. (Def's SUMF ¶¶ 11-16.)

10. Teva organizes its activities by informal business segments. In their daily activities, Teva employees pay no attention to the separate corporate identities of the various legal entities within the Teva family of companies and are often unaware of which Teva company formally employs those they work with—even their own bosses. (Deposition of Larry Downey, excerpts at **Exhibit 5**, at 31:21-32:5, 77:4-78:10; Jacobs Depo., **Ex. 2**, at 40:18-41:1, 67:21-68:3; Deposition of David Loughery, excerpts at **Exhibit 6**, at 51:15-52:3; Deposition of John Hassler, excerpts at **Exhibit 7**, at 44:2-9, 60:2-15.)

11. As one senior manager testified, the separate legal entities were "really more for taxing authorities" and did "not have any impact on how we would interact with each other. We were all employees of Teva. Teva, the big unit, not any individual company." (Loughery Depo., **Ex. 6**, at 98:16-21.)

12. The businesses within the Teva organization instead were told to operate with a "one Teva mindset," meaning that they were encouraged to shift resources to help other business within the Teva family of companies where this would benefit the overall Teva organization. (Downey Depo., **Ex. 5**, at 186:15-187:2; 187:17-20.)

13. Teva Int'l is financially dependent on other Teva entities. Nearly all of its transactions are with other Teva affiliates and most of its assets and liabilities are debts owed by

or to other Teva affiliates. (T_A_00581784, **Exhibit 8, at 4-6;** T_A_581817, **Exhibit 9**, at 4-6**;** T_A_00582655, **Exhibit 10,** at 4-6.)

*Authority Over Amrix Strategy*

14. At the times relevant to this suit, Amrix was within the Central Nervous System ("CNS") "business unit" of the North American Specialty Medicines ("NASM") segment of Teva's business. (Hassler Depo., **Ex. 7**, at 8:2-3, 18:9-14, 102:21-103:1; Rule 30(b)(6) Deposition of Teva Int'l ("Teva Int'l Depo."), excerpts at **Exhibit 11**, at 53:7-20.)

15. Neither CNS nor NASM is a formal legal entity. (Downey Depo., **Ex. 5**, at 81:15-18; Jacobs Depo., **Ex. 2**, at 112:17-113:1; Loughery Depo. **Ex. 6**, at 97:22-98:5.)

16. In 2016, the senior vice president and general manager of CNS was John Hassler, who was employed by Teva Sales & Marketing ("Teva S&M"). (Hassler Depo., **Ex. 7**, at 7:22-8:3; 10:16-18.) Directly under Hassler were Jim Reilly, VP for sales, and Dalton Tomlinson, VP for marketing. (*Id.* at 22:10-12, 24:15-18, 103:22-104:11.)

17. Hassler's supervisor was Larry Downey, the head of NASM. (Hassler Depo., **Ex. 7**, at 43:1-3; Downey Depo., **Ex. 5**, at 16:15-20; Teva Int'l Depo., **Ex. 11**, at 55:21-56:2.)

18. Downey's supervisor, in turn, was Rob Koremans, the head of Teva's Global Specialty Medicines ("GSM") group. (Downey Depo., **Ex. 5**, at 31:15-20, 72:21-73:7, 275:3-5; Jacobs Depo., **Ex. 2**, at 76:13-17; Hassler Depo., **Ex. 7**, at 134: 1-4.)

19. Above GSM was Teva's team in Israel, including Teva Ltd's CEO and Board. (Teva Int'l Depo., **Ex. 11**, at 53:17-20.)

20. Teva developed annual strategy and budgets in documents called annual operating plans ("AOPs"). (Hassler Depo., **Ex. 7**, at 132:10-20.)

21. AOPs were developed by lower-levels managers and then consolidated, reviewed, and approved by increasingly senior levels of management, all the way to the top. The Amrix

AOP, for example, was developed by a brand manager within CNS and then consolidated with other product AOPs for review and approval by the head of CNS, John Hassler. (Hassler Depo., **Ex 7**, at 132:10-14.) The process continued through Larry Downey, the head of NASM. (Jacobs Depo., **Ex. 2**, at 69:8-20, 121:6-14; Hassler Depo., **Ex. 7**, at 68:18-69:5, 69:15-17; Downey Depo., **Ex. 5**, at 70:14-18, 72:6-9.) And Downey, in turn, rolled up the AOPs he reviewed and submitted them to his boss, Rob Koremans, the head of GSM, for consideration and approval. (Downey Depo., **Ex. 5**, at 31:15-20, 72:21-73:7, 275:3-5; Jacobs Depo., **Ex. 2**, at 76:13-17; Hassler Depo., **Ex. 7**, at 134:1-4.)

22. The consolidated operating plans were ultimately submitted to Teva Ltd.'s CEO and Board in Israel for their consideration and approval. (Hassler Depo., **Ex 7**, at 132:10-14.; Teva Int'l Depo., **Ex. 11**. at 34:9-14) Teva Ltd. had the final say on decisions regarding budget and strategy for all of Teva's products, including Amrix. (Downey Depo., **Ex. 5**, at 34:4-9; Jacobs Depo., **Ex. 2**, at 73:7-74:1; Hassler Depo., **Ex. 7**, at 132:18-20, 133:21-133:8, 145:14-19.)

23. Although Teva Int'l had formally assumed the obligation to promote Amrix using CRE, it played no role in the AOP process. (Teva Int'l Depo., **Ex. 11**. at 28:20-29:17.) It employed none of the persons formulating Amrix sales and marketing strategy, and none of the persons formulating Amrix sales and marketing strategy consulted with Teva Int'l before making their decisions. (Teva Int'l Depo., **Ex. 11**, at 30:17-31:2, 32:10-34:1; Downey Depo., **Ex. 5**, at 80:22-81:4; Loughery Depo., **Ex. 6,** at 48:10-19; Hassler Depo., **Ex. 7**, at 39: 9-18, 40:6-8, 225:15-226:1.) It was Teva Ltd., not Teva Int'l, who exercised ultimate control over Amrix. (Teva Int'l Depo., **Ex. 11**, at 48:4-49:15.)

*Growth of Amrix Sales*

24. After a successful patent defense, Amrix sales grew rapidly in 2012 and 2013. (ROBINS_0008424, **Exhibit 12;** T_A_00010742, **Exhibit 13,** Tab "Amrix P&L.")

25. Amrix was one of Teva's most promotionally sensitive drugs, meaning that most of its sales were due to marketing efforts. (Jacobs Depo., **Ex. 2**, at 85:9-86:4; 93:2-5; 220:12-221:4; Hassler Depo., **Ex. 7**, at 76:5-9, 83:1-4.) Amrix's promotional sensitivity increased over time. In 2013, promotional tactics accounted for [redacted]% of Amrix sales. (T_A_00226542, **Exhibit 14,** at slide 3.) In 2014, they accounted for [redacted]% of Amrix sales. (T_A_00131789, **Exhibit 15,** at slide 5.) And in 2016, they accounted for [redacted]% of Amrix sales. (T_A_00529542, **Exhibit 16,** at slide 6.). A field sales team was the key to Amrix's success.

26. When promoted appropriately, Amrix was highly profitable, generating around $[redacted] million in operating profits per year. (Downey Depo., **Ex. 5**, at 130:16-131:1.) It generated $[redacted] million in operating profits in 2014 and $[redacted] million in operating profits in 2015. (T_A_00045111, **Exhibit 17**, at tab "Amrix."**)**

27. Teva's "Long Range Plans" ("LRPs") for Amrix during this time predicted continued growth until the drug's predicted loss of exclusivity ("LOE") in 2022. (T_A_000181427, **Exhibit 18,** at slide 3; T_A_000254008, **Exhibit 19,** at slide 8; T_A_ 00016947, **Exhibit 20,** Tab "AMRIX LRP Compare"; Hassler Depo., **Ex. 7**, at 142:2-3.)

28. It was Teva's standard practice to promote its patented drugs until their LOE. (Deposition of Jeffrey Dierks, excerpt at **Exhibit 21** at 372:1-373:4; Jacobs Dep., **Ex. 2**, at 96:20-97:8; Deposition of James Reilly, **Exhibit 22**, at 148:15-149:1; T_A_00125382, **Exhibit 23**, at p. 93.)

*Teva Suffers Financial Setbacks in 2015-17*

29. Between mid-2015 and early 2017, Teva suffered a series of financial shocks. Foremost among them was Teva's mid-2016 purchase of Actavis Generics from Allergan PLC. (ROBINS_0023815, **Exhibit 24,** at 24.) To finance the purchase, Teva had to borrow approximately $27 billion. (*Id.* at 10; Downey Depo., **Ex. 5**, at 67:8-11.)

30. Teva also had to pay large amounts to settle proceedings brought against it by the United States Government. These included a $1.2 billion payment in 2015 to settle claims of antitrust violations, and a $519 million payment in 2016 to settle claims of Foreign Corrupt Practices Act violations. (**Ex. 24**, at 12, F-48.)

31. Finally, Teva had major product setbacks. Zecuity—a transdermal patch for migraine sufferers, launched by Teva in 2016 and anticipated to be a source of significant revenue in the following years—had to be pulled from the market after users reported burns and scarring. (**Ex. 24**, at 8.) At around the same time, Teva's blockbuster multiple-sclerosis drug Copaxone, which accounted for [redacted]% of CNS's operating profit, lost its patent protection and was exposed to increased competition from rival MS products. (*Id.* at 8-9; T_A_00141479, **Exhibit 25**, at 4.)

32. These events adversely affected the company's finances. Teva's total debt went from $9.9 billion to $35.8 billion, Teva drew down $1.2 billion of its $3 billion line of credit, and its financial assets (available cash, cash equivalents, and securities) went from $8.4 billion to $1.9 billion. (**Ex. 24**, at 3.) The loss of patent protection for Copaxone threatened the large income stream Teva had enjoyed from that product. (*Id.* at 8.)

*Teva Decides to Eliminate Promotion of Amrix*

33. Teva responded to these financial difficulties by adopting a strategy of aggressive budget cuts that focused the company's efforts away from smaller products like Amrix and towards higher-priority products. (Jacobs Depo., **Ex. 2**, at 65:7-21, 66:9-67:3, 130:19-131:10.) These involved "big . . . targets for cost reductions across the board" because "the company was in financial distress." (*Id.* at 135:1-15, 160:22-161:9, 164:7-9, 235:3-22, and 236:6-15.)

34. In determining the level of efforts with which to support a product, it is standard in the pharmaceutical industry to rely on the advice of outside consultants to determine the

optimal level of sales-force and marketing resources for a product. (Expert Report of Peter Lankau, attached as **Exhibit 26**, at 7-8.)

35. In mid- to late-2016, John Hassler and his team—including Tomlinson and Reilly—worked with Teva's outside consultant, ZS Associates, to determine the optimal level of sales-force and marketing resources to devote to Amrix in 2017. (Deposition of Dalton Tomlinson, excerpts attached at **Exhibit 27**, at 31:19-32:6, 36:2-7, 38:20-39:13; Hassler Depo., **Ex. 7**, at 152:3-153:11; 154:3-6.)

36. ZS was "one of the best in the industry." (Jacobs Depo., **Ex. 2**, at 147:7-15.) Even Teva's expert, John Russell, concedes that ZS was a "best-in-class consultancy for pharmaceutical marketing mix and sales force sizing analyses." (Expert Report of John Russell, attached hereto as **Exhibit 28**, at 33.)

37. ZS recommended that Teva's field sales force continue to support Amrix through at least 2020. (T_A_00140372, **Exhibit 29**, at slide 17.)

38. Hassler, Reilly, and Tomlinson—the three senior Teva employees most knowledgeable about the marketing and sale of Amrix (Tomlinson Depo., **Ex. 27**, at 55:12-21)—took ZS's advice into consideration for the CNS AOP for 2017, recommending that Teva continue to support Amrix with a field sales force of between [redacted] and [redacted] representatives throughout 2017. (T_A_00142605, **Exhibit 30,** at slides 94, 97; Tomlinson Depo., **Ex. 27**, at 61:9-62:10, 100:1-9.) They did not recommend making significant cuts to the Amrix sales force. (Hassler Depo., **Ex. 7**, at 182:6-9; 211:9-212:10.) In making their recommendations, Hassler, Reilly, and Tomlinson considered all the information and risks known at the time. (Tomlinson Depo., **Ex. 27**, at 52:14-53:10.)

39. Even while Hassler and other NASM managers were finalizing their proposed AOPs, however, they were warned that significant modifications would be likely. On October 4, 2016 (shortly after the Actavis acquisition), David Loughery, Vice President of Finance for NASM, circulated an email to his business-unit managers with the subject line "AOP Review guidance." (T_A_00185771, attached hereto as **Exhibit 31**.) In it, Loughery explains that Teva's business situation had changed since the LRP submissions earlier in the year, that there were "challenges across the portfolio," and that the business units needed to look for "strategic levers" to "bridge the gap." (*Id.*)

40. Downey suggested that his managers shift resources away from "smaller older products" to support "our newer and higher priority products." (*Id*. *See also* Downey Depo. 225:6-226:12.) John Jacobs, head of the Commercial Operations business unit, passed along the message to his leadership team and, in accordance with Downey's request, identified Amrix as one of the "older products" whose budget he thought could be cut. (**Ex. 31;** Downey Depo., **Ex. 5**, at 231:4-13.)

41. In fact, Teva's senior management had "challenged" the North American Specialty Medicines division to cut its budget by around $[redacted] million. (T_A_143219, attached hereto as **Exhibit 32**; Downey Depo., **Ex. 5**, at 135:16-136:10; **Jacobs Depo., Ex. 2**, at 162:21-163:6, 263:14-264:5, 264:22-265:1-3, 265:17-22, 303:16-304:7.)

42. When Downey and other senior management reviewed the proposed CNS AOP, they told Hassler that CNS needed to make greater improvements to its operating profits. (Hassler Depo., **Ex. 7**, at 299:2-300:5; Tomlinson Depo., **Ex. 27**, at 108:22-110:19, T_A_144091, **Exhibit 33.)** From late-October through early-December 2016, Hassler, Reilly,

and Tomlinson worked with ZS to model the effects that reducing sales force size would have on Teva's net income and profits. (T_A_00305083, **Exhibit 34;** Hassler Depo, **Ex. 7**, at 102:8-15.)

43. Despite the mandate for more budget cuts, they again recommended that Amrix be supported by a substantial field sales force throughout 2017. (**Ex. 34**, at 10; Tomlinson Depo., **Ex. 27**, at 140:22-142:9.) In their recommended scenario, the total Amrix field sales team would be reduced from around [redacted] to [redacted]. (**Ex. 34**, at 10; Downey Depo., **Ex. 5**, at 249:17-22; Tomlinson Depo., **Ex. 27**, at 167:8-168:22.) In the first half of 2017, all [redacted] of the representatives would support Amrix. (**Ex. 34**, at 11.) In the second half, [redacted] of these employees would shift to another drug, Austedo TD, to assist in its launch. (*Id.*) The remaining [redacted] field representatives would continue to promote Amrix. (*Id.*)

44. The other main option under consideration was one where Amrix would be supported by [redacted] field representatives in the first part of 2017, but all [redacted] of these representatives would shift their efforts to Austedo TD in mid-2017 and no one would promote Amrix in the field. (**Ex. 34**, at 11.) This scenario offered a small benefit to Teva in 2017, improving the bottom line by about $[redacted] million. (T_A_00143726, attached hereto as **Exhibit 35**, at slide 10) But taking 2018 into consideration, it would *lower* profits a total of $[redacted] million over the two year period. (*Id. See also* Downey Depo., **Ex. 5**, at 167:18-170:2; Hassler Depo., **Ex. 7**, at 210:16-211:1.) Viewed from the perspective of Amrix's interests, this was a poor choice. (Downey Depo., **Ex. 5**, at 171:12-172:7.)

45. Against CNS's recommendation, senior management opted for the [redacted]-representative plan—including the decision to shift the entire sales force from Amrix to Austedo in mid-2017. (Downey Depo., **Ex. 5**, at 157:5-9; Hassler Depo., **Ex. 7**, at 185:4-12, 189:20-190:2, 213:18-214:13; Tomlinson Depo., **Ex. 27**, at 140: 12-21, 186:1-187:16.)

46. In January 2017, Teva announced a layoff of approximately [redacted] the Amrix sales force. (T_A_00144097, **Exhibit 36**, at 1.) And in July, all the remaining Amrix sales representatives were reassigned to Austedo TD (T_A_00145718, **Exhibit 37;** Loughery Depo., **Ex. 6**, at 59:12-16; Hassler Depo., **Ex. 7**, at 71:1-5.)

47. As predicted by Teva's outside and internal analyses, Amrix sales fell rapidly in the third and fourth quarters of 2017. (Downey Depo., **Ex. 5**, at 239:1-4 and 13-18, 254:15-20; Tomlinson Depo., **Ex. 27**, 191: 5-10.) Gross sales of Amrix were $[redacted] million in the first quarter of 2017 and $[redacted] million in the second quarter, but only $[redacted] million in the third quarter, and $[redacted] million in the fourth quarter. (**Ex. 17**, tab "Amrix".) Amrix sales continued their drop in 2018 and never recovered. (*Id*.)

*Robins Seeks Information About Declining Amrix Sales*

48. Although Amrix's decline was "immaterial" to Teva, a company with billions of dollars in annual sales (Downey Depo., **Ex. 5**, at 172:17-21; Loughery Depo., **Ex. 6**, at 45:1-7, 57:1-5), it caught the attention of Robins.

49. On November 7, 2017, Fred Hall at Robins emailed Teva to ask about the "drastic drop in gross sales" in the third quarter of 2017. (ROBINS_0002074, **Exhibit 38**). Not receiving a response, he sent another email a few weeks later, again asking for an explanation for the fall in Amrix sales (ROBINS_0001976, **Exhibit 39**.)

50. A Teva USA employee, Francine Del Ricci, responded to Hall's inquiry by attributing the decline in sales to: (1) the increasing genericization of the skeletal muscle relaxant space, and (2) the rising costs of coupons. (*Id.*) Del Ricci failed to mention that Teva—against the advice of its outside consultant and the members of Teva's management team most familiar with Amrix—had eliminated the Amrix field sales in mid-2017. Del Ricci declined Hall's

invitation to discuss Amrix, explaining that "Year-end activities preclude scheduling a call." (**Ex. 39**.)

51. Not satisfied with Del Ricci's response, Hall replied: "I have one very important question for you. Is there an active Teva sales force in the field marketing AMRIX?" (**Ex. 39**.) Del Ricci responded that "Teva has an appropriate level of sales effort on AMRIX . . . including sales representatives who detail AMRIX to physicians." (**Ex. 39**.)

52. Del Ricci's response to Hall's question was, at best, misleading. There was no active field sales force marketing Amrix at the time. Del Ricci knew that the field sales force had been mostly, or entirely, supplanted by internal sales representatives—telemarketers. (Deposition of Francine Del Ricci, excerpts at **Exhibit 40**, at 177:17-178:7.) So the "physician details" that Del Ricci refers to are not visits by field representatives, they are telephone calls by the telemarketers (the "inside sales representatives") that replaced the Amrix field sales force in July 2017.

53. On January 9, 2018, E. Claiborne Robins himself wrote a letter to Del Ricci, explaining Robins' frustration with the lack of information from Teva and demanding a meeting with a high-level counterpart at Teva. (ROBINS_0001048, **Exhibit 41**.) Robins told Del Ricci that he preferred such a meeting to litigation. (*Id.*) Del Ricci responded two weeks later, providing essentially the same explanation as before, i.e., increased managed-care restrictions and increasing costs of the Amrix coupon program. (ROBINS_1850, **Exhibit 42.)** She ended the letter by telling Mr. Robins that the only information the company was entitled to was "reports of gross and net sales on a quarterly basis" and warning him that Teva would seek costs and legal fees if Amrix sued Teva and lost. (*Id.*)

54. This action followed.

ARGUMENT

## I. Teva Ltd. is bound by the Agreement's consent-to-jurisdiction provision.

In its motion, Teva asks the Court to dismiss the counts against Teva Ltd. for lack of personal jurisdiction. [ECF No. 250, at 15-25.] It contends that Teva Ltd. did not assume any rights or obligations under the Agreement and so is not bound by the consent-to-jurisdiction provision in § 13.11 of the Agreement. As shown below, however, the Court has personal jurisdiction over Teva Ltd. because, as the Court already has found[3] and the record evidence confirms, Robins has established a prima facie case[4] that (1) Teva Ltd. was a successor or assign of Teva Int'l, and (2) Teva Ltd. and its subsidiaries were mere "alter egos."

### A. Teva Ltd. is a "successor" or "assign" under the Agreement.

This Court has jurisdiction over Teva Ltd. pursuant to the Agreement's consent-to-jurisdiction provision. Section 13.11 states that "[e]ach party hereby irrevocably submits to the jurisdiction of . . . the United States District Court for the Eastern District of Virginia." The Agreement, including § 13.11, "is binding on, inures to the benefit of and is enforceable by the parties hereto and their respective successors and permitted assigns." (Agreement, **Ex. 3**, at § 13.01.) Teva does not dispute that § 13.11 confers jurisdiction over Teva USA, Teva Int'l, or Cephalon. But it claims the Court lacks jurisdiction over Teva Ltd., their corporate parent.

[3] ECF No. 75, at 41.

[4] Where a court rules on personal jurisdiction without the aid of an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction; the court must "resolve all factual disputes in the plaintiff's favor." *Mylan Laboratories, Inc. v. Akzo, N. V.*, 2 F.3d 56, 60 (4th Cir. 1993).

Not so. Teva Ltd. is a "successor" and "assign" to Teva Int'l insofar as it has voluntarily undertaken Teva Int'l's responsibilities under § 4.02(c) of the Agreement. The Agreement does not define either "successor" or "assign." As a general matter, "successor" means: "1. Someone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor. 2. A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." SUCCESSOR, Black's Law Dictionary (11th ed. 2019). And under New York law, a party is a successor, subject to liability, where "there is an express or implied agreement to assume the other company's debts and obligations," *Eclaire Advisor as Tr. to Daewoo Int'l (Am.) Corp. Creditor Tr. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 267 (S.D.N.Y. 2005). "Assign," when used as a noun, is synonymous with "assignee." ASSIGN, Black's Law Dictionary (11th ed. 2019). And an "assignee" is "[s]omeone to whom property rights or powers are transferred by another." ASSIGNEE, Black's Law Dictionary (11th ed. 2019). Whether Teva Int'l is a "successor" or "assign" thus depends on whether Teva Int'l has ceded, and Teva Ltd. has voluntarily assumed, rights and obligations under the Agreement.

The evidence supports Robins' claim that Teva Int'l voluntarily ceded, and Teva Ltd. voluntarily assumed, duties concerning the sale and marketing of Amrix under § 4.02(c) of the Agreement. Teva Int'l is the Teva entity that formally assumed Anesta AG's rights and obligations under the Agreement. (SAMF ¶¶ 8.) But the evidence shows that Teva Int'l ceded those rights and obligations to other entities within the Teva family of companies. Teva Int'l did not participate in decisions about how Amrix was to be marketed or sold—the individuals responsible for Amrix were not Teva Int'l employees, and did not consult with anyone at Teva Int'l when formulating their marketing and sales plans. (SAMF ¶¶ 23.)

The evidence further shows that Teva Ltd.'s CEO and Board assumed ultimate responsibility for the marketing and sale of Amrix. Among other things, they exercised final approval authority over all of CNS's budget decisions, including those concerning Amrix. (SAMF ¶¶ 21-23.) Having voluntarily assumed the right to decide the level of efforts and resources to be deployed on Amrix's behalf, Teva Ltd. has likewise succeeded to the obligations under the Agreement, including consent to jurisdiction in the Eastern District of Virginia. This interpretation accords with the Court's earlier jurisdictional ruling, which states: "If between 2011 and 2019, Teva Ltd. and Teva USA were responsible for the sale and marketing of Amrix, then it reasonably follows that those entities became parties to the contract." [ECF No. 75, at 24.] To the extent that Teva Ltd. disputes that it assumed responsibility for Amrix, this presents a question for the jury, not the Court.[5]

### B. Teva Ltd. is the alter ego of entities over which the Court has jurisdiction.

The Court also may exercise personal jurisdiction over Teva Ltd. under an alter-ego theory. Courts evaluating whether jurisdiction over a subsidiary extends to its parent company consider the following factors: (1) common ownership, (2) financial dependency of the subsidiary on the parent corporation, (3) the degree to which the parent influences the selection of the subsidiary's executive personnel and observes corporate formalities, and (4) the parent's degree of control over marketing decisions and operational policies. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-21 (2d Cir. 1984) (Winter, J.)

[5] Teva Ltd.'s status as a "successor" or "assign" under the Agreement goes to the merits of Robins' claims against Teva Ltd. Where, as here, jurisdictional facts are intertwined with facts that must be decided by a jury, the Seventh Amendment forbids the court from resolving them. *See Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006).

(applying New York Law).[6] *See FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 56 N.Y.S.3d 12, 16 (App. Div. 2017) (applying *Beech Aircraft* standard).

In *Beech Aircraft*, the plaintiff alleged that the landing gear of a Beech "King Air 200" aircraft was defectively designed, leading to a crash in Bremen, West Germany. 751 F.2d at 119. The plaintiff sued the manufacturer in New York. Although Beech was headquartered in Kansas, it marketed aircraft in New York through a wholly owned subsidiary. The district court dismissed the claims against Beech, finding that jurisdiction over the subsidiary did not confer jurisdiction over its parent. *Id.* On appeal, the Second Circuit reversed. It noted that jurisdiction may be asserted over a parent company "when the activities of the parent show a disregard for the separate corporate existence of the subsidiary" over which the court has jurisdiction. *Id.* at 120. Applying the four factors listed above, the court concluded that Beech's New York subsidiary was a "mere department" of the parent company, subjecting the parent company to personal jurisdiction.

In the present case, there is sufficient evidence to establish jurisdiction over Teva Ltd. under an alter-ego theory. It is undisputed that this Court has jurisdiction over Teva Int'l pursuant to the consent-to-jurisdiction provision. And it also is undisputed that Teva Int'l is a wholly owned subsidiary of Teva Ltd.—the two have common ownership. The evidence further shows that Teva Int'l is financially dependent on Teva Ltd. and the other Teva entities. Most of its assets and obligations are loans to and from other Teva entities, and more than 99% of its business transactions are with other Teva entities. (SAMF ¶ 13.) The evidence also shows that

---

[6] As noted above, the parties chose New York law to apply to issues regarding the interpretation of the Agreement. Because the jurisdiction issue concerns the scope of the Agreement's consent-to-jurisdiction clause, New York law applies. The result would be the same under Virginia law. *See Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 392 (4th Cir. 2018).

Teva Int'l disregarded corporate formalities. Teva Int'l does not have a CEO or board of directors. (Teva Int'l Depo., **Ex. 11**, at 27:9-14.) The company's Rule 30(b)(6) corporate representative, Jon Miller, could not say what management structure, if any, the corporation had; could not say whether management conducted meetings where minutes were taken; and did not know—even approximately—the number of its employees. (*Id.* at 27:15-28:19.) No Teva Int'l employees were involved in any decisions regarding Amrix. (*Id.* at 29:3-11, 31:3-32:4.) Finally, the record evidence establishes that, on the whole, Teva operated as a single business organization, with employees paying little or no attention to the formal Teva entities that employed them or their coworkers. (SAMF ¶¶ 10-12.) Viewed in the light most favorable to Robins, and resolving all reasonable inferences in Robins' favor, this evidence establishes a prima facie case for personal jurisdiction under an alter-ego theory.

## II. The record evidence supports Robins' contract claim against Defendants.

"Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *ChemTreat, Inc. v. Certain Underwriters at Lloyd's of London*, 488 F. Supp. 3d 343, 354 (E.D. Va. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986)). Summary judgment does not lie where there is a disputed question of "material" fact, i.e., where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### A. Teva breached § 4.02(c) of the Agreement.

Teva's summary-judgment motion fails on the merits because Robins can establish a prima facie case of breach of contract. "Under New York law, a cause of action for breach of

contract requires '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F.Supp. 3d 16, 33 (S.D.N.Y. 2017) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004)). In its motion, Teva does not dispute the existence of the Agreement, adequate performance of the Agreement by Robins, or Robins' ability to establish damages. Its argument focuses instead on the third element: breach. But the record evidence, viewed in the light most favorable to Robins, establishes that Teva breached its CRE obligations under § 4.02(c) of the Agreement.

The Agreement defines "Commercially Reasonable Efforts" as the "efforts and resources" that the buyer would use "consistent with its normal business practices," which "in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry" for a similarly sized company, taking into account "efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product." (Agreement § 4.02(c).) Thus, Robins can establish a breach by showing that Teva's actions vis-à-vis Amrix were either: (1) inconsistent with Teva's "normal business practices," or (2) inconsistent with the level of support "standard in the pharmaceutical" industry for a product like Amrix.

The evidence shows that, by withdrawing support for Amrix five years before its expected loss of exclusivity, Teva deviated from its "normal business practices." Teva's normal business practice was to provide field sales support for its patent-protected drugs until their "loss of exclusivity." (SAMF ¶ 28.) But Teva pulled field sales support from Amrix in mid-2017, even though it predicted at the time that the drug would not lose exclusivity until 2022. (SAMF

¶¶ 27, 45-46.) This deviation from its normal business practices in marketing patent-protected drugs is alone sufficient to create a jury question on the issue of breach.

The evidence also shows that Teva's level of support for Amrix fell below industry standards. Standard industry practice is to obtain an analysis from and work with an established industry consultant like ZS to determine optimal sales force sizing. (Lankau Report, **Ex. 26**, at 9.) After reviewing all the relevant facts, ZS recommended to Teva that it maintain an Amrix field sales force with approximately [redacted] representatives (or their equivalent) until at least 2020. (SAMF ¶ 37.) Yet Teva rejected this recommendation, eliminating field sales support for Amrix in mid-2017. Accordingly, Teva's conduct fell below industry-standard efforts for a drug like Amrix.

This is confirmed by additional statements by Robins' expert, Peter Lankau. Lankau is the former CEO of Endo Pharmaceuticals, and has wide experience in marketing drugs like Amrix (Lankau Report, **Ex. 26**, at 1-2.) Lankau observes that Amrix was a profitable, but highly promotionally sensitive, product and that standard industry practice for such a product was to provide substantial field support until loss of exclusivity. (*Id.* at 16-17.) Applying his experience in the pharmaceutical industry to the facts of this case, Lankau opines that maintaining a field sales force of around [redacted] representatives would represent the standard pharmaceutical industry level of support for a product like Amrix. (*Id.* at 16.)

Because evidence supports Robins' claim that Teva breached its obligation to use CRE to support Amrix at all times during the earnout period, and because Teva has refused to pay the alternate purchase price triggered by its failure to exercise CRE, Robins has established a prima facie case of breach. Accordingly, the Court should deny Teva's motion for summary judgment.

### B. Teva's financial problems do not justify its failure to use CRE.

The Agreement's CRE definition takes the following factors into account: "efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product." (Agreement § 4.02(c).) It does not reference the buyer's financial condition or business priorities. Under "the maxim *expressio unius est exclusio alterius,* which applies to contracts as well as statutes '[w]here a [document] describes the particular situations in which it is to apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted and excluded.'" *Dunn Auto Parts, Inc. v. Wells*, 155 N.Y.S.3d 507, 510 (App. Div. 2021) (quoting *Village of Webster v. Town of Webster*, 705 N.Y.S.2d 774 (App. Div. 2000)) (internal citation omitted) (brackets in original). Accordingly, in determining whether Teva complied with its CRE obligations, the only relevant factors are those enumerated in the parties' CRE definition. Because the buyer's financial condition and business priorities are not among those factors, they are not relevant considerations regarding CRE.

In its brief, however, Teva claims that New York law allows consideration of a party's business interests when evaluating whether a party exercised commercially reasonable efforts. [ECF No. 250, at 26-29.] The cases Teva relies on, however, are inapposite. In all but two of them, the parties did not define "commercially reasonable efforts" or otherwise describe what efforts would be necessary to satisfy the CRE requirement.[7] The courts in those cases needed to

[7] *See Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *42 (S.D.N.Y. Oct. 13, 2021); *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 472 (S.D.N.Y. 2018); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568 (S.D.N.Y. 2013); *Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 915 (E.D. Cal. 2010); *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, No. 03 CIV. 8259 (CSH), 2007 WL 1988150, at *19 (S.D.N.Y. July 10, 2007); *Bioventus LLC v. Trindent Consulting Int'l, Inc.*, No. 1:18-CV-815, 2020 WL 8996156, at *5 (M.D.N.C. Oct. 20, 2020) (applying N.Y. law); *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. CIV.03-5441 PAM/RLE, 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005). *Cf. Napo Pharmaceuticals, Inc. v. Salix Pharmaceuticals, Inc.*, No.

supply a definition for the parties. In the present case, by contrast, the parties themselves supplied the definition for CRE. That definition specifies, in no uncertain terms, the level of efforts deemed to be commercially reasonable. Under New York law, contracting parties are free to define contract terms however they like. *See, e.g.*, *Fox Film Corp. v. Springer*, 8 N.E.2d 23, 24 (N.Y. 1937). Because the parties agreed upon the meaning of CRE and included that definition in § 4.02(c), it is that specific meaning of CRE—not the general one developed in New York case law—that applies to this case.

In only two of the cases Teva cites did the parties define CRE. Those cases— *Napo Pharmaceuticals v. Salix Pharmaceuticals* and *InspiRx v. Lupin Atlantis*—do not support Teva's argument. In *Napo Pharmaceuticals*, the parties entered into an agreement in which the defendant agreed to commercialize a drug then under development. The contract defined CRE, in relevant part, as the "efforts and resources commonly used in the research-based pharmaceutical industry for an internally developed product of similar commercial potential, at a similar stage in its lifecycle, taking into consideration is safety and efficacy, its *cost to Develop*, the competitiveness of alternative products, its proprietary position, and *the likelihood of regulatory approval*." 2014 WL 1093536 (emphasis added). The plaintiff alleged that the defendant failed to use CRE because it took too long to obtain FDA approval. The undisputed evidence, however, showed that the defendant sought FDA approval within the industry-standard time frame after phase III trials. Similarly, the plaintiff argued that the defendant failed to use CRE because it delayed construction of a costly manufacturing facility until after it received the drug's phase III clinical-trial results. But the plaintiff's expert conceded that only 50% of drugs

651214/2011, 2014 WL 1093536 (N.Y. Sup. Ct. Jan. 29, 2014) (parties defined CRE); *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, No. 20 CIV. 3214 (JPC), 2021 WL 3604850, at *8 (S.D.N.Y. Aug. 12, 2021) (same).

in phase III trials obtain FDA approval. Given this risk, the court held that it was not commercially unreasonable to wait for positive Phase III results before commencing expensive construction. *Id.*

In *InspiRx v. Lupin Atlantis Holdings*, the defendant agreed to market, sell, and distribute a respiratory inhaler. The contract's definition of CRE was much looser than the definition in the present case—requiring efforts that were "not . . . less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective . . . taking into account efficacy, safety, approved labeling, the competitiveness of alternative products in the marketplace, the patent and other proprietary position of the product, *and other relevant factors commonly considered in similar circumstances.*" *Id.* at *2 (emphasis added). The evidence showed that, despite the defendant's vigorous efforts to market the product, sales were disappointing and soon "flat-lined." *Id.* at *3. After this discouraging start, the defendant altered its marketing strategy—a plan that the plaintiff endorsed. These new efforts were not successful, either. Unhappy with the poor sales, the plaintiff claimed that the defendant failed to use CRE as defined by the Agreement. The court granted the defendant's motion for summary judgment, noting that the product's "weak sales . . . cannot be attributed to any unreasonable efforts on [the defendant's] part." *Id.* at *9. The facts in *InspiRx* are the opposite of those here: In InspiRx, the defendant reduced its marketing efforts because sales had flat-lined; here, Amrix sales flat-lined because Teva reduced its marketing efforts. Neither *Napo Pharmaceuticals* nor *InspiRx* supports Teva's argument that its business interests were a relevant factor when determining strategy for the marketing and sale of Amrix.

Construing the Agreement's CRE provision to take Teva's financial situation into account is not just inconsistent with the CRE definition 4.02(c); it is antithetical to it. As the

second sentence in 4.02(c) makes plain, the purpose of the CRE provision is to protect Robins against "changes" in the "business strategy" of the buyer or its successors-in-interest. All else being equal, businesses try to maximize their profits—adjusting their strategy from time to time to achieve this goal. If, as Teva contends, the buyer could justify its failure to exercise CRE under 4.02(c) by arguing that doing so was better for its business, then the CRE provision would rarely, if ever, protect Robins against "changes" in the buyer's "business strategy." Accordingly, interpreting CRE to allow consideration of Teva's overall financial condition would defeat the explicit purpose of the CRE requirement. The Agreement's CRE definition requires that marketing decisions be based on Amrix's commercial merits, not on Teva's financial exigencies.

### C. Teva's breach of the CRE provision did not improve profits.

Yet even if the impact on Teva's overall business were a relevant consideration—and it is not—the record evidence still supports Robins' claim of breach. Analyses done by ZS and by the CNS business unit show that eliminating field support for Amrix would *reduce* CNS's profits by approximately $[redacted] million over a two-year period. (SAMF ¶44.) This is why Hassler, Reilly, and Tomlinson repeatedly recommended keeping an Amrix sales force in the field even after the Austedo TD launch. (SAMF ¶ 43.) There is, by contrast, no evidence that eliminating the field sales force would improve Teva's overall profits.

* * *

For all of the above reasons, Robins can establish a prima facie case for breach of contract. The Court therefore should reject Teva's argument that Robins cannot establish a breach of the CRE provision.

### III. The Court should reject Teva's assertion that Robins has pleaded itself out of a contract claim.

In its brief, Teva claims that the present case is ripe for summary judgment because, it says, *Robins* argues that using CRE to support Amrix would have bankrupted Teva. Teva then claims that, *if* this were true, it would mean that Teva was "privileged" to disregard the CRE requirements and so Amrix's contract claims fail as a matter of law.

Teva's argument applies arguments that Robins never made to a hypothetical situation that never occurred. As an initial matter, Teva's argument is procedurally barred because it asserts an affirmative defense that it has not pleaded and cannot prove. Whether the application of CRE would contribute to Teva's financial distress is not relevant to Robins' positive contract claim. Section 4.02(c)'s definition of CRE does not mention financial distress. So Robins need not plead or prove that promoting Amrix would not cause Teva to suffer such distress. Financial distress—or its absence—is not an element of Robins' contract claim, it is an attempted affirmative defense to such claim. At bottom, the defense is one of impossibility—i.e., that complying with the CRE provision was impossible because doing so would have been financially ruinous. But impossibility is an affirmative defense that must be pleaded and proven by the party asserting it. *Red Tree Invs., LLC v. Petroleos de Venezuela, S.A.*, No. 19-CV-2519 (PKC), 2021 WL 6092462, at *5 (S.D.N.Y. Dec. 22, 2021). Teva does not include impossibility in its list of affirmative defenses. [ECF No. 77, at 29-30] And even if had done so, it could not prove the facts needed to establish it. Under New York law, impossibility is a defense to breach of contract only where (1) destruction of the contract's subject matter renders performance impossible, or (2) the impossibility was produced by an unanticipated and unforeseeable event. *CAI Rail, Inc. v. Badger Mining Corp.*, No. 20 CIV. 4644 (JPC), 2021 WL 705880, at *7 (S.D.N.Y. Feb. 22, 2021) (*Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902 (1987)).

"'[I]mpossibility' does not excuse performance of a contract merely because the performance would be burdensome or unprofitable." *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 840–41 (Bankr. S.D.N.Y. 2020) (citing *Kel Kim*, 519 N.E.2d 295). "[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968).

Teva attempts to circumvent these problems by attributing the impossibility argument to *Robins*. Thus, it claims—falsely—that *Robins* has alleged that Teva needed to use CRE to support Amrix even though this would have bankrupted Teva:[8]

> Even assuming arguendo that all Plaintiff's allegations are true, *its theory would require Defendants to risk bankruptcy* to prioritize the marketing and sale of a single product Amrix.

[ECF No. 250, at 26.] Teva makes the same assertion later in its brief, attributing to Robins the position that Teva needed to use CRE to support Amrix even "when doing so could have forced Defendants into bankruptcy or forced Defendants to risk financial collapse." [ECF No. 250, at 29-30] (emphasis omitted). Teva goes so far as to say that Robins "admits" that "Defendants' actions with respect to Amrix…were 'necessary' to 'save the company.'" [*Id.* at 30.]

Teva attacks a straw-man. Robins has never alleged or "admitted" that providing Amrix the sales and marketing support required by § 4.02(c) of the Agreement would have forced the company into bankruptcy or caused its financial collapse. Nor has Robins alleged that it was necessary for Teva to eliminate the entire Amrix field sales force in order to save the company. Instead, Robins simply alleges that—because of the large amount of debt that Teva voluntarily

[8] Teva does not admit this in its Answer and does not present any evidence that promoting Amrix would have bankrupted the company. Instead, it (falsely) attributes that assertion to Robins.

assumed in its risky ~$40 billion purchase of Actavis—Teva needed to make cuts to its sales and marketing spending. (ECF No. 47, at ¶¶ 72-75.) Teva could have, and should have, looked elsewhere to implement its cost-cutting strategy: the CRE provision was designed to insulate Amrix from these shifts in business strategy.

Teva's argument also fails because it is, at bottom, a belated claim Robins has pleaded itself out of a cause of action. Such an argument, if one was to be made, needed to be asserted in Teva's 12(b)(6) motion. The Court already has held that the Second Amended Complaint states a claim for breach of contract. [ECF No. 75 at 34.] It should reject Teva's attempt to have the Court revisit the issue in the guise of ruling on a summary-judgment motion.

Teva attempts to dress up the argument as a factual one by claiming that Robins has "retain[ed] experts whose opinions are that Teva's financial condition absolutely necessitated its reduction in Amrix marketing." To support this argument, it cites pages 14-15 of the expert report of Peter Lankau, page 24 from Lankau's rebuttal report, and pages 11-12, 22-25, 38-39, 42, and 52 of the report of Guy Davis.[9] But none of these documents asserts that Teva's financial condition "absolutely necessitated" the drastic reduction in Teva's marketing efforts for Amrix. In pages 14-15 of his report, Lankau states that the business units in NASM were told to make significant budget cuts and that Amrix was singled out early in the process as a place for cuts. On page 24 of his rebuttal report, Lankau states that Teva's "self-inflicted financial crisis" led it to "adopt a strategy of slashing expenses across the board." (Rebuttal Report at 24.) That Teva adopted a general strategy of slashing expenses does not mean that using CRE to support

[9] Teva's reliance on Davis' report to support its summary judgment motion is an implicit acknowledgement that the report is admissible at trial. *See* Fed. R. Civ. P. 56(c)(2) (noting that a party may object to materials supporting summary judgment on the grounds that it would be inadmissible at trial).

Amrix would have broken the bank. Indeed, elsewhere in his report, Lankau observes that—far from being essential to Teva's recovery—cutting sales support for Amrix was inconsistent with maximizing profit from the product. (Lankau Report at 16-17.) The cited portions of the Davis Report likewise do not say that supporting Amrix with CRE would have been financially ruinous for Teva. (*See* Declaration of Guy Davis, attached as **Exhibit 43**, at ¶¶ 8-14.)

Notably absent from Teva's summary-judgment motion is any evidence that supporting Amrix with CRE would have been financially disastrous for Teva. Indeed, testimony from Teva's witnesses show that actions regarding Amrix could have had only a tiny effect on the company's overall finances. In their depositions, Downey and Loughery emphasize that Amrix was only a small part of NASM's multi-billion-dollar portfolio. (Loughery Depo., **Ex. 6**, at 45:5-7 (Amrix risk was "immaterial"); Downey Depo., **Ex. 5**, at 172 (noting that risk of losing $20 million in profits was "pretty small in [the] billion and a half dollars of [NASM's annual] operating profit.") And even if budgeting decisions concerning Amrix had a significant effect on Teva's finances, the evidence shows that—far from bankrupting the company—retaining a [redacted]-person field sales force for Amrix would have resulted in *increased* profits. (SAMF ¶¶ 38, 43-45.) Because there is no evidence that supporting Amrix with CRE would have injured Teva's finances, let alone bankrupted the company, the Court should deny Teva's motion.

CONCLUSION

For all the foregoing reasons, Robins respectfully requests that the Court deny Teva's motion for summary judgment.

Dated: January 5, 2022

Respectfully submitted,

E. CLAIBORNE ROBINS COMPANY, INC.

By: /s/ Thomas M. Wolf
Counsel

Thomas M. Wolf (VSB No. 18234)
Joseph M. Rainsbury (VSB No. 45782)
John "Jack" M. Robb, III (VSB No. 73365)
Kenneth T. Stout (VSB No. 88027)
Jason F. Goldsmith (VSB No. 95264)
MILES & STOCKBRIDGE P.C.
919 E. Main Street, Suite 1302
Richmond, Virginia 23219
804.905.6910 (Telephone)
804.905.6910 (Facsimile)
twolf@milesstockbridge.com
jrainsbury@milesstockbridge.com
jrobb@milesstockbridge.com
ktstout@milesstockbridge.com
jgoldsmith@milesstockbridge.com

James A. Sullivan, Jr. (admitted *pro hac vice)*
Matthew M. May (admitted *pro hac vice)*
MILES & STOCKBRIDGE P.C.
11 North Washington Street, Suite 700
Rockville, Maryland 20850
301.762.1600 (Telephone)
301.762.0363 (Facsimile)
jsulliva@milesstockbridge.com
mmay@milesstockbridge.com

*Counsel for E. Claiborne Robins Company, Inc.*