**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| E. CLAIBORNE ROBINS COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICALS INTERNATIONAL GMBH AND CEPHALON, INC.,<br><br>Defendants. | Civ. Action No. 3:18-cv-00827-DJN |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

January 11, 2022

## INTRODUCTION

It is undisputed that Teva Ltd. does no business in Virginia, has no offices here, and is otherwise not subject to personal jurisdiction in this district. Nevertheless, Plaintiff asserts Teva Ltd. is subject to personal jurisdiction in this district because it "voluntarily assumed obligations under the Agreement and so is bound by the Agreement's consent-to-jurisdiction provision" as a "successor or assign of" Teva Pharmaceuticals International GmbH ("TPIG"). (Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Opp.") 1, 16, ECF No. 258.) Plaintiff attempts to create disputed factual issues by arguing that: (1) TPIG "ceded . . . rights and obligations [under the Agreement[1]] to *other entities within the Teva family of companies*"; and (2) Teva Ltd.'s "CEO and Board" exercised final authority over all of CNS's budget decisions, including those concerning Amrix. (Opp. 17, 18 (emphasis added).) Even accepting those facts as true for purposes of this motion, they do not create a disputed issue of *material* fact on the jurisdictional question. Plaintiff cites no authority (and there is none) for the proposition that a parent company's high-level review or approval of a subsidiary's budgets demonstrates the requisite intent to be bound by the subsidiary's contractual obligations. Plaintiff also argues—for the first time—that Teva Ltd. is subject to the personal jurisdiction of this Court based on an alter ego theory. Plaintiff's operative complaint, however, contains *no* such alter ego allegations. Plaintiff has thus waived this theory. Accordingly, this Court should grant Teva Ltd.'s motion for summary judgment based on lack of personal jurisdiction.

Summary judgment is also appropriate as to *all* Defendants because they were legally privileged to take the very actions Plaintiff contends breached the CRE provision—the decision to reduce the marketing spend for Amrix in 2017. Plaintiff contends Defendants reduced the

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Defendants' Memorandum of Law in Support of Motion for Summary Judgment (the "Motion").

marketing spend because they were experiencing financial problems. (*See, e.g.*, Opp. 29-30 (ignoring Plaintiff's own admissions that "Teva's financial difficulties ***required*** drastic cuts that ultimately included cuts to Amrix" (Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 48 (emphasis added)) in arguing ***Defendants*** have not proven financial inability to perform).) But as a matter of law, that cannot constitute a breach of the CRE because "a commercially reasonable efforts clause does not require the signatory to act against its own interest." *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, --- F. Supp. 3d ---, 2021 WL 3604850, at *10 (S.D.N.Y. 2021). Indeed, the CRE provision at issue here specifically allowed Defendants to consider their own financial and other business interests when making Amrix marketing decisions. *See* SUMF ¶ 3 (the CRE Provision's definition includes "efforts and resources … consistent with its ***normal business practices***" and also "the level of efforts and resources standard in the pharmaceutical industry ***for a company similar in size and scope***") (emphasis added). Plaintiff's claims thus fail under Plaintiff's own theory of the case, and summary judgment should be granted for all Defendants.

## DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ("DSAMF")[2]

### A. Teva Entities Observe Appropriate Corporate Formalities and Teva Ltd. Never Had Responsibility For Amrix Marketing Efforts.

1. Teva Ltd. is the parent company of various subsidiaries in Europe, North America, Latin America, and Asia. Ex. 39, TEVA_AMRIX_00638419, § 3.1.

2. TPIG is located in Rapperswil-Jona, Switzerland and is a subsidiary of Teva Pharmaceuticals Europe B.V. ("Teva Europe"). TPIG performs activities for Teva-affiliated

[2] Because the majority of the facts Plaintiff lists in its "Statement of Additional Material Facts" ("SAMF") are irrelevant and/or immaterial to this motion (*e.g.*, SAMF ¶¶ 1-4, 24-28, 34-54), and also because many are legal conclusions or otherwise inadmissible (*e.g.*, SAMF ¶¶ 5-6, 13, 23, 48, 52), Defendants do not respond to each in turn (nor are they required to under the Rules (*see* E.D. Va. Local Civ. Rule 56 (directing that the Court may assume facts identified by the moving party which are not controverted in the non-moving party's opposition are admitted, but including no

entities. *Id.* § 3.2.3.4. "TPIG trades mainly global specialty medicines and branded generic products with various markets in the European Union, Latin America, and United States. Its manufacturing and sales activities are coordinated from the headquarters in Jona, Switzerland." *Id.*

3. Teva USA is the "primary operating subsidiary in North America, and is a leading pharmaceutical distributor in the United States." *Id.* § 3.2.1. Teva USA distributes products that "are either manufactured by [Teva USA], purchased from foreign and domestic related parties, or purchased from third parties that manufacture on behalf of [Teva USA's] foreign and domestic related parties." *Id.*

4. Teva Sales & Marketing, Inc. ("Teva Sales") is incorporated in the United States and engages in sales and marketing services on behalf of TPIG and Teva Ltd. through arm's-length agreements. *Id.* §§ 3.2.2, 3.2.3.1, 3.2.3.4. Teva Sales' "core competency is the marketing of proprietary pharmaceutical products of the Teva Group in the United States." *Id.* § 3.2.2.2.

5. Pursuant to a number of agreements, TPIG, and its predecessor, assigned responsibility for Amrix sales and marketing efforts to Teva USA and Teva Sales. *See* SUMF ¶¶ 13-18; Opp. Ex. 11, at 29:6-31:2. Teva USA and Teva Sales made marketing strategy decisions for Amrix. *See* SUMF ¶¶ 28-32; Ex. 39, TEVA_AMRIX_00638419 § 3.4; Ex. 40, TPIG 30(b)(6) Tr. 30:20-31:2.

6. The Teva employees in involved with Amrix marketing efforts were employed by Teva USA, Teva Sales, Teva Women's Health Sales Corp., and/or Teva Branded Pharmaceutical Products R&D, Inc. Ex. 38, Teva Ltd.'s Second Amended Responses & Objections to Plaintiff's Second Set of Interrogatories, at Response to Interrogatory No. 2; Ex. 13 ¶ 21 (declaration that

requirement to respond to the non-moving party's statement of disputed facts.))). Rather, to the extent Plaintiff's alleged disputed issues of material fact warrant a response, Defendants' response is set forth in its argument.

individuals Plaintiff alleges were involved in the marketing and/or sale of Amrix, are current or former employees of Teva Ltd.'s affiliates, but none are current or former employees of Teva Ltd.).

7. Rob Koremans, the former head of Teva's Global Specialty Medicines group, was employed by Teva Europe. Ex. 40, TPIG 30(b)(6) Tr., at 53:2-6.

8. Neither Teva Ltd. nor any of its current or former direct employees were involved in the marketing or sale of Amrix. *See* SUMF ¶¶ 28, 33-34. Teva Ltd. also did not review Amrix specific Annual Operating Plans ("AOP") and did not make any strategy decisions regarding Amrix. *See* SUMF ¶¶ 28, 29, 31; Ex. 40, TPIG 30(b)(6) Tr. at 54:5-22 (testifying final Amrix AOP approval would have occurred within Teva USA); Opp. Ex. 7, at 132:21-133:8 (Hassler stating that Teva Ltd.'s board did not "see the specific tactical plans that are associated with brands other than potentially Copaxone"), 145:2-6 (Hassler confirming that the board did not look at individual products when they approved AOPs). Teva Ltd.'s involvement was limited to review and approval of CNS-level, not Amrix-specific, budgets. *See* Opp. Ex. 2, at 73:7-74:1 (Jacobs stating that Koremans "signed off" on budgets and sent them "to Israel for a rollup"); Opp. Ex. 5, at 34:4-9 (Downey stating that "the CEO and his leadership team" had "final say" over business unit budgets).

9. Teva employees involved in Amrix marketing had general knowledge about what Teva entity employed them, to the extent it was relevant to their specific roles. *See, e.g.*, Opp. Ex. 2, at 74:15-20 (Jacobs stating that he viewed himself as "a member of Teva's North American-branded team"); Opp. Ex. 5, at 16:10-17 (Downey stating he worked for "Teva Pharmaceuticals USA"); Opp. Ex. 7, at 10:16-18 (Hassler stating he was an employee of Teva Sales); Ex. 41, Loughery Tr., at 9:5-8 (Loughery stating he was employed by "Teva USA").

10. None of the individuals who have been deposed in this case are employees or representatives of Teva Ltd. or otherwise have authority to make any representations on its behalf.

## ARGUMENT

## I. THIS COURT LACKS PERSONAL JURISDICTION OVER TEVA LTD.

At the summary judgment stage, Plaintiff "must demonstrate by a preponderance of the evidence" that personal jurisdiction exists over Teva Ltd. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). Plaintiff advances two arguments in support of personal jurisdiction over Teva Ltd.: (1) "Teva Ltd. was a successor or assign of [TPIG]"; and (2) "Teva Ltd. and its subsidiaries were mere 'alter egos.'" Opp. 16. Robins is wrong on both counts.[3] In assessing whether a corporation impliedly assumed another's obligations, New York courts typically examine if the alleged successor made admissions of liability, and the impact of the acquisition or transfer on the seller's creditors. *State of N.Y. v. N. Storonske Cooperage Co.*, 174 B.R. 366, 389 (N.D.N.Y. 1994). Here, those factors cut decidedly against a finding that Teva Ltd. impliedly assumed responsibility for Amrix marketing and sales efforts.

### A. Teva Ltd. Is Not A Successor Or Assign Under The Agreement.

Plaintiff claims that Teva Ltd. is a "successor" or "assign" under the Agreement because: (1) "[TPIG] voluntarily ceded, and Teva Ltd. voluntarily assumed, duties concerning the sale and marketing of Amrix" (Opp. 17); and (2) Teva Ltd.'s CEO and Board assumed responsibility for Amrix. Both of these arguments fail.

---

[3] Plaintiff also mischaracterizes Judge Lauck's earlier ruling on the motion to dismiss, asserting that the "Court already . . . found . . . Teva Ltd. and its subsidiaries were mere 'alter egos.'" Opp. 16. Judge Lauck made no such finding and did not even consider an alter ego theory, likely because Robins did ***not*** plead any such theory. *See generally* ECF No. 47.

*First*, it is simply not true that Teva Ltd. voluntarily assumed duties regarding the sale and marketing of Amrix. To the contrary, the undisputed evidence confirms that TPIG entered into agreements with *other Teva subsidiaries, and not Teva Ltd.,* to have those subsidiaries assume responsibility for the marketing and sale of Amrix. TPIG, a Swiss entity, relied on Teva USA and Teva Sales, not Teva Ltd., to make marketing and sales decisions concerning Amrix, a U.S. product. *See* DSAMF ¶ 5. These responsibilities were conveyed through written agreements, which TPIG's outside consultant opined were entered into on arm's-length terms. *See* DSAMF ¶¶ 4-5. TPIG's reliance on other Teva subsidiaries to market and sell Amrix in no way suggests that TPIG assigned to Teva Ltd. any responsibilities for Amrix.

*Second*, Teva Ltd.'s CEO and Board did not assume "ultimate responsibility for the marketing and sale of Amrix." Opp. 18. While Teva Ltd. does not dispute that it approved CNS-level budgets, *see* DSAMF ¶ 8,[4] that does not mean that any Teva Ltd. employee made decisions about Amrix marketing tactics. This distinction is important. Plaintiff cites no authority holding that a parent company's *general* supervision, consideration, or approval of a subsidiary's budget indicates an intent to assume obligations under a *specific* contract entered into by the subsidiary. And for good reason. Under Plaintiff's theory, a parent company's general supervision or approval of a subsidiary's budget would automatically subject the parent to jurisdiction under the terms of every contract entered into by that subsidiary. Parent companies, in turn, would routinely be held liable for *all* obligations under their subsidiaries' contracts simply by engaging in the "normal parent corporation behavior[]" of reviewing and approving "budget decisions." *Miami Prod. & Chem. Co. v. Olin Corp.*, --- F. Supp. 3d ---, 2021 WL 2587214, at *8 (W.D.N.Y. 2021) (quoting

[4] Contrary to Plaintiff's assertions, none of the witness testimony cited in SAMF ¶ 22 stated that Teva Ltd. made final decisions for Amrix marketing strategy.

*United States v. Bestfoods*, 424 U.S. 51, 72 (1998)); *see also Beech Aircraft*, 751 F.2d at 120 ("The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction."). Plaintiff's position would obliterate the corporate form, and is contrary to controlling law.

Indeed, and as explained above, in assessing successor liability, New York courts traditionally look at (1) whether any "[a]dmissions of liability on the part of officers or other spokesmen of the successor corporation" were made; and (2) "the effect of the transfer upon creditors of the predecessor corporation." *N. Storonske Cooperage Co.*, 174 B.R. at 389-90 (citation omitted). There is no record evidence of any "[a]dmissions of liability on the part of officers or other spokesmen of" Teva Ltd. *See id.* (Mot. 20-21.) In fact, Plaintiff admits that no Teva Ltd. employee communicated with Plaintiff about Amrix. *See* Opp. 2. Plaintiff has failed to identify even a single Teva Ltd. employee or representative who made any admission about Amrix to Robins or to anyone else. *See Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 537 (W.D.N.Y. 2001) (finding no implied assumption of liability on the part of an alleged successor corporation where "[n]o evidence ha[d] been offered . . . revealing any admissions of liability on the part of officers or other spokespersons of the alleged successor corporation").

Similarly, there is no evidence that the corporate transactions at issue here had any adverse "effect … upon creditors of the predecessor corporation." *N. Storonske Cooperage Co.*, 174 B.R. at 389. Neither Cephalon nor Anesta (or its successors) became "mere shells" as a result of the 2011 merger. Mot. 21-22. Thus, this factor also weighs against a finding that Teva Ltd. impliedly assumed obligations under the Agreement.

Defendants have submitted sworn statements that Teva Ltd. was ***never assigned*** any rights or obligations related to Amrix. *See* SUMF ¶¶ 12, 25. (Mot. 17.) That means Teva Ltd. did not assume any obligation under the Agreement to litigate in Virginia. *See Danstan Properties v. Merex Corp.*, No. 09 CIV 6137 RMB RLF, 2011 WL 135843, at *3 (S.D.N.Y. Jan. 7, 2011) (granting summary judgment in favor of defendant on successor liability claim where plaintiff failed to "adduce[ ] any facts from which the Court [could] infer that [d]efendant explicitly assumed liabilities" under the relevant agreement).

**B. Teva Ltd. Is Not The Alter Ego Of Its Subsidiaries.**

As a threshold matter, Plaintiff has waived any argument that Teva Ltd. is subject to personal jurisdiction in this Court based on an alter ego theory of personal jurisdiction because Plaintiff's operative complaint contains *no* factual allegations or claim that Teva Ltd. is the alter ego of any Defendant. "Without such allegations, the issue is not adequately raised, and [Teva Ltd.] was not put on notice that this was a theory against which it should be prepared to defend."[5] *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1067 (C.D. Cal. 2002). Had Teva Ltd. received adequate notice that Plaintiff intended to proceed on this theory, it could have sought expert discovery on this issue; allowing Plaintiff to raise this theory now would unfairly prejudice Teva Ltd. This Court should not permit Plaintiff to effectively amend its complaint *after* the close of discovery by raising a new theory of personal jurisdiction in its opposition to Teva Ltd.'s motion for summary judgment. Other courts have routinely held the same. *See, e.g.*, *id.* (holding that plaintiff may not argue an unpleaded alter ego theory to avoid summary judgment); *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09 CIV. 488 LGS HBP, 2015

[5] The only pleading that ever raised an alter ego theory was Plaintiff's Proposed Third Amended Complaint. But this Court denied Plaintiff's motion for leave to file that pleading. (ECF No. 177.)

WL 4998638, at *2 (S.D.N.Y. Aug. 20, 2015) (holding plaintiff could not raise alter ego theory for the first time in summary judgment opposition because plaintiff "did not plead facts showing an alter ego relationship in the Amended Complaint and declined to raise it . . . at the motion to dismiss stage"); *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 82 (S.D.N.Y. 2010) (same); *Scully v. US WATS, Inc.*, 238 F.3d 497, 515-16 (3d Cir. 2001) (alter ego theory was "never raised" in initial pleadings and therefore defendant "had no opportunity to present a defense").

In any event, as a matter of law, Teva Ltd. is not the alter ego of TPIG. Defendants agree the Court should apply the *Beech Aircraft Corp.* factors in assessing the alter ego issue. Applying those factors to the undisputed facts confirms that Teva Ltd. is not an alter ego of TPIG.

Teva Ltd. does not challenge the first factor, common ownership. The second factor, the financial dependency of the subsidiary on the parent corporation, cuts against Plaintiff's position. "[C]ourts require more than merely that a subsidiary derives income from its parent's business to show that the subsidiary is a mere department of the parent for jurisdictional purposes." *Stutts v. De Dietrich Grp*, 465 F. Supp. 2d 156, 164 (E.D.N.Y. 2006). "[E]xamples of a subsidiary's financial dependency on a parent corporation include the parent's provision of no-interest loans to the subsidiary, the parent's control of the subsidiary's finances, and the parent's financing of inventory for the subsidiary." *Id.* Plaintiff presents no such evidence. Instead, it argues that TPIG is "financially dependent on Teva Ltd. and the other Teva entities" because "its assets and obligations are loans to and from other Teva entities" and "more than 99% of its business transactions are with other Teva entities." Opp. 19. But even accepting those "facts" as true for purposes of this motion, they do not create a prima facie case of alter ego. Plaintiff presents no evidence that the loans were anything but proper, well-documented, arm's-length transactions. *See*

*In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 626-27 (Bankr. S.D.N.Y. 2015) (finding plaintiff failed to make out a "*prima facie* case for financial dependency" where the complained of loans were "well-documented," had a "market interest rate," and were "an arm's-length, market-rate transaction"); *see also Wilder v. News Corp.*, No. 11 CIV. 4947 PGG, 2015 WL 5853763, at *10 (S.D.N.Y. Oct. 7, 2015) (plaintiff's allegation that parent approved yearly budget and provided financial support to subsidiary were not sufficient to demonstrate financial dependence). Likewise, the fact that TPIG purportedly derives the majority of its business from *other Teva entities* (not Teva Ltd.) does not demonstrate TPIG is financially dependent on Teva Ltd. *Stutts*, 465 F. Supp. 2d at 164 (finding allegations that, without the parent "to sell and service," the subsidiary "would have no business or income" did not "suggest[ ] financial dependency").

The third and fourth *Beech Aircraft* factors examine the extent to which Teva Ltd. "interferes in the selection and assignment of [TPIG] executive personnel and fails to observe corporate formalities" and Teva Ltd.'s "degree of control over [TPIG's] marketing and operational policies." *Beech Aircraft*, 751 F.2d at 121-22. The record is devoid of any evidence on these points. The record is clear, however, that TPIG observed corporate formalities and, through documented, arm's-length agreements, relies on Teva USA and Teva Sales to market and sell Amrix in the United States. DSAMF ¶¶ 4-5. Teva USA and Teva Sales assumed Amrix responsibilities, but Plaintiff does not allege they were alter egos of Teva Ltd. Also conspicuously absent from Plaintiff's Opposition are any facts demonstrating how *Teva Ltd. and TPIG* interacted. Thus, even if TPIG does not employ a CEO or board of directors, that does not mean there is an alter ego relationship between TPIG and Teva Ltd.[6] Plaintiff has not identified any facts showing Teva Ltd.

[6] Although the purported admissions Plaintiff cites regarding TPIG's management structure (Opp. 19-20) are irrelevant to assessing Teva Ltd.'s alleged control over TPIG, the Rule 30(b)(6) notice to TPIG contained 46 topics, none of which were about TPIG's management structure or general

controlled TPIG or its operations. *But see id.*, *Beech Aircraft Corp.*, 751 F.2d at 122 (finding parent was alter ego where, *inter alia*, parent assigned common officers and directors to subsidiary who "met frequently to discuss policy," parent trained subsidiary's employees, and parent prepared marketing materials). As such, Plaintiff's alter ego theory of jurisdiction cannot defeat Teva Ltd.'s motion.

## II. PLAINTIFF'S BREACH CLAIM FAILS AS A MATTER OF LAW.

There is no dispute that Defendants reduced their marketing expenditures and eliminated the Amrix in-person sales force in 2017. Plaintiff contends Defendants made those decisions because they were experiencing severe financial issues, and had to eliminate the sales force to survive. (*See, e.g.*, SUMF ¶¶ 36-38, 48.) According to Plaintiff, the decision to eliminate the sales team breached the CRE Provision because (1) it was inconsistent with Defendants' normal business practices, and (2) it was inconsistent with the level of support "standard in the pharmaceutical industry" for a product like Amrix. (Opp. 21.)[7] Accepting those assertions as true solely for purposes of this motion, the law is clear that Defendants still had a legal privilege to make such decisions because they were doing so to advance their own financial interests.

---

operations. *See* Ex. 42. Therefore, any questions relating to such were outside the scope of Plaintiff's notice. *See* Ex. 40, TPIG 30(b)(6) Tr. at 27:9-28:19. Moreover, none of Plaintiff's questions about TPIG and its management structure related to the time period at issue in this case. *See id.*

[7] Defendants dispute that the decision to remove the external sales force for Amrix in 2017 was either inconsistent with Defendants' normal business practices or the level of support "standard in the pharmaceutical industry" for a product like Amrix. But that is not the issue this motion asks the Court to decide.

### A. Under New York Law, Defendants Are Legally Privileged To Make CRE Decisions Based On Their Own Business Interests.

The "standard for satisfying commercial reasonability under New York law is a fairly lenient one." *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). A CRE provision "requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018), *aff'd* 769 F. App'x 40 (2d Cir. 2019). And critically, "a commercially reasonable efforts clause does not require the signatory to act against its own interest." *InspiRx*, 2021 WL 3604850, at *10.

Here, Plaintiff has asserted that Defendants eliminated the Amrix sales force in 2017 to address their alleged dire financial straits. (SUMF ¶¶ 46, 48, 53-54, 56.) And Plaintiff's own experts similarly concede that Defendants' decision to eliminate the Amrix sales force advanced their own business interests. That means there was no breach of the CRE as a matter of law.

In an attempt to avoid this logical result, Plaintiff contends the CRE provision precludes Defendants from considering their own financial condition because the contract "does not [explicitly] reference" that condition. (Opp. 23.) But New York law confirms that a buyer subject to a CRE provision can make decisions based on its own financial interests, even if the contract does not explicitly say so. Defendants cited no less than six cases so holding. (Mot. 26-27.) Plaintiff argues that all but two of those cases are inapposite because in those cases (unlike here), the parties did not specifically define what constitutes CRE. While Defendants dispute that distinction is relevant, it is nevertheless true that two of the cases Defendants cited *did* include specific CRE definitions, and neither of those explicitly referenced defendant's financial condition as a relevant CRE factor. For example, in *InspiRx*, the relevant contract included a definition of

CRE very similar to the provision at issue in this case.[8] 2021 WL 3604850, at *10. The federal court applied New York law and held that "a commercially reasonable efforts clause ***does not*** require the signatory to act against its own interest." *Id.* The *InspiRx* court emphasized, "[t]his is particularly true . . . where the Agreement gave [the signatory] the power to make . . . decisions commensurate with the efforts of other similarly situated companies." *Id.*[9]

Similarly, in *Napo Pharms., Inc. v. Salix Pharms., Inc.*, No. 651214/2011, 2014 WL 1093536 (N.Y. Sup. Ct. Jan. 29, 2014), the parties' agreement included an agreed-upon definition of CRE.[10] Plaintiff alleged that defendant failed to "follow its own Development Plan and Budget"

---

[8] *Compare* SUMF ¶ 3 (defining CRE as: "the efforts and resources that would be used (including the promptness in which such efforts and resources would be applied) by such Person consistent with its normal business practices, ***which in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry for a company similar in size and scope*** to such Person, with respect to a product at a ***similar stage in its development or product life taking into account efficacy, safety***, commercial value, the ***competitiveness of alternative products*** of third parties that are in the marketplace or under development, and ***the Patent and other proprietary position*** of such product."), *with InspiRx*, 2021 WL 3604850, at *10 (defining CRE as: "reasonable, diligent, good-faith efforts to accomplish such task or objective as soon as practicable, ***which efforts shall not be less than the efforts that other similarly situated companies would normally use to accomplish a similar task or objective under similar circumstances*** exercising reasonable business judgment, with respect to a product owned by it or to which it has similar rights as the Products, which product is at a ***similar stage in its product life*** and is of similar market, commercial and profitability potential as the Product, ***taking into account efficacy, safety***, approved labeling, the ***competitiveness of alternative products*** in the marketplace, ***the patent and other proprietary position*** of the product, and other relevant factors commonly considered in similar circumstances.") (italicized language emphasizes near equivalents).

[9] Plaintiff attempts to distinguish *InspiRx* because the CRE definition allowed for consideration of "other relevant factors commonly considered in similar circumstances." (Opp. 25 (quoting *InspriRx*, 2021 WL 3604850, at *2).) But the *InspiRx* court did not tether its holding to that language, instead observing that for contractually-defined or undefined CRE provisions, a signatory is "not require[d] . . . to act against its own interest." *Id.* at *10.

[10] Defining CRE as: "with respect to research, Development, Commercialization or other Exploitation of a Licensed Product, as the case may be, efforts and resources commonly used in the research-based pharmaceutical industry for an internally developed product of similar commercial potential at a similar stage in its lifecycle, taking into consideration its safety and

when it did not order certain manufacturing equipment by a particular date, which, according to plaintiff, resulted in inadequate manufacturing scale-up. The court granted defendant summary judgment on the CRE claim, explaining that "the evidence establishe[d] that [Defendant] made a ***business decision*** not to spend millions of dollars to purchase new manufacturing columns and skids," and that decision "was commercially reasonable as a matter of law." *Id.* (emphasis added).

These cases confirm that regardless of the how the parties defined CRE in their contract, a defendant is permitted to make decisions that are in its own financial interests, even if that decision might not be in the plaintiff's best interest. Plaintiff suggests that allowing Defendants to make decisions based on their own financial circumstances would be "antithetical" to the purpose of the CRE provision, because if a "buyer could justify its failure to exercise CRE" by doing what is "better for its business," a CRE provision would not protect the seller. (Opp. 25-26.) But that position completely contradicts New York law. In each case Defendants cite, the courts ***agreed*** that the correct result is ***to consider*** the business interests of the buyer in assessing whether commercially reasonable efforts were used. *See, e.g.*, *InspiRx*, 2021 WL 3604850, at *10; *Alto v. Sun Pharm. Indus., Inc.*, No. 1:19-CV-09758-GHW, 2021 WL 4803582, at *41 (S.D.N.Y. Oct. 13, 2021), *judgment entered,* No. 19 CIVIL 9758 (GHW), 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021); *Holland Loader*, 313 F.Supp. 3d at 472. Plaintiff has not identified—and cannot identify—a single case holding otherwise.

Defendants' right to consider their own financial interests in making Amrix decisions is further supported by the contract language itself. The CRE provision permits marketing efforts consistent with the buyer's "***normal business practices***" and "the level of efforts and resources

efficacy, its cost to Develop, the competitiveness of alternative products, its proprietary position and the likelihood of regulatory approval." *See id.*

standard in the pharmaceutical industry for ***a company similar in size and scope***." (SUMF ¶ 3 (emphasis added).) Considerations of the buyer's "normal business practices," as well as those practices that are standard for a company of "similar size and scope," ***must*** involve consideration of the buyer's financial condition and business interests. Thus, Defendants were permitted to eliminate the Amrix in-person sales force because it was consistent with their normal business practices, given their then-current financial condition.

**B. Plaintiff Has Alleged That Defendants Eliminated The Amrix In-Person Sales Force To Survive Financially.**

In the SAC, Plaintiff alleged that "[a]s a result of" Defendants' "poor financial position," Defendants "stopped undertaking Commercially Reasonable Efforts … to market and sell Amrix." (SUMF ¶¶ 37-38.) Plaintiff experts Lankau and Davis[11] parroted and supported Plaintiff's theory in their expert reports. Now, Plaintiff argues that Lankau's and Davis's statements do not support the theory that "Teva's financial condition absolutely necessitated its reduction in Amrix marketing." (*See* Opp. 29-30.) Mr. Lankau's and Mr. Davis's statements speak for themselves.

Both experts repeatedly state that Teva was on the precipice of bankruptcy. (*See* SUMF ¶¶ 46, 48, 53-54, 56.) Mr. Lankau further opines that "Teva's financial difficulties ***required*** drastic cuts that ultimately included cuts to Amrix." (SUMF ¶ 48 (emphasis added).) He opines that

[11] Plaintiff argues that Defendants' citation to Mr. Davis's report in its Motion "is an implicit acknowledgment that the report is admissible at trial." (Opp. 29 n.9.) Quite the opposite: Defendants specifically pointed out in their motion that the report was "disallowed" (SUMF ¶ 52), and have already advised Plaintiff and the Court that they will move *in limine* to exclude any reference to Mr. Davis at trial. (*See* ECF No. 240 at 6 n.3.) However, as explained in their opening brief, the Davis report is cited in the Lankau report, and the consulting group associated with Mr. Davis, Protiviti, is disclosed as having assisted Mr. Lankau with his rebuttal report. (*See* SUMF ¶¶ 51-52.) Because Messrs. Davis's and Lankau's opinions oftentimes overlap, particularly in the area of financial considerations and how they impacted Defendants' marketing efforts for Amrix, and because without Mr. Davis at trial, Defendants expect Plaintiff will try and frame Mr. Lankau's scope to include much of what it originally contemplated as being covered by Mr. Davis, Defendants' opening brief included Mr. Davis's statements.

Defendants' "severe . . . financial crisis" was the "real reason" Defendants "elimit[ed] the Amrix field sales force" and that this alleged crisis forced them to "adopt a strategy of slashing expenses across the board . . . just ***to save the company***." (*Id.*) In this way, Mr. Lankau's opinion is fatal to Plaintiff's case.

Likewise, Mr. Davis opines that Defendants' "remediation strategy was ***critical to Teva's survival***." (SUMF ¶ 56 (emphasis added).) He asserts that the strategy, *i.e.*, cutting expenses including those related to Amrix marketing, was "effective in allowing [Defendants] to avoid covenant violations, loan defaults, asset foreclosures, and . . . Chapter 11 bankruptcy" and was "consistent with the strategies adopted by restructuring and turnaround professionals faced with similar circumstances." (*Id.*) Plaintiff's argument that nothing in its expert reports indicates "using CRE to support Amrix would have broken the bank" (Opp. 29-30) is belied by these statements.

Guy Davis's Declaration (Opp. Ex. 43) fixes nothing. Mr. Davis is not permitted to testify (SUMF ¶ 51), so his *ex post facto* submission is irrelevant to this motion. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[A]ffidavits submitted on summary judgment" must "contain admissible evidence and be based on personal knowledge."). Further, even if it were admissible (it is not), the Declaration admits the quotes Defendants cite in their motion are "accurate," asserting only that Defendants have somehow mischaracterized them. (Opp. Ex. 43 ¶ 6.) But the meaning of the statements in Mr. Davis's report is clear on their face (*see* SUMF ¶¶ 52-56), and those statements are entirely consistent with the theory Plaintiff and its testifying expert, Mr. Lankau, paraded before the present motion. Indeed, Plaintiff has not developed a speck of evidence that it would be ***unreasonable*** for a similarly situated company to "slash[ ] expenses," including expenses for Amrix, in an effort to "save the company." (SUMF ¶ 48.) Thus, summary judgment on Plaintiff's breach claim is appropriate.

### C. Defendant's Motion For Summary Judgment Is Procedurally Proper.

Plaintiff's procedural arguments also fail. *First*, Plaintiff contends Defendants' motion is "procedurally barred because it asserts an affirmative defense that it has not pleaded and [Defendants] cannot prove." (Opp. 27.) That argument is wrong. Defendants do not invoke impossibility of performance as an affirmative defense to the alleged breach. Rather, it is ***Plaintiff*** who has *sua sponte* presented that theory, arguing both in pleadings and through its expert disclosures, that Defendants' financial condition "necessitated" shifts in Amrix marketing. (SUMF ¶ 46.) Financial circumstances of the company are appropriate to consider in assessing whether the level of marketing effort undertaken was commercially reasonable, and Plaintiff has admitted those circumstances necessitated the allegedly breach-inducing Amrix marketing changes. (*See, e.g.*, SUMF ¶¶ 37-38 ("[a]s a result of" Defendants' "poor financial position," Defendants "stopped undertaking Commercially Reasonable Efforts … to market and sell Amrix").) The breach claim is ripe for summary judgment.

*Second*, Plaintiff argues Defendants' motion is "a belated claim Robins has pleaded itself out of a cause of action" and "needed to be asserted in Teva's 12(b)(6) motion." (Opp. 29.) Plaintiff ignores that Defendants did, in fact, raise the argument in their 12(b)(6) motion. (ECF No. 59 at 24-25.) There, Defendants maintained that "courts are clear that it is permissible for a company to consider its own financial condition when using commercially reasonable efforts." (ECF No. 68 at 17.) Although the Court found it could not "weigh whether Teva's reductions in marketing and sales for Amrix . . . were commercially reasonable without further factual development" at the 12(b)(6) stage, it found that it "may weigh Teva's financial position at the summary judgment stage." (ECF No. 75 at 32 & 32 n.24.)

While the Court contemplated this very assessment at this stage of the case, Plaintiff's own admissions on the issue have simplified the Court's job. Indeed, Plaintiff has done the "weighing"

for the Court, concluding Defendants' "financial difficulties required . . . cuts to Amrix" (SUMF ¶ 48); Defendants' "financial crisis [] caused it to have to adopt a strategy of slashing expenses . . . which led to . . . Teva's decision to promote other products in lieu of Amrix" (*id.*); "What was Teva's motive for reducing its support of Amrix to sub-optimal levels? Teva took these actions because it was facing a liquidity crisis . . ." (ECF No. 190 at 3); "Teva had strong financial reasons to shortchange Amrix" (*id.* at 3). It is Plaintiff's conclusion—repeated again and again in both its pleadings and its expert reports—that Defendants' cuts to Amrix were a direct result of their alleged "financial crisis," and needed to save the company. But New York law is clear, as outlined above, that taking actions to avoid financial ruin cannot, as a matter of law, constitute breach of a CRE provision, and summary judgment should therefore be granted in Defendants' favor.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court enter summary judgment in their favor.

Dated: January 11, 2022

Respectfully submitted,

*/s/ John M. Erbach*

SPOTTS FAIN P.C.
Hugh M. Fain, III (VSB No. 26494)
hfain@spottsfain.com
M. F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
411 East Franklin St., Suite 600
Richmond, VA 23219
T: (804) 697-2000
F: (804) 697-2100

KIRKLAND & ELLIS LLP

Jay P. Lefkowitz, P.C. (admitted *pro hac vice*)
Devora W. Allon, P.C. (admitted *pro hac vice*)

Kyla A. Jackson (admitted *pro hac vice*)
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Brian D. Sieve, P.C. (admitted *pro hac vice*)
Christina E. Sharkey (admitted *pro hac vice*)
Chris Stackhouse (admitted *pro hac vice*)
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
*Attorneys for Defendants*