IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

E. CLAIBORNE ROBINS CO., INC.,
    Plaintiff,

v().                                                            Civil No. 3:18cv827 (DJN)

TEVA PHARMACEUTICAL
    INDUSTRIES, LTD, *et al.*,
    Defendants.

## MEMORANDUM OPINION
### (Construing Contract and Setting Evidentiary Parameters)

This matter comes before the Court following extensive briefing by the parties regarding the business interest privilege that Defendants first asserted in their Motion for Summary Judgment (ECF No. 246). Thereafter, the Court ordered the parties to file supplemental briefing on this privilege, which they submitted (ECF Nos. 268, 269, 296, 314.) In its Memorandum Order addressing the business interest privilege ("Mem. Order" (ECF No. 365)), the Court found that the privilege "exists as an inherent component of a party's normal business practices." (Mem. Order at 3.) Construing the Asset Purchase Agreement ("the Agreement") at issue, the Court concluded that "by operation of the plain-meaning rule of contractual interpretation and the business interests privilege, Defendants were permitted to consider the profitability of Amrix and whether the commercialization of that product would harm their business interests, but could not simply reduce or abandon their sales force efforts if they believed other products might be more profitable in comparison to Amrix." (Mem. Order at 3.)

Following that ruling, the Court conducted a conference call with the parties on February 23, 2022. (Tr. of Conference Call ("Tr.") (ECF No. 368).) During the call, the Court elaborated

on its Memorandum Order addressing the business interest privilege and informed the parties that they would be precluded from presenting evidence or argument during trial on two issues: (1) the profitability of other products in Defendants' portfolio, and (2) Defendants' financial condition, including any losses arising from any lawsuits. (Tr. at 6:14-10:25.) The Court also required the parties to resubmit their jury instructions by March 2, 2022. Thereafter, the Court entered an Order that addressed these points, as well as other trial issues. (ECF No. 366.)

Because these two issues and the terms of the Agreemnet lie at the heart of the dispute between the parties, the Court provides this Memorandum Opinion construing the relevant provision of the Agreement to provide guidance to the parties as they prepare their revised proposed jury instructions and to set the parameters for the evidence to be admitted at trial. Consequently, the parties should base their jury instructions on the following interpretation of Section 4.02(c) (the "CRE Provision") of the Agreement, as well as the Court's previous rulings.

The Court begins with the canons of contract interpretation under New York, as previously discussed in the Memorandum Order Addressing the Business Interest Privilege (ECF No. 365). "Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). As a threshold matter, a court must decide whether a contractual provision demonstrates ambiguity. *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 2021 WL 3604850, at *6 (S.D.N.Y. Aug. 12, 2021) (quoting *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001)). "No ambiguity exists . . . when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (quoting *Planète Bleue Télévision, Inc. v. A&E Television Networks, LLC*, 2018 WL 10579873, at *8 (S.D.N.Y.

Sept. 19, 2018)). When a contractual provision is unambiguous, "[c]onstruing [that provision] is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.'" *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citation omitted).

To this end, a court "must consider 'the provisions of the contract as a whole,' and cannot 'view sentences or clauses in isolation.'" *InspiRx, Inc.*, 2021 WL 3604850, at *7 (quoting *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989)). "[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency," and to avoid "adopting an interpretation that would render any individual provision superfluous." *Id.* (quoting *Terwilliger*, 206 F.3d at 245; and then quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010)).

Here, the Agreement required Anesta AG, as the purchaser of Amrix, to use CRE in marketing and selling Amrix. The Agreement defined CRE as:

> the efforts and resources that would be used (including the promptness in which such efforts and resources would be applied) by such Person consistent with its normal business practices, which in no event shall be less than the level of efforts and resources standard in the pharmaceutical industry for a company similar in size and scope to such Person, with respect to a product at a similar stage in its development or product life taking into account efficacy, safety, commercial value, the competitiveness of alternative products of third parties that are in the marketplace or under development, and the Patent and other proprietary position of such product.

Agreement § 4.02(c) (the "CRE Provision").) Plaintiff and Defendants agree that this provision is unambiguous, rendering interpretation of this provision within the Court's province. (Defs.' Mem. at 5.) "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the

language employed and the parties' reasonable expectations." *3DT Holdings LLC v. Bard Access Sys., Inc.*, 2022 WL 409082, at *6 (S.D.N.Y. Feb. 10, 2022) (cleaned up).

As New York courts have emphasized, the definition of the business interest privilege — and, by extension, the privilege's relationship to CRE — "is anything but a model of clarity." *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018). However, in defining the contours of this privilege, those courts have held that provisions like the one at issue do not require contracting parties to ignore their own business interests when attempting to comply with such a provision. *See, e.g., InspiRx, Inc.*, 2021 WL 3604850, at *10 ("A commercially reasonable efforts clause is not a 'hell or high water' clause tying the signatory to use all efforts possible, no matter the cost.") (citation omitted). "The standard for satisfying commercial reasonability under New York law is a fairly lenient one, but a business which engages in no effort cannot be found to have engaged in commercially reasonable efforts." *3DT Holdings LLC*, 2022 WL 409082, at *8 (internal citations omitted). Furthermore, "compliance with a 'commercially reasonable efforts' clause requires at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business efforts." *Id.* (cleaned up). A court must determine whether a contracting party has exercised CRE in light of the party's privilege to protect its business interests, using an objective standard rather than a subjective one. *Holland Loader Co., LLC*, 313 F. Supp. 3d at 473.

As the Court has previously ruled, applying these principles to the CRE provision at issue here permitted Defendants "to consider the profitability of Amrix and whether the commercialization of that product would harm their business interests, but [Defendants] could not simply reduce or abandon their sales force efforts if they believed other products might be

4

more profitable in comparison to Amrix." (Mem. Order at 3.) That is so, because the CRE provision here makes no mention of the profitability of other products in Defendants' portfolio. Instead, the only reference to other products involves "the competitiveness of alternative products of third parties that are in the marketplace or under development." (Agreement § 4.02(c).)

This silence speaks volumes. Under the textual canon of *expressio unius est exclusio alterius*, the fact that the parties explicitly agreed to permit Defendants to compare their competitors' products to Amrix while failing to allow them to compare Amrix with the other products in their portfolio demonstrates that the Agreement barred Defendants from taking the latter factor into account. *See Novella v. Westchester Cnty.*, 661 F.3d 128, 142 (2d Cir. 2011) ("[F]ollowing both the presumption of consistent usage and meaningful variation, and the textual canon of *expressio unius est exclusio alterius* — the presence of that provision applicable to one type of pension makes clear that the omission of that provision in the part of the Plan governing another type of plan was deliberate." (citation omitted)); *Sharkey v. Zimmer USA, Inc.*, 2021 WL 3501160, at *6 (S.D.N.Y. Aug. 9, 2021) (noting that the inclusion of a "best efforts" clause in one section of the agreement meant that the omission of such a clause in another part of the agreement pertaining to a different product was intentional). The Court must necessarily infer that CRE as defined in this contract did not encompass comparisons between Amrix's viability and the rest of Defendants' portfolio, making evidence and argument on this point irrelevant. *Cf. Sharkey*, 2021 WL 3501160, at *6 (discussing the inclusion of a "best efforts" clause in one portion of a contract and the exclusion of this clause in another).

Likewise, the CRE provision makes no mention of Defendants' financial condition. Instead, it defines "normal business practices" as no "less than the level of efforts and resources

5

standard in the pharmaceutical industry for a company similar in size and scope to such [company.]" (Agreement § 4.02(c).) This provision focuses on simply the resources available to a reasonable pharmaceutical company of similar size and scope of Defendants, not the overall financial goals or motives of Defendants.

At the bottom, the Court construes the CRE provision narrowly, such that the dispute at issue at trial will focus on whether a reasonable pharmaceutical company of similar size and scope to Defendants would have found the continued sale of Amrix sufficiently profitable in the then-existing marketplace. In making this judgment, Defendants could compare the resources required to achieve a sufficient level of profitability with the other factors that the CRE enumerates.

To be clear, "sufficiently profitable" does not mean any level of profitability, no matter how low. Companies of Defendants' size and scope surely have a minimum level of profitability that they expect from a product before dedicating resources to it. The parties will need to present evidence on this point at trial. This evidence may include the level of profitability that Defendants or pharmaceutical companies of similar size and scope have previously accepted. *See InspiRx, Inc.*, 2021 WL 3604850, at *12 (citing lack of evidence presented regarding "efforts that other similarly situated companies would have taken in these circumstances").

Importantly, under the CRE provision, Defendants could only consider the profitability of Amrix when making this calculation — not other products in Defendants' portfolio. *See 3DT Holdings LLC*, 2022 WL 409082, at *9 (defendant could not end support of purchased product for no reason other than because the presence of another product rendered it commercially impracticable). The questions of whether Defendants could have obtained higher returns or improved their financial condition had they allocated their resources to other products do not

bear relevance on this analysis. In short, Defendants' motive in reallocating resources away from Amrix is irrelevant. Plaintiff need only establish that commercializing Amrix could achieve sufficient profitability if reasonably supported by the resources available to a pharmaceutical company of similar size and scope as Defendants, "taking into account efficacy, safety, commercial value, the competitiveness of alternative products of third parties . . . and the Patent and other proprietary position of such product." (Agreement § 4.02(c).)

Having provided this interpretation of the CRE provision at issue, the Court expects the parties to submit revised jury instructions that are consistent with this Opinion. The Court further expects the parties to tailor their evidentiary presentation in a similar fashion.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

\_\_\_\_\_/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: February 28, 2022